## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JANET TAYLOR and JAMES NEWLANDS, individually and on behalf of all others similarly situated, | Case No. 1:21-cv-00839 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| CARRIER GLOBAL CORPORATION and WALTER KIDDE PORTABLE EQUIPMENT, INC. | |
| Defendants. | |

Plaintiffs Janet Taylor and James Newlands (collectively, "Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendants Carrier Global Corporation ("Carrier Global") and Walter Kidde Portable Equipment, Inc. ("Kidde" and collectively "Defendants") for the manufacture, marketing, and sale of plastic handle fire extinguishers and push-button Pindicator fire extinguishers as identified below. Plaintiffs make the following allegations based upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys:

### NATURE OF THE ACTION

1.    This is a class action against Defendants for the manufacture and sale of over 40 million plastic handle fire extinguishers and push-button Pindicator fire

extinguishers (collectively, the "Products"), all of which suffered from the following defect in design: nozzles frequently becoming detached, becoming clogged, or requiring excessive force to discharge causing a failure to activate during a fire emergency (the "Product Defect" or "Defect"). A fire extinguisher that fails to function properly during an emergency poses a threat to the life, safety, and property of the user and those in their immediate surroundings. This Defect rendered the Products unsuitable for their principal and intended purpose.

2.      Plaintiffs bring their claims against Defendants individually and on behalf of a class of all other similarly situated purchasers of the Products for (1) violation of California's Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et. seq.*; (2) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200-17210; (3) Breach Of Implied Warranty under California's Song-Beverly Act, Cal. Civ. Code § 1790, *et seq.*; (4) violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*; (5) Breach of Implied Warranty under Florida Law, Fla. Stat. Ann. § 672.314; (6) violation of North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq.*; (7) Breach of Implied Warranty under North Carolina Law, N.C. Gen. Stat. § 25-2-314; (8) Fraudulent Misrepresentation; (9) Negligent Misrepresentation; (10) Fraudulent Concealment; (11) Unjust Enrichment; (12) Negligent Failure to

Warn or to Instruct; (13) Negligent Design Defect; and (14) Violations of the Magnuson-Moss Warranty Act.

## PARTIES

3.     Plaintiff Janet Taylor is, and at all times relevant to this action has been, a resident of Elverta, California.  Plaintiff Taylor purchased a Kidde model H110G fire extinguisher with a plastic handle for approximately $30.00 from a Walmart located in Antelope, California.   Plaintiff purchased the Product because she believed it was fit for use as a fire extinguisher.  However, the Product that Plaintiff Taylor purchased was not fit for use as a fire extinguisher due to a Product Defect causing it to fail to activate when needed.  Plaintiff would not have purchased the Product had she known that the Product was unfit to perform its intended purpose, rendering the Product useless.

4.     The Product Plaintiff Taylor purchased failed to activate during the spring of 2021.  As Plaintiff Taylor's son was working on his motorcycle in the family garage, a fire broke out.  Plaintiff Taylor's son yelled for Plaintiff, asking her to bring a fire extinguisher.  Plaintiff Taylor grabbed her Kidde model H110G and ran to the garage.  When she pulled the pin to unlock the extinguisher and squeezed the handle to activate the flame-retardant spray, as the instructions directed, a small drizzle came out and otherwise stopped.  As the flames continued to rise, Plaintiff Taylor grabbed baking soda and a water hose and successfully suppressed the

3

flames. Plaintiff Taylor is still in possession of the Defective Extinguisher. Plaintiff Taylor reviewed the Product's packaging prior to purchase. Defendants disclosed on the packaging that the Product was a fire extinguisher and described features typical of fire extinguishers but did not disclose the Defect. Plaintiff Taylor would not have purchased the Product had there been a disclosure informing her that the Product was useless and unfit to perform its intended purpose.

5.     Plaintiff James Newlands is, and at all times relevant to this action has been, a resident of Port Orange, Florida. In 2012, Plaintiff Newlands purchased two Kidde model H110G fire extinguishers from a Lowe's located in Orlando, Florida. Plaintiff Newlands purchased the Product because he believed it was fit for use as a fire extinguisher. However, the Product Plaintiff Newlands purchased was not fit for use as a fire extinguisher due to the Product Defect. Plaintiff Newlands would not have purchased the Product had he known that the Product was unfit to perform its intended purpose, rendering the Product useless.

6.     Plaintiff Newlands reviewed the Product's packaging prior to purchase. Defendants disclosed on the packaging that the Products were fire extinguishers and described features typical of fire extinguishers but did not disclose the Defect. Had there been a disclosure, Plaintiff Newlands would not have bought the Product because the safety defect would have been material to him. Plaintiff Newlands relied on the packaging in making his purchase decision.

4

7.     Defendant Carrier Global is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard in Palm Beach Gardens, Florida.   In 2020, Carrier Global, parent to over 80 brands across three sectors, including HVAC, refrigeration, and fire and security, generated $17.5 billion in net sales, and employed roughly 56,000 employees.

8.     Defendant Kidde is one of Defendant Carrier Global's brands.  Kidde is a Delaware corporation with its headquarters located at 1016 Corporate Park Drive in Mebane, North Carolina.  Defendant manufactures, markets, and distributes the Products throughout the United States. Defendant sells the Products on its website and through third-party retailers such as Walmart, The Home Depot, and Amazon.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question).  This Court has jurisdiction over supplemental state law claims pursuant to 28 U.S.C. § 1367.

10.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interests and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are more than 100 Class members, members of the Classes (as defined below) are citizens of states different from Defendants, and greater than two-thirds of the members of the Classes reside in states other than the states in which Defendants are citizens.

11.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendant Kidde resides in and is headquartered in this District, regularly transacts substantial business in this District, is subject to personal jurisdiction in this District, and therefore is deemed to be a citizen of this District.  Venue is also proper in this judicial District as to Defendant Carrier because Defendant Carrier owns Defendant Kidde and like Defendant Kidde has received substantial revenue and profits from their sales of the Products in this District; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this District.

12.    This Court has personal jurisdiction over Defendants because they have conducted substantial business in this judicial District, and intentionally and purposefully placed the Products into the stream of commerce beginning within North Carolina and extending throughout the United States.

## FACTUAL ALLEGATIONS

### I.    Fire Extinguishers Failing To Discharge

#### A.    Despite Its Purported Commitment To Quality, Performance, And Responsibility, Defendants Knowingly Manufactured, Marketed, And Sold Defective Fire Extinguishers

13.    As advertised, Carrier Global's "fire business encompasses a wide range of residential, commercial and industrial systems, including . . . fire, gas and

6

water mist suppression and fire and gas safety solutions."[1]  Carrier Global's fire business is led by Kidde which describes itself as "one of the world's largest manufacturers of fire safety products . . . to protect people and property from fire and related hazards."[2]  Kidde claims to be "committed to ensuring [its] products are safe and dependable, especially those related to life safety such as . . . fire extinguishers."[3]  To that end, Kidde proclaims that values such as quality, performance, and responsibility are among "the pillars of [its] business."[4]

14.    However, Kidde neglects to mention that it has received hundreds of complaints related to the propensity of its fire extinguishers to become clogged and to fail to discharge during fires.[5]  This Product Defect has led to at least 16 reports of personal injury, including one fatality, and 91 reports of property damage.[6]

---

[1] Carrier Global Corporation, "Carrier Fire Solutions: Protecting What Matters Most," *Fire & Security*, Available at https://www.carrier.com/fire-security/en/north-america/products-services/product-category-solutions/fire-solutions/ (last visited Oct. 27, 2021).

[2] Walter Kidde Portable Equipment Inc., "About Kidde," Available at https://www.kidde.com/home-safety/en/us/about/ (last visited Oct. 27, 2021).

[3] Walter Kidde Portable Equipment, Inc., "Product Safety," Available at https://www.kidde.com/home-safety/en/us/about/product-safety/ (last visited Oct. 27, 2021).

[4] Walter Kidde Portable Equipment, Inc., "Kidde Core Values," Available at https://www.kidde.com/home-safety/en/us/about/corevalues/ (last visited Oct. 27,, 2021).

[5] Mary H.J. Farrell, "Kidde Recalls More Than 40 Million Fire Extinguishers," *Consumer Reports* (November 2, 2017), Available at https://www.consumerreports.org/fire-extinguishers/kidde-fire-extinguisher-recall/ (last visited Oct. 27, 2021).

[6] *Id.*

7

15.     With tens of millions of units sold at a price point of $12 to $200, Defendants have profited enormously from their failure to disclose the Product Defect sooner.

16.     Defendants made partial representations to Plaintiff and Class Members, while suppressing the safety defect.  Specifically, by displaying the Products and describing their features, the Products' packaging implied that the Products were suitable for use as fire extinguishers, without disclosing that they had a critical safety-related defect that could inhibit the proper functioning of the device and lead to harm to users of the Products.

17.     The Products at issue are numerous.  Although sold under different brand names, these fire extinguishers are substantially similar.  They all suffer from the same Defect involving their tendency of their nozzles to frequently become detached, clogged, or require excessive force to discharge causing a failure to activate during a fire emergency.  Each fire extinguisher substitutes important metal components such as the handle or push button with cheaper and less reliable plastic handles or plastic push buttons.  Further, these fire extinguishers were sold for years despite Defendants' knowledge of the Defect, risking the personal health and safety of the consumer for corporate profits.  And these fire extinguishers, as discussed below, were subject to the same ineffective, sham recalls that left consumers uninformed and vulnerable.

8

**B. Defendants' Defective Fire Extinguishers Risked The Lives, Safety, And Property Of Defendants' Consumers**

18.     The consequences of this Product Defect can be severe.  On March 18, 2017, one consumer, for example, submitted a report to the United States Consumer Products Safety Commission ("CPSC") concerning Kidde Model 1-A-10-BC.  He stated that "I was working with beeswax [when] materials caught fire."  The consumer wrote that "I tried to put [out] the fire with the Kidde extinguisher[,] but it didn't work."  The consumer continued that "I had to get close to the fire to put it [out] with my jacket: as a result my jeans caught on fire and I ended up with a serious third-degree burn on my left leg."  Consequently, the consumer reported that he "underwent skin graft surgery all around my left leg."  He stated that he has "been recovering for almost one year" but that "[i]f the extinguisher had worked I could have put [out] the fire without getting close to it."  Kidde was informed of this incident through the CPSC on April 6, 2017.  Kidde responded to this consumer's complaint stating that "[b]ased upon the information provided, we cannot determine why the fire extinguisher failed to deploy."

19.     On November 2, 2017, another consumer submitted a report to the CPSC concerning Kidde Model FA-110.  The consumer stated that his "gas stove caught on fire and my fire extinguisher did not work."  He reported that as a result, "my stove burned and my house filled with smoke.  The microwave above my stove was also ruined."  He stated that he "had to call the fire department" and only "[a]fter

9

the incident, I found out that my (recently purchased) fire extinguisher had been recalled. I had actually purchased it AFTER the recall." Kidde was informed of this incident by the CPSC on December 4, 2017.

20. On November 17, 2017, another consumer submitted a report to the CPSC concerning Kidde Model FA-110. He stated that "[a]n oven fire flared up during preheating, and my wife grabbed the Kidde fire extinguisher which is kept several feet away. We believed this to be a smart purchase, and [a] great location." The consumer noted that "[t]his was our first use of the extinguisher, and we have previously reviewed how to use it." He explained that "I was upstairs, and heard her call for my help, and when I got halfway down the stairs I could see her depressing the lever multiple times, with no discharge from the extinguisher." As a result, he "ran back upstairs to grab some clothes to smother the flames . . . while attempting to not have the clothes catch on fire." He reported that "[i]n the process the flames burned my right hand, but I had to continue subduing the flames. Meanwhile[,] I was asking her to try different methods or angles with the extinguisher, but to no avail." The consumer concluded that "[f]inally, 1 puff of dry chemicals came out but it was not under proper pressure . . . the discharge caused no significant reduction in the flame, but instead sprayed our counter, cabinets, sink, etc. with a fine layer of dust." Kidde was informed of this incident by the CPSC on December 5, 2017.

21.     On December 1, 2017, another consumer submitted a report to the CPSC.  The consumer stated that "[m]y neighbors' house was on fire.  I recognized this and called 911, and ran over with my Kidde fire extinguisher."  The consumer stated that "[a]t this point the house was filled with smoke but there was a medium sized fire and I tried to put it out but the fire extinguisher would not deploy – the father / a strong man also tried but it did not work."  The consumer reported that "[l]uckily the firemen came about 3 minutes after we tried."  But this did not prevent the following disastrous outcome: "[t]he fire caused [$]100,000 of damages (so far)."  Kidde was informed of this incident by the CPSC, which sent its report to Kidde on December 11, 2017.  Kidde responded shortly afterwards "apologiz[ing] for any inconvenience this has caused."

22.     On January 20, 2018, another consumer submitted a report to the CPSC.  The consumer stated that a "[s]mall fire was started from an old ember.  First [the Kidde] fire extinguisher failed to discharge, the plastic handle just bent around the pin.  Eventually got it to work but fire had grown significantly in the 15 seconds of fiddling it took to get it to discharge."  The consumer stated that the "[e]xtinguisher only discharged about 50% of its contents.  Daughter ran inside the house for our other [Kidde] extinguisher.  It also failed to discharge and took fiddling because of the plastic handle while the fire grew."  The consumer stated that "[t]his [second] one did discharge all of its contents[,] but it was too late at this time, the fire grew

11

and caught an adjacent field on fire resulting in minor structure damage and about 30 acres burned before the fire department could put it out." The consumer concluded that he "[c]ould have stopped the fire early if the extinguisher had functioned properly." Kidde was informed of this incident by the CPSC on February 9, 2018. Kidde responded shortly afterwards "sincerely apologiz[ing] for the incident that occurred."

23. On December 7, 2020, another consumer submitted a report to the CPSC concerning Kidde Model H110G. The consumer stated that he "had what started as a minor grease fire on our kitchen stove . . . my wife then attempted to use the Kidde ABC fire extinguisher nearby but upon pulling the pin and squeezing the trigger, nothing happened." In turn, he "attempted as well, [but] to no avail. My wife was evacuating our two daughters and dog from the house and I was starting to dial 911 when I remembered I had another extinguisher [nearby]." So, he "grabbed it, returned within 30 seconds, and successfully put out the fire that had quickly grown to close to ceiling height." The consumer stated that "[u]nfortunately, the time lost allowed the fire to burn far longer than it would have, had our extinguisher worked properly." He reported that "[a]s a direct result of the failure, our stove's control partially melted and the smoke damage to our ceiling is going to require the mineral fiber tiles to be replaced." The consumer concluded that he is "left with what I would estimate to be $1,200 in property damage." Significantly, after the

event, the consumer "looked into why the extinguisher failed and found that the [CPSC] had issued a recall [in 2017] 'due to a failure to discharge and nozzle detachment.'" Kidde was informed of this incident by the CPSC on December 23, 2020. Kidde responded shortly afterwards noting that "[a]ny claim for property damage would be properly handled through the homeowner's insurance carrier."

### C.   Defendants' Defective Fire Extinguishers Include More Than 134 Models Totaling Nearly 40 Million Devices In All

24.    The Products at issue include several models that have been recalled. As demonstrated above and further below, Defendants' recall was totally ineffective at remedying the problems herein discussed. **Tens of thousands, if not hundreds of thousands of consumers, have not been informed of Defendants' recalls and are still at risk.** The models at issue include:

13

**Models Manufactured July 23, 2013 – October 15, 2014**

| | | | |
|---|---|---|---|
| 10BC | 1-A-10BC | 1A 10BCW | 2A10BC |
| 5BC | 5BCW | FA110G | FA110 |
| FA5B | FC110 | FC5 | FH/RESSP |
| FX10 | FX10BC | FX10K | FX210 |
| FX210R | FX210W | FX340GW | FX340SC |
| FX5II | KFH Twin | M110 Twin | M5 Twin |
| Mariner 10 | Mariner 110 | Mariner 5 | Mariner 5G |
| XL5MR | | | |

**Models Manufactured Between July 2, 2012 – August 15, 2017**

| | | | |
|---|---|---|---|
| AUTO FX5 II-1 | FC5 | M10G | FA10G |
| FS110 | M10GM | FA10T | FS110 |
| M110G | FA110G | FS5 | M110GM |
| FA5-1 | FX10K | M5G | FA5G |
| FX5 II | M5GM | FC10 | H110G |
| RESSP | FC110 | H5G | |

14

**Additional Recent Models**

| KK2 | 100D | 210D | 210D-1 |
|---|---|---|---|
| H110G | Home 110 | FX340SC-2 | Pro 5 TCM-8 |
| FX110E | FX340G | FA110G | FA10 |
| FX340GW-2 | | | |

25.     For models suffering from the same Product Defect that have yet to be recalled, and for which there is limited information publicly available, Plaintiffs reserve the right to amend their complaint to reflect these additional models once they are identified.

## II.     Defendants' Sham and Ineffective Recalls

### A.     Despite Knowledge of The Product Defect, Defendants Dragged Their Feet, Requiring Multiple Recalls And Incurring Civil Penalties

26.     On February 12, 2015, Kidde issued a recall involving 31 models of Kidde fire extinguishers manufactured between July 23, 2013 through October 15, 2014.  This recall involved a total of nearly 4.6 million units in the United States.[7]

27.     Kidde's February 12, 2015 recall was woefully inadequate considering the severity of the problems with their fire extinguishers, as alleged in this complaint.

_____

[7] U.S. Consumer Product Safety Commission, "Kidde Recalls Disposable Plastic Fire Extinguishers Due to Failure to Discharge," (February 12, 2015), Available at https://www.cpsc.gov/recalls/2015/kidde-recalls-disposable-plastic-fire-extinguishers/# (last visited Oct. 27, 2021).

Consumers who put their faith in Kidde's ability to manufacture high-quality firefighting products were led to believe that the equipment they purchased could keep them safe in life-threatening fires. Instead, consumers had to learn the hard way and in times of crisis that the fire extinguishers they purchased were defective. And, for a period of two-and-a-half additional years until Kidde issued its November 2, 2017 recall, over 32 million defective fire extinguishers remained in the marketplace and were purchased and relied upon by at-home consumers.

28. In December 2015, the U.S. Department of Justice ("DOJ") along with the CPSC filed a complaint against Kidde for failing to inform the CPSC in a timely manner about problems associated with Kidde's fire extinguishers.[8] The DOJ alleged that before the 2015 recall, Kidde significantly underreported "the scope and nature of the defect and risk, and the number of products and models affected."[9]

29. According to the DOJ, as early as November 2014, Kidde "failed to immediately and adequately report information that fire extinguishers with plastic handles manufactured by Kidde could become clogged or require excessive force to

---

[8] Ryan Felton and Rachel Rabkin Peachman, "Kidde Mishandled Problems With Its Fire Extinguishers for Years as Homes Burned and Injuries Mounted," Consumer Reports (January 12, 2021), Available at https://www.consumerreports.org/product-safety/kidde-mishandled-problems-with-fire-extinguishers-for-years/#:~:text=Kidde%20eventually%20filed%20a%20new,require%20excessive%20force%20to%20discharge. (last visitedOct. 27,2021).

[9] Id.

discharge and thus fail to activate during a fire emergency." [10] The DOJ determined that "[a]lthough Kidde provided some information to the CPSC regarding the discharge failures, it significantly underreported the scope and nature of the defect and risk, as well as the number of products and models affected." *Id.*

30. The DOJ described that "[i]n November 2014, Kidde proposed to the CPSC a recall of approximately 4.6 million fire extinguishers manufactured from July 2013 through October 2014 because the extinguishers risked not fully discharging when the lever is repeatedly pressed and released during a fire emergency, posing a risk of injury to consumers." *Id.* ¶ 17.

31. Misrepresenting material facts, Kidde "informed the CPSC that it had determined the cause of this defect to be an out-of-specification valve component." *Id.* However, Kidde's "testing and incident data show[ed] that the scope and nature of the defect and risk it had reported to the CPSC was false and misleading in material respects." *Id.* ¶ 18. The DOJ specifically determined that "[d]espite test reports showing discharge failures across many models of fire extinguishers sold over decades, and an acknowledgement from its engineers that they had 'not found any components out of specification,'" Kidde "in its November 2014 Section 15(b) report . . . reported to the CPSC that the defect involved an out-of-specification valve

---

[10] *United States of America v. Walter Kidde Portable Equipment Inc.*, 1:20-cv-01172, ECF No. 1 ¶ 16 (Dec. 30, 2020)

component for a more limited set of models sold for only 15 months." *Id.* ¶ 18(a).

32.     Moreover, "[d]espite test reports throughout December 2014 showing consistent failures across Kidde fire extinguisher models, Kidde informed the CPSC in January 2015 that 100% of its repaired fire extinguishers since November 2014 had passed performance tests." *Id.* ¶ 18(b).  However, "Kidde failed to disclose that the repaired units were tested by a machine, as opposed to a manual test that would more accurately reflect how consumers actually used the fire extinguishers."  The DOJ concluded that "Kidde knew that manual testing showed high failure rates across many models of fire extinguishers." *Id.*

33.     In connection with Kidde's 2014 "reports to the CPSC and 2015 recall, Kidde reported 12 incidents of fire extinguishers failing to discharge to the CPSC, but Kidde had actually received reports of at least 100 incidents of fire extinguishers failing to discharge." *Id.* ¶ 19.  Furthermore, "[a]fter the recall in February 2015, Kidde continued to accumulate additional reports of failures to discharge, demonstrating that the scope of the February 12, 2015 recall was far too narrow." *Id.* ¶ 20.  However, "Kidde did not disclose to the CPSC the additional test and incident reports demonstrating a wider problem with its fire extinguishers' discharge mechanism until August 2017." *Id.* ¶ 21.

34.     The DOJ also determined that "[b]eginning as early as 2005 and continuing until August 2017, Kidde . . . failed to immediately report to the CPSC

18

that it possessed information concerning nozzle detachment from fire extinguishers with plastic handles that it manufactured."  *Id.* ¶ 22.  Additionally, "[o]n November 15, 2014, Kidde engineers internally reported that testing over a previous five-week period showed a high occurrence of nozzles becoming dislodged from the fire extinguishers during discharge."  But "Kidde did not provide this information to the CPSC until August 2017."  *Id.* ¶ 23.

35.    The DOJ further determined that "[d]uring a 2015 civil penalty investigation by the CPSC regarding Kidde's reporting, Kidde materially misrepresented to the CPSC staff in the course of the staff's investigation of Kidde that the company had produced all relevant documents to the CPSC.  The CPSC staff relied on Kidde's material misrepresentations in closing the civil penalty investigation."  *Id.* ¶ 25.  However, "[i]n August 2017, Kidde filed a new report under section 15(b), finally revealing the true nature and scope of the intermittent discharge defect, and reporting also the nozzle detachment defect."  *Id.* ¶ 26.  All in all, the DOJ concluded that "Kidde's report under section 15(b) also revealed the actual number of products and models affected, leading to the announcement of one of the largest recalls in CPSC's history."  *Id.*

36.    Specifically, Kidde's 2017 recall for nearly 38 million plastic-handle and push-button Pindicator fire extinguishers in the U.S., implicating 134 models

19

produced as far back as 1973.[11]  Many of these models are set out above.  In addition, Kidde was ordered to pay a $12 million civil penalty in connection with the allegations that the company failed to timely inform the CPSC about problems with the fire extinguishers it manufactured.[12]

37.    The recall allowed Kidde to say it was doing right by consumers, but in fact the recall protected Kidde's profits by suppressing returns.  As a Consumer Reports' article notes, "[d]espite the 2017 announcement, many people seem to not have heard about the recall."[13]  Further, "[s]everal incident reports reviewed by [Consumer Reports], for example, involve Kidde fire extinguishers that had already been recalled."[14]

38.    Numerous of these consumer reports are included here and have continued well into the latter half of 2021, demonstrating that despite Kidde's recall, consumers have not heard of the recall and are still at risk of injury.  On August 2, 2021, for example, one consumer reported to the CPSC concerning Kidde Model

---

[11] U.S. Consumer Product Safety Commission, "Kidde Recalls Fire Extinguisher with Plastic Handles Due to Failure to Discharge and Nozzle Detachment: One Death Reported," Available at https://www.cpsc.gov/Recalls/2018/Kidde-Recalls-Fire-Extinguishers-with-Plastic-Handles-Due-to-Failure-to-Discharge-and-Nozzle-Detachment-One-Death-Reported# (last visited Oct. 27, 2021).

[12] *United States of America v. Walter Kidde Portable Equipment Inc.* No. 1:20-cv-01172-LCB, ECF No. 3 (M.D.N.C. Jan. 4, 2021); U.S. Department of Justice, "Fire Extinguisher Manufacturer Ordered to Pay $12 Million Penalty for Delay and Misrepresentations in Reporting Product Defects," *Justice News*, Available at https://www.justice.gov/opa/pr/fire-extinguisher-manufacturer-ordered-pay-12-million-penalty-delay-and-misrepresentations (last visited Oct. 27, 2021).

[13] *See supra* n. 8.

[14] *Id.*

Auto 5FX that his "fire extinguisher failed to discharge" and that "[a]s a result, the fire grew in size," leading to injuries sustained by the consumer. Kidde was informed of this incident through the CPSC on August 5, 2021.

      **B.    Many Consumers Were Unable To Contact Kidde To Secure Their Replacement Despite Following The Procedures Set Out By Kidde**

39.    Several customers who were informed of the recall were either unable to establish contact with Kidde despite repeated attempts or encountered issues with the website or customer service. One consumer wrote to Consumer Reports in 2018 stating that the "recall site won't allow me to enter information such as model number." The consumer continued that the "[i]nformation page seems to be dead."

40.    Another consumer reported to Consumer Reports in 2018 that she "entered four units on the appropriate Kidde Product Safety Recall page . . . but the page does not include any button or other method to send the page to the company."

41.    Another consumer reported to Consumer Reports in 2018 that she "ha[s] been waiting two months for my replacement." She reported that "[p]honing is impossible, on hold forever." She concluded that she "[w]ould like an honest answer from the company."

42.    Another consumer reported to Consumer Reports in 2018 that they "have been waiting since Nov[ember] 10[, 2017] for the replacements." The consumer stated that they "contacted [Kidde] by email and phone." The consumer

concluded that they "would just like a straight answer from [Kidde]."

43.　Another consumer reported to Consumer Reports in 2018 that they are "[n]ot sure [Kidde is] taking this recall seriously." The consumer reported that they were "told [the] replacement extinguisher would be sent out back in Nov[ember 2017] and nothing." The consumer called Kidde the day before making their report "and [Kidde] couldn't even find me in their system." The consumer concluded that the "[l]ady said she'd call . . . right back and never did . . . so taking things seriously? I think not." Another consumer responded that "[t]his is exactly what happened to me. What do we do now?"

44.　Another consumer wrote to the Better Business Bureau (hereinafter "BBB") on June 7, 2018 that they "have 4 fire extinguishers that were part of the recall from the fall of 2017. I contacted Kidde within the first week after the recall to determine what needed to be done [to] receive replacements. I still have not received my [replacement]." Following up, the consumer "contact[ed] [Kidde] through the recall phone number given at least 8 times since the recall and have repeatedly had to re-confirm all my information, re-confirm all my fire extinguishers, and then have been told I would be receiving the new ones." But, the consumer wrote, "[t]hey have never shown up." The consumer then provided their case reference number and wrote that "both [extinguishers] confirmed recalled for failure to deploy." Kidde was informed of this complaint by the BBB on the same

day.[15]

45.     Another consumer reported to the BBB on July 3, 2018 that they "had three fire extinguishers subject to the current Kidde recall."  The consumer "submitted a claim . . . to get the three fire extinguishers replaced in the fall of 2017. [But] [t]he replacement fire extinguishers[s] have not arrived."  The consumer stated that "[e]ach time I called to follow up on the status of the replacement extinguishers, I was transferred to another person who said they would call back."  However, the consumer wrote that they "did not receive a call" and "still do not have the replacement extinguishers."  Kidde was informed of this complaint by the BBB on the same day.

46.     Another consumer reported to the BBB on August 17, 2018 that their "first call [to Kidde] was 11-03-17."  The consumer then "made follow up calls 12-19-17, 02-28-18, and 05-01-18" and "also spoke to someone at Kidde [on] 5-01-18."  The consumer reported that "[e]ach time I was told varying time frames for replacement fire extinguishers to arrive.  Each time they would say they were missing some information at the previous call.  Each time they would create a new reference [number]."  But the consumer "received neither of the two fire extinguishers [Kidde] acknowledge[s] were part of the safety recall."  Kidde was

---

[15] Better Business Bureau, "What Complaints Do We Handle?" Online Complaint System, Available at https://www.bbb.org/consumer-complaints/file-a-complaint/get-started (last visited Oct. 27,, 2021).

23

informed of this complaint by the BBB within two business days of the complaint. Kidde responded on August 21, 2018 only that it "will look into this issue."

47.     Another consumer reported to the BBB on July 24, 2020 – more than two years after the recall – that after "[f]inding there is a recall on my Kidde fire extinguisher, I attempted, and failed to contact Kidde by these means: 1. [u]sing Kidde's online webmail (there is no email address listed), I filled out my request." The consumer reported, however, that "when I pressed 'Send,' the site did not respond." The consumer "tried again.  No response. (I have no problem currently sending webmail to other sites, as [the BBB's] receipt of this webmail shows!)." The consumer continued: "2. I phone[d] the number on Kidde's site and pressed the 'I have a recall' option.  No one answered.  I called back and tried general customer support with the same non-response."   The consumer concludes that they are "distressed insufficient notice was given at the time of the recall, as I have been relying on a defective product as a result."  Kidde was informed of this complaint by the BBB within two business days of the complaint.  Kidde responded on July 27, 2020: "apologiz[ing] for [the consumer's] inconvenience."

### C.     Other Consumers Experienced Significant Delays In Securing A Replacement

48.     For those consumers who did not cave to Kidde's test of exhaustion, many were, nonetheless, met with significant delays in securing their replacement.

49.     One consumer wrote to Consumer Reports in 2019 that he "put [his]

claim in twice since the day the recall was announced." But he reported that he has "heard nothing." He concluded: "I suppose my house must burn down before they send a replacement."

50.    Another consumer reported to Consumer Reports in 2018 that he "[p]ut [his] recall request in [during] November 2017. It is now March 25, 2018." He urged that "someone should do a follow-up article exposing this fraud."

51.    Another consumer reported to Consumer Reports in 2018 that "[i]t has been 5 months now since I requested a replacement Fire Extinguisher[,] and nothing has happened." She concluded "[w]hat do I have to do now?????"

52.    Another consumer reported to Consumer Reports in 2018 that he is "[s]till waiting . . . five months since submitting claim and long times on hold only to be disconnected." He concluded that he is "[g]lad to see it's not personal."

53.    Another consumer reported to Consumer Reports in 2018 that it is "March 19 . . . still waiting for the five units we submitted claim for on November 2 . . . no response whatsoever to repeated emails which included the ID # for claim."

54.    Another consumer reported to Consumer Reports in 2018 that he "submitted a claim and for several months [Kidde] made excuses, but now you can only reach the call center for rebates. They say you can submit another claim otherwise [they] cannot help you!" The consumer concluded that "this recall is a joke and nothing will get done!!!!"

55.    Another consumer reported to Consumer Reports in 2019 that "I put my claim [in] more than a year ago.  When you call, you are on a hold for an hour or long[er].  When someone answers they simply lie, e.g., server is down, [or they] need to check and get back to you in 24 hours and so on."  The consumer reported that "[n]o one ever calls.  Why do they lie?  Just tell us that you are not going to replace it."  The consumer concluded that the "FTC should get after them, and fine this company for announcing a recall and won't fulfill."

56.    Another consumer reported to the BBB as recently as June 12, 2021 that "[t]he Kidde Fire Extinguisher has been recalled.  However, I did not know that when I tried to use it to extinguish a fire in my outdoors B-B-Q.  The fire extinguisher failed to spray a uniform amount of material as it was designed to do so.  Instead the handle was extremely difficult to use and instead of a uniform amount of discharge, it sprayed a glob of material and then it went into a mode that would spray no longer. I have contacted Kidde by email and they said they would replace the extinguisher due to the recall within two to three weeks.  It has been a month and today I placed my fourth call asking about the replacement.  They advise that a replacement model is not now in stock but that I should call in a week checking on the replacement status.  Every time I call, the waiting time for a replacement gets pushed further forward.  Kidde was informed of this complaint by the BBB within two business days of the complaint.

**D.** **Several Of The Fortunate Few Who Received Replacements Were Supplied With Either An Inferior Product, A Damaged Product, Or Another Recalled Product**

57.     Several of the consumers who succeeded in completing Kidde's marathon of endurance and setbacks were rewarded with a product inferior to the one that they intended to purchase, or their recalled product was replaced with an otherwise malfunctioning product, or even worse, their recalled product was replaced with *another* one of Kidde's recalled products.

58.     One consumer wrote to Consumer Reports in 2018 that after following through with Kidde's recall process, "I was sent a discharged extinguisher with no pin." He stated that "I will keep [the recalled product] and send back the empty extinguisher [Kidde] sent me."

59.     Another consumer reported to Consumer Reports in 2018 that "I received the replacement for one of the two fire extinguishers affected by the recall. The one being replaced is a model FX210R with a 4A40BC rating. The one I received is a Model FX210 with a 2A10BC rating." He stated that "[t]o me that means that I only get ¼ of the area for a flaming fire with the replacement one." To remedy this situation, the consumer reported that "I have called Kidde twice and left messages with the answering service who said someone would call me back[,] but I have not received any return call." The consumer concluded that Kidde's "customer service is not very good."

27

60.    Another consumer reported to Consumer Reports in 2018 that "I received my replacement Kidde fire extinguisher today. It was immediately apparent that the replacement extinguisher is significantly smaller than my original." The consumer stated that "[m]y original had a tank that was 14.5 inches tall and the replacement tank is only 12 inches tall. Diameter and pressure are the same. So that means the capacity of the replacement is 17% smaller!" He continued that "[i]n addition, the extinguisher I had was rechargeable, the replacement is not. Looking at the product catalog, I see they have a Pro 110 version which is much closer to what I had (Home 110) but instead they replaced my extinguisher with a smaller and cheaper version." The consumer concluded that "I called them 2 days ago and was told I would receive a call back but no call. What is my recourse?"

61.    Another consumer reported to the CPSC on November 17, 2017 that "I just received two replacement Kidde fire extinguishers as part of the recall. One of my units arrived covered in powder, safety pin removed and at empty state according to the pressure monitor." The consumer stated that "I am not sure if the chemicals I've touched are dangerous and if my other unit is safe." Kidde was informed of this consumer's complaint by the CPSC on December 19, 2017. Kidde responded that it "reached out to [the consumer] to discuss his concerns."

62.    Another consumer reported to the CPSC on December 12, 2017 that "I just wanted to let you know about this ridiculous Kidde fire extinguisher recall. I

got my replacement from them yesterday after waiting about three weeks (good thing there wasn't a fire in that long time)."  The consumer continued that "I don't trust them and was concerned they sent me one with the same model number[,] so I called them to verify they didn't send me a recalled one.  He checked the serial number and they did."  The consumer continued: "They sent me a recalled fire extinguisher to replace a recalled one.  And since they screwed up the guy at the call center . . . couldn't even send me a new one.  He had to escalate it so an actual Kidde employee will call me back."  The consumer reported that "[h]e said to call back if I don't hear from them in a week.  So that will be a month without a working fire extinguisher plus probably another three weeks to get the replacement sent which may or may not be recalled."  The consumer concluded that Kidde "need[s] to get fined or something. They can't send a recalled item to replace a recalled item and take forever in doing so when it is an item people rely on for safety."  Kidde was informed of this consumer's complaint twice: once by the consumer and once by the CPSC on January 17, 2018.  Remarkably, Kidde responded that "[i]f this consumer needs to use the recalled fire extinguisher, while waiting for the replacement, they should do so."

63.    Another consumer reported to the CPSC on December 13, 2017 that "I have three Kidde Home fire extinguishers that were on the recall list[,] so I called the number which I was given to get placement ones (it's only a call center), I was

29

sent two of the three replacements which were on empty." The consumer stated that "I have called three times to get the new ones replace[d] also and to receive my third original replacement but was told I had to wait until some[one] called me back." The consumer noted that "this started in November and to date [I] have never heard from anyone[;] right now I have three extinguishers which are defective and two new ones that are empty." The consumer concluded that "hopefully I don't have a fire in my house while I am waiting around for Kidde to respond." Kidde was informed of this consumer's complaint twice: once by the consumer and again by the CPSC on January 17, 2018. Kidde responded only that it "will be reaching out to . . . discuss the replacement units."

64.    Another consumer reported to the CPSC on December 30, 2017 that "I made a submission to Kidde and was promptly shipped a replacement. Unfortunately, what they sent me was a damaged and unusable extinguisher." The consumer stated that "[a]fter I reported the problem with the replacement to Kidde . . . they have ignored me." The consumer concluded: "I don't think this is the way a recall is supposed to work." Kidde was informed of this consumer's complaint twice: once by the consumer and again by the CPSC on January 17, 2018. Kidde responded only that it "will be reaching out . . . to discuss the replacement."

65.    Another consumer reported to the CPSC on January 12, 2018 that "[a] Kidde fire extinguisher which I purchased was recalled two years after I purchased

it. [Kidde] sent me a replacement. Now, one year later, they informed me that the replacement is recalled." The consumer stated that Kidde "said they would send me a new one; it took them three months to do so." The consumer continued: "When I received the new fire extinguisher the gauge was on empty. In other words, they sent me a faulty extinguisher to replace the faulty extinguisher they had sent me to replace the original faulty extinguisher." The consumer reported that "[i]n addition, I checked the other Kidde extinguisher which I had purchased at the same time as the first one, and the gauge is on empty. This extinguisher [is] several years away from the expiration of Kidde's warranty. And this extinguisher was not part of any recall." The consumer concluded that "[i]t seems to me that this company should be investigated and that all consumers should be advised to check the gauge on their Kidde extinguishers on a regular basis." Kidde was informed of this complaint twice: once by the consumer and again by the CPSC on January 23, 2018. Kidde, however, responded only that it "would invite the individual making this report to contact" customer service.

66.    Another consumer reported to the CPSC on February 3, 2018 that "I did everything needed to have one of my extinguishers replaced through the recall. Unfortunately, the replacement unit I was sent was damaged before I received it." The consumer stated that "[a]ll of my attempts via phone and email to contact Kidde to remedy the situation have gone unanswered. I am concerned that I now have two

31

unsafe fire extinguishers, and I don't know how to proceed." Kidde was informed of this complaint by the CPSC on May 7, 2018. Kidde responded with respect to this complaint as well that it "would invite the individual making this report to contact" customer service.

67. Another consumer reported to the CPSC on May 24, 2018 that his "Kidde Fire extinguisher was recalled. Got replacement unit, however it was defective on arrival." He stated that the "[y]ellow retardant material / powder was already leaking from the box. This was extremely unfortunate as I just happened to have brought home my ~8 month [infant] from the hospital with chronic lung disease." The consumer also included the following photographs with their complaint:

 

Kidde was informed of this complaint by the CPSC on August 15, 2018. Kidde

responded only that it "will be reaching out to [the consumer] to [e]nsure that his fulfillment requests have been satisfied."

### III. Defendants' Pre-Sale Knowledge Of The Defect

### A. Defendants' Engineers Apprised Kidde Of The Defect Well Before The Recall. Nonetheless, Defendants' Continued To Sell The Defective Extinguishers

68. As the Department of Justice's investigation revealed, Kidde had long known about the Product Defect. As described above, there are at least three sources of Kidde's knowledge. First, Kidde was informed as early as 2005 of the widespread problems involving its extinguishers. Nonetheless, Kidde failed to report this information to the CPSC as it was required to do by law. Second, in 2014, Kidde underreported the number of incidents reported to it, stating that it was aware of only 12 incidents, whereas the truth was that it was aware of well over 100 incidents involving the Products. Third, Kidde's own internal test reports demonstrated consistent failures across the Products.

69. In addition to these sources of knowledge, Defendants had long received reports of the plastic handle fire extinguishers and push-button Pindicator fire extinguishers frequently becoming detached, becoming clogged, or requiring excessive force to discharge causing a failure to activate during a fire emergency.

70. As demonstrated above, the CPSC operates a website where consumers can post complaints about unsafe products and provide details about any incidents

they experienced.

71.    Online safety reports to the CPSC show that Defendants knew or should have known of the Product Defect since at least 2012, yet it continued to sell the defective products anyway.

72.    Per federal regulations, all safety reports that are submitted online through the CSPC website are sent directly to the product's manufacturer. As set forth in more detail below, the CPSC website indicates that all safety complaints referenced herein were sent to Kidde, including the dates on which they were sent. Defendants also monitor safety complaints from the CPSC, and thus Defendants would have independently become aware of each safety complaint reported to the CPSC separate and apart from notice received from the CPSC.

73.    On December 31, 2012, a consumer submitted a report to the CPSC concerning Kidde Model FA110. The consumer stated that he "was cooking on November 8th, 2012 . . . when a small grease fire began building with flames of approx[imately] 6-12' high, causing me to grab [a] fire extinguisher to put it out." He stated that he "removed the safety pin, verified the pressure indicator was green[,] pressed on the lever[,] but nothing came out." The consumer stated that he "kept trying for approximately a minute longer pressing on [the] lever over and over[,] but nothing was coming out to end the fire." The consumer stated that "there have been no injuries, but there was about $1000 worth of fire damages that could have been

34

averted had this fire extinguisher worked." The consumer stated that he independently contacted and alerted Kidde about this Product Defect. The CPSC also sent the report to Kidde on February 15, 2013. Kidde responded shortly afterwards. Hence, Kidde was alerted twice about this incident – once by the consumer directly and then again later by the CPSC. Kidde responded by instructing the consumer to "contact [the] customer service manager."

74.    On August 10, 2013, another consumer submitted a report to the CPSC concerning Kidde Model H110G. The consumer stated that his "pick up truck caught on fire on August 8, 2013." He stated that "I grabbed my fire extinguisher (that has never been used before) and pulled the tab and squeezed the trigger." The consumer noted that "[a] very small amount of chemical came out and the gauge then read empty, however it [was] still full." As a consequence of this failure, the consumer reported that "[t]he cab of my truck went up in flames and is now totaled." The consumer attached the following photograph of his truck:



The CPSC sent this complaint to Kidde on August 19, 2013. Remarkably, Kidde responded by stating that "[b]ased on a review of the information provided here, Kidde does not have sufficient information to believe that the specific product concerns suggest a defect that presents a substantial product hazard."

75.   On November 5, 2014, a Fire Department submitted a report to the CPSC concerning Kidde Model FX340SC-2. A representative of the Fire Department stated that the Department "responded to a fire at an apartment complex." The representative explained that "[t]he occupant had tried to use a fire

36

extinguisher and it would not function." The representative reported that "[a]bout 8 other fire extinguishers were tried and none of them worked" despite the fact that "[a]ll the extinguishers were new." The representative "advised that the extinguishers malfunctioned due to the plastic discharging mechanism not working" and further that "[t]he plastic handle was not strong enough to depress the discharge piston before collapsing." The CPSC sent this report to Kidde on December 4, 2014. Kidde responded that "[b]ased on the information provided to date, Kidde is unable to determine if the particular incident described involved a defect."

76. On March 10, 2015, another Fire Department submitted a report to the CPSC concerning Kidde Model Pro 5 TCM-8. A representative of the Department stated that "[t]he department responded to a report of an outside fire at a retail grocery store. The Ambulance was the first unit to arrive and found . . . cardboard on fire against the exterior of the store." The representative noted that "[t]he staff on the ambulance deployed the fire extinguisher from the ambulance in an attempt to extinguish, if not at least slow the fire until the arrival of the [Fire] Engine." The representative continued that "[t]he firefighter pulled the pin, removed the hose and squeezed the handle. After somewhat of a brief delay the powder 'dribbled' out [of] the end of the hose." The fire fighter "looked at the gauge which was still showing in the green. She again squeezed the handle and the agent slowly left the hose. She attempted to shake the hose towards the flames to get any powder to be useful."

37

Eventually the Fire Engine arrived mitigating the circumstance. The representative noted that "[t]his situation ended without injury or major property damage but could easily have ended differently should it [have] occurred in a structure or confined space, or [had there been] trapped occupants." The CPSC sent this report to Kidde on March 25, 2015. Kidde responded that it "is in the process of investigating this report."

77. On March 23, 2015, another consumer submitted a report to the CPSC concerning Kidde Model H110G. The consumer stated that "I attempted to use my Kidde Fire Extinguisher on a brush fire at a neighbor's home." He noted that he "depressed the plastic lever one time which worked." But "[t]he second time I tried, it was impossible to depress it. Another one could not be operated at all. The lever could not be depressed. Striking it on a tree or rock was the only way to depress the valve." The CPSC sent this report to Kidde on March 30, 2015. Kidde was aware of this malfunction as reflected by the fact it responded to this consumer's complaint shortly afterwards.

78. On August 14, 2015, another consumer submitted a report to the CPSC concerning Kidde Model FX340SC-2. The consumer stated that "I had a small fire in my house." He noted that "I proceeded to use my Kidde fire extinguisher for the first time to put it out. The tank capacity point[ed] to full as it was never used before. After I pulled out the pin and squeezed the lever, the extinguisher puffed once and

38

died." The consumer continued "[i]f the fire was larger or spread faster, it would [have] put my family's life in danger." The CPSC sent this report to Kidde on August 24, 2015.

79.    On August 18, 2015, another consumer submitted a report to the CPSC concerning Kidde Model FA110. The consumer reported that "[d]uring annual fire extinguisher training we are required to put out a controlled fire. I pulled [the] pin and gave a short burst of extinguisher. I then proceeded to approach [the] base of fire and attempted to discharge the remainder of the bottle and nothing happened." The consumer stated that "[s]queezing the handle did nothing, it appears the valve is stuck. I had fire fighter person[nel] try also and nothing." The CPSC sent this report to Kidde on August 26, 2015.

80.    On April 13, 2017, a Fire Investigator submitted a report to the CPSC concerning a defective extinguisher. The Fire Investigator stated that "[o]n April 12, 2017, 2350 hrs, there was a kitchen fire I investigated. The occupant of the residence attempted to use a Kidde 3lb disposable fire extinguisher and it failed to operate." The Fire Investigator stated that "[t]he date stamp on the base of the extinguisher was '2015.' The extinguisher was rated for ABC type fires and contained a number on the label of 'A99014677.' This model extinguisher appears to be the same type of a recall previously issued on extinguishers made up to 2014." The Fire Investigator stated that "I attempted to use the extinguisher to see if I could

39

get it to operate and I was unable to squeeze the handle to activate the extinguisher. The pin had been pulled . . . As a result of the inoperability of the extinguisher, an occupant of the residence used water to extinguisher a cooking oil fire and as a result spread the fire." The Fire Investigator continued that "upon my examination of the extinguisher I noticed a piece of plastic on the upper handle that is to extend into a hole in the lower handle; in my attempt to activate the extinguisher, I had to manually manipulate this protruding piece of plastic into the lower handle." The Fire Investigator concluded that "[t]his utilized a fine motor skill that, I believe a normal person would not be able to perform under a high stress situation as a fire." Kidde was informed of this incident by the CPSC on July 18, 2017. Kidde responded that it is "unable to determine what may have caused the alleged failure."

81. Every time the CPSC's website describes a consumer complaint, the website also discloses the date when CPSC sent that complaint to the manufacturer. This is separate from the portion of the safety complaint where the consumer states whether he or she independently contacted the manufacturer. As alleged above, all of the above-referenced complaints were sent to Defendants by CPSC shortly after being submitted to the CPSC.

82. For each of the following additional reasons, Kidde's management knew or should have known about the complaints referenced above as soon as they began appearing on the CPSC website in 2012:

40

(a)    First, as noted above, Kidde was repeatedly contacted directly by consumers and by the CPSC about the same problem.

(b)    Second, the CPSC website is a government-run repository for complaints about safety-related defects, and many of Kidde's products appear on the website.  The CPSC website provides businesses with early warnings of product defects, and monitoring reports is easy because users can search for reports by company names.  Hence, since at least 2012, it required negligible effort for Kidde's management and other personnel to visit the CPSC website, type "Kidde" in the search field, and view a list of reports of safety incidents related to Kidde products, including reports about the Product Defect at issue here.

(c)    Third, Kidde knows about the CPSC website because for each of the reports described above, Kidde registered a response.  For example, with regard to the first incident described and reported on December 31, 2012, Kidde responded that the consumer should contact customer service.

(d)    Fourth, for each of the recalls pertaining to the Defective Products, Kidde has a hard-to-locate tab on its website linking consumers to details of the recall as posted on the CPSC's website.

83.    Despite Kidde's knowledge of these complaints, Kidde continued to manufacture, market, and sell these defective products for purchase for five additional years from the date of the first reported complaint on the CPSC website.

41

This does not include numerous complaints that were only made to Kidde and were not otherwise publicly disclosed. Nonetheless, only on November 2, 2017 did Kidde issue a comprehensive recall on these Defective Products. And, even then, Kidde underreported the extent of these defects.

**B.    Other Indicia Of Defendants' Pre-Sale Knowledge**

84.    In addition to receiving safety complaints from the CPSC, Defendants also knew or should have known about the defects from several other sources. First, Plaintiff is informed and believes that Kidde maintains an online and telephonic consumer complaint database that allows consumers to report their experiences. Kidde would have been on notice from the information reported in these systems.

85.    Second, online reputation management (commonly called "ORM" for short), is now a standard business practice among most major companies and entails monitoring consumer forums, social media, and other sources on the internet where consumers can review or comment on products. "Specifically, [online] reputation management involves the monitoring of the reputation of an individual or a brand on the internet, addressing content which is potentially damaging to it, and using customer feedback to try to solve problems before the damage to the individual's or brand's reputation."[16]    Many companies offer ORM consulting services for

---

[16] WebSolutions Maine, "Online Reputation," Available at https://websolutions-maine.com/online-reputation/ (last visited Oct. 27, 2021).

Case 1:21-cv-00839-WO-JLW   Document 1   Filed 10/28/21   Page 42 of 81

businesses.

86.    Like most companies, Defendants presumably care about their reputation and regularly monitor on-line consumer reviews because they provide valuable data regarding quality control issues, customer satisfaction, and marketing analytics.  Reviews like those copied above would be particularly attention-grabbing for Defendants' management because extreme reviews are sometimes the result of extreme problems, and – just like any other company – Defendants are presumably sensitive to the reputational impact of negative online reviews.  Hence, Defendants' management knew or should have known about the above-referenced consumer complaints shortly after each complaint was posted online.

87.    Defendants' management also knew or should have known about the Product Defect because of the similarity of complaints to the CPSC, the Better Business Bureau, Consumer Reports, and other websites.  The fact that so many consumers made similar complaints about the same product indicates that the complaints were not the result of user error or an anomalous incident, but instead a systematic problem with the product.  Here, the reports and complaints from consumers – whether made directly to Defendants employees or forwarded from the CPSC – were similar enough to put Defendants' management on notice that the incidents described were the result of a defect, and that the Products were experiencing unusually high levels of complaints about the nozzles frequently

43

becoming detached, becoming clogged, or requiring excessive force to discharge causing a failure to activate during a fire emergency.

88.     Even if Defendants were not made aware of the Product Defect through the above sources – although they were – Defendants also would have learned through court filings. Since at least 2012, several complaints have been filed against Defendants by plaintiffs in their individual capacities alleging the Defect described in this complaint. Descriptions contained in those complaints and information learned through discovery would have disclosed the Defect, especially in light of Judge Nora B. Fischer's determination on March 24, 2015 that "punitive damages may be appropriate as a reasonable jury could find that Kidde was recklessly indifferent at to the safety of its consumers."[17]

## TOLLING OF THE STATUTE OF LIMITATIONS

89.     Any applicable statute of limitations has been tolled by the deceptive conduct alleged herein. Through no fault or lack of diligence, Plaintiffs and Class members were deceived regarding the Product Defect and could not reasonably discover the latent nature of the defect.

90.     Plaintiffs and Class members could not reasonably discover Defendants' deception with respect to the Product Defect prior to experiencing a

---

[17] *McDaniel v. Kidde Residential & Fire & Com.*, 2015 WL 1326332, at *2 (W.D. Pa. Mar. 24, 2015).

failure and/or being informed of the reason for the failure. Within the time period of any applicable statute of limitations, Plaintiffs and Class members could not have discovered through the exercise of reasonable diligence that Defendants were concealing the Product Defect.

91.    Plaintiffs and Class members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were concealing a latent defect and/or that the Defective Products contained a defect in design causing nozzles to frequently become detached, become clogged, or require excessive force to discharge and causing a failure to activate during a fire emergency. As alleged herein, the existence of the Product Defect and safety risk were material to Plaintiffs and Class members at all relevant times.

92.    At all times, Defendants are and were under a continuous duty to disclose to Plaintiffs and Class members the true standard, quality, and grade of the fire extinguishers at issue and to disclose the Product Defect and potential safety risk associated with the fire extinguisher failing to function during an emergency.

93.    Defendants knowingly, actively, and affirmatively concealed the facts alleged in this complaint, including the Product Defect. Plaintiffs and Class members reasonably relied on Defendants' knowing, active, and affirmative concealment.

94.    For these reasons, all applicable statutes of limitation have been tolled

45

based on the discovery rule and Defendants' fraudulent concealment, and Defendants are estopped from relying on any statutes of limitation in defense of this action.

## CLASS ALLEGATIONS

95.    Plaintiffs bring this nationwide class action pursuant to 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as all persons in the United States who purchased the Products (the "Class").  Excluded from the Class are persons who made such purchases for purpose of resale.

96.    In connection with her California purchases, Plaintiff Taylor further seeks to represent a subclass of all Class Members who purchased the Products in the State of California (the "California Subclass"). Excluded from the California Subclass are persons who made such purchases for purpose of resale.

97.    In connection with his Florida purchases, Plaintiff Newlands further seeks to represent a subclass of all Class Members who purchased the Products in the State of Florida (the "Florida Subclass").  Excluded from the Florida Subclass are persons who made such purchases for purpose of resale.

98.    As a result of additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

99.     At this time, Plaintiffs do not know the exact number of members of the aforementioned Class and Subclasses ("Class Members" and either "California Subclass Members" or "Florida Subclass Members" respectively or collectively "State Subclass Members"); however, given the nature of the claims and the number of retail stores in the United States selling Defendants' Products, Plaintiff believes that Class and State Subclass Members are so numerous that joinder of all members is impracticable.

100.    There is a well-defined community of interest in the questions of law and facts involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class Members include:

        (a)     whether Defendants misrepresented and/or failed to disclose material facts concerning the Products;

        (b)     whether Defendants' conduct was unfair and/or deceptive;

        (c)     whether Defendants have been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendants to retain the benefits conferred upon Defendants by Plaintiff and the Class;

        (d)     whether Plaintiffs and the Class sustained damages with respect to the common law claims asserted, and if so, the proper measure for their damages.

101.    With respect to the California Subclass, additional questions of law and fact common to the members that predominate over questions that may affect individual members include whether Defendants violated the California Consumers Legal Remedies Act as well as California's Unfair Competition Law.

102.    With respect to the Florida Subclass, additional questions of law and fact common to the members the predominate over questions that may affect individual members include whether Defendants violated Florida's Deceptive and Unfair Trade Practices Act.

103.    Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, purchased, in a typical consumer setting, Defendants' Products, and Plaintiffs sustained damages from Defendants' wrongful conduct.

104.    Plaintiffs are adequate representatives of the Class and the State Subclasses because their interests do not conflict with the interests of the Class Members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of the Class members will be fairly and adequately protected by Plaintiffs and their counsel.

105.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members.  Each individual Class Member may lack the resources to undergo the burden and expense of individual

48

prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

## COUNT I

### (Violation of California's Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq*.)

106. Plaintiff Taylor realleges and reincorporates by reference all paragraphs alleged above.

107. Plaintiff Taylor brings this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

108. Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

109. Civil § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

110. Civil § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

111. Defendants violated Civil Code § 1770(a)(5), (a)(7), and (a)(9) by holding out Products as fit for use as fire extinguishers, when in fact the products were defective, dangerous, and useless.

112. The Defect at issue here involves nozzles frequently becoming detached, becoming clogged, or requiring excessive force to discharge causing a failure to activate during a fire emergency. This Defect affected Defendants' plastic handle fire extinguishers and push-button Pindicator fire extinguishers as identified throughout this complaint.

113. Defendants have exclusive knowledge of the Defect, which was not known to Plaintiff or California Subclass Members.

114. Defendants made partial representations to Plaintiff Taylor and California Subclass Members, while suppressing the Product Defect. Specifically, by displaying the Products and describing their features, the product packaging and Defendants' website implied that the product was suitable for use as a fire extinguisher, without disclosing that the Products had a critical safety-related defect

50

that could result in harm to users of the Products. As described above, Kidde was in receipt of knowledge pertaining to the Defect and yet for a period of several years continued to sell the defective Products.

115. Plaintiff Taylor and the California Subclass Members have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid.

116. On February 10, 2021, prior to the filing of this Complaint, Plaintiff's counsel sent Defendants a CLRA notice letter, which complies in all respects with California Civil Code § 1782(a). The letter was sent via certified mail, return receipt requested, advising Defendants that they were in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom. The letter stated that it was sent on behalf of all other similarly situated purchasers. Defendants responded to the letter on February 25, 2021.

117. Plaintiff Taylor and the California Subclass Members seek all relief available under the CLRA, including restitution, the payment of costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court.

## COUNT II
### (Violation of California's Unfair Competition Law,
### Cal. Bus. & Prof. Code §§ 17200, *et seq*.)

118. Plaintiff Taylor realleges and reincorporates by reference all paragraphs alleged above.

119. Plaintiff Taylor brings this claim individually and on behalf of the proposed California Subclass against Defendants.

120. California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice." For the reasons discussed above, Defendants have engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

121. By committing the acts and practices alleged herein, Defendants have violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the California Subclass, by engaging in unlawful, fraudulent, and unfair conduct.

122. Defendants have violated the UCL's proscription against engaging in **Unlawful Business Practices** as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5) and (a)(7) as alleged above.

123. As more fully described above, Defendants' misleading marketing, advertising, packaging, and labeling of the Products is likely to deceive reasonable consumers. In addition, Defendants have committed unlawful business practices by,

52

inter alia, making the representations and omissions of material facts, as set forth more fully herein, and violating the common law.

124. Plaintiff Taylor and members of the California Subclass reserve the right to allege other violations of law which constitute other unlawful business acts or practices.

125. Defendants have also violated the UCL's proscription against engaging in **Unfair Business Practices**. Defendants' acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq*. in that their conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

126. There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

127. Defendants have further violated the UCL's proscription against engaging in **Fraudulent Business Practices**. Defendants' claims, nondisclosures and misleading statements with respect to the Products, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

128.   Plaintiff Taylor and the other California Subclass Members suffered a substantial injury by virtue of buying the Products that they would not have purchased absent Defendants' unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Products.

129.   There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the defective nature of the Products.

130.   Plaintiff Taylor and the other California Subclass Members had no way of reasonably knowing that the Products they purchased were not as marketed, advertised, packaged, or labeled.  Thus, they could not have reasonably avoided the injury each of them suffered.

131.   The gravity of the consequences of Defendants' conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff Taylor and the other California Subclass Members.

132.  Pursuant to California Business and Professional Code § 17203, Plaintiff Taylor and the California Subclass seek an order of this Court that includes, but is not limited to, an order requiring Defendants to (a) provide restitution to Plaintiff and the other California Subclass Members; (b) disgorge all revenues

obtained as a result of violations of the UCL; and (c) pay Plaintiff's and the California Subclass' attorneys' fees and costs.

**COUNT III**
**(Breach of Implied Warranty Under the Song-Beverly Act, Cal. Civ. Code § 1790, *et seq*. and California Commercial Code § 2314)**

133. Plaintiff Taylor realleges and reincorporates by reference all paragraphs alleged above.

134. Plaintiff Taylor bring this claim individually and on behalf of all members of the California Subclasses.

135. Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790. et seq., and California Commercial Code § 2314, every sale of consumer goods in the State of California is accompanied by both a manufacturer's and retailer seller's implied warranty that the goods are merchantable, as defined in that Act. In addition, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose (here, to be used as fire extinguishers) and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

136. California has codified the third-party beneficiary exception to any privity requirement. Therefore, while ordinarily, Plaintiff Taylor might be required

55

to demonstrate vertical privity, she need not do so where, as here, she is a third-party beneficiary of Defendants' contracts with wholesalers or retail sellers and relied on Defendants' packaging in making her purchase. Plaintiff Taylor and members of the California Subclass are third-party beneficiaries because the extinguishers passed into commerce with warranties that were designed for the benefit of the end-user and not for the benefit of a wholesaler or retailer.

137. The Products at issue here are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

138. Plaintiff Taylor and the Class Members who purchased one or more Products are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

139. Defendants are in the business of manufacturing, assembling, and/or producing the Products and/or selling the Products to retail buyers, and therefore are a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

140. Defendants impliedly warranted to retailer buyers that the Products were merchantable in that they would: (a) pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Products are used. For a consumer good to be "merchantable" under the Act, it must satisfy both of these elements. Defendants breached these implied warranties because the Products were unsafe and defective. Therefore, the fire

56

extinguishers would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

141. Plaintiff Taylor and California Subclass Members purchased the Products in reliance upon Defendants' skill and judgment in properly packaging and labeling the Products.

142. The Products were not altered by Plaintiff Taylor or the California Subclass Members.

143. The Products were defective at the time of sale when they left the exclusive control of Defendants. The Defect described in this complaint was latent in the product and not discoverable at the time of sale.

144. Defendants knew that the Products would be purchased and used without additional testing by Plaintiff and Class Members.

145. As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiff and Class Members have been injured and harmed because they would not have purchased the Products if they knew the truth about the Products, namely, that they were unfit for use as fire extinguishers.

146. Plaintiff Taylor and the California Subclass seek compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

## COUNT IV
**(Violation of Florida's Deceptive and Unfair Trade Practices Act,
Fla. Stat. §§ 501.201 *et seq.*)**

147.  Plaintiff Newlands realleges and reincorporates by reference all paragraphs alleged above.

148.  Plaintiff Newlands brings this claim individually and on behalf of all members of the Florida Subclass.

149.  Plaintiff Newlands and Florida Subclass Members are "consumers" under Fla. Stat. § 501.203(7), the Products are "goods" within the meaning of the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA"), and the transactions at issue constitute "trade or commerce" as defined by the FDUTPA.

150.  The FDUTPA, Fla. Stat. § 501.204, provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

151.  For the reasons alleged above, Defendants violated and continue to violate the FDUTPA by engaging in the described unconscionable, deceptive, unfair acts or practices proscribed by Fla. Stat. § 501.201, *et seq*.

152.  Defendants' acts and practices, including its material omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

153. At all times mentioned herein, Defendants engaged in trade or commerce in Florida, as defined by Fla. Stat. § 501.203(8), in that they advertised, offered for sale, sold, or distributed goods or services in Florida and/or engaged in trade or commerce directly or indirectly affecting the people of Florida.

154. Defendants repeatedly advertised, both on the labels for the Products, on their website, and through a national advertising campaign, among other items, that the Products were and are safe for use by individuals when in fact they were not safe for use in their ordinary and intended purpose.

155. As discussed, the Products here are defective in that they have nozzles that frequently become detached or clogged, or they require excessive force to discharge causing a failure to activate during a fire emergency. This Defect affected Defendants' plastic handle fire extinguishers and push-button Pindicator fire extinguishers as identified throughout this complaint.

156. Defendants have exclusive knowledge of the Defect, which was not known to Plaintiff Newlands or Florida Subclass Members.

157. Defendants made partial representations to Plaintiff Newlands and Florida Subclass Members, while suppressing the Product Defect. Specifically, by displaying the Products and describing their features, the product packaging and Defendants' website implied that the product was suitable for use as a fire extinguisher, without disclosing that the Products had a critical safety-related defect

59

that could result in harm to users of the Products. As described above, Kidde was in receipt of knowledge pertaining to the Defect and yet for a period of several years continued to sell the defective Products.

158. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers to induce them to buy the Products without being aware that the Products did not function as fire extinguishers and posed a threat to the lives, safety, and security of Plaintiffs and consumers by making them believe that in the event of a fire they could use the Products as fire extinguishers. However, as discussed throughout this complaint, these Products are not in fact usable as extinguishers.

159. As a direct and proximate result of Defendants' unfair and deceptive acts or practices, Plaintiff Newlands and Florida Subclass Members suffered damages by purchasing the Products because they would not have purchased the Products had they known the truth, and they received a product that was worthless because it was unsafe for its ordinary and intended purpose.

160. Defendants' deceptive trade practices caused injury in fact and actual damages to Plaintiffs and class members in the form of the loss of value of the Products, which allowed Defendant to profit at the expense of Plaintiffs and class members. The injuries were to legally protected interests. The gravity of the harm

60

of Defendants' actions is significant and there is no corresponding benefit to consumers of such conduct.

161.   Plaintiff Newlands and Florida Subclass Members seek relief for the injuries they have suffered as a result of Defendants' unfair and deceptive acts and practices, as provided by Fla. Stat. § 501.211 and applicable law.

## COUNT V
### (Breach of Implied Warranty Under Florida Law, Fla. Stat. Ann. § 672.314)

162.   Plaintiff Newlands realleges and reincorporates by reference all paragraphs alleged above.

163.   Plaintiff brings this claim individually and on behalf of all members of the Florida Subclass.

164.   Every sale of consumer goods in the State of Florida is accompanied by both a manufacturer's and retail seller's implied warranty that the goods are merchantable, as defined in that Act.  In addition, every sale of consumer goods in Florida is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose (here, to be used as fire extinguishers) and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

61

165.   Defendants breached its implied warranty of merchantability when it designed, manufactured, distributed, and sold the Products in their unsafe and unmerchantable condition.

166.   Florida jurisprudence recognizes the third-party beneficiary exception to any privity requirement.  Therefore, whereas ordinarily, Plaintiff Newlands may be required to demonstrate vertical privity, he need not do so where, as here, he is a third-party beneficiary to contracts between Defendants and wholesalers or retail sellers and relied on Defendants' packaging in making his purchase.  Plaintiff Newlands and members of the Florida Subclass are third-party beneficiaries because the extinguishers passed into commerce with warranties that were designed for the benefit of the end-user and not for the benefit of a wholesaler or retailer.

167.   Defendants each constitute a "merchant" within the meaning of Fla. Stat. Ann. § 672.104.

168.   The Products at issue here are "goods" within the meaning of Fla. Stat. Ann. § 672.105.

169.   Plaintiff Newlands and the Florida Subclass Members who purchased one or more of the Products are "buyers" within the meaning of Fla. Stat. Ann. § 672.103(1)(a).

170.   Defendants are in the business of manufacturing, assembling, and/or producing the Products and/or selling the Products to retail buyers, and therefore are a "manufacturer" and "seller" within the meaning of Fla. Stat. Ann. § 672.103(d).

171.   Defendants impliedly warranted to retailer buyers that the Products were merchantable in that they would: (a) pass without objection in the trade or industry under the contract description, (b) are of fair average quality within the description; (c) are fit for the ordinary purpose for which such goods are used; (d) run within the variations permitted by the agreement; (e) are adequately contained, packaged, and labeled as the agreement may require; and (f) conform to the promises or affirmations of fact made on the container or label.

172.   Defendants breached the implied warranty under Florida law because the Products were unsafe and defective.  Therefore, the fire extinguishers would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

173.   Plaintiff Newlands and Florida Subclass Members purchased the Products in reliance upon Defendants' skill and judgment in properly packaging and labeling the Products.

174.   The Products were not altered by Plaintiff Newlands or the Florida Subclass Members.

63

175.  The Products were defective at the time of sale when they left the exclusive control of Defendants.  The Defect described in this complaint was latent in the product and not discoverable at the time of sale.

176.  Defendants knew that the Products would be purchased and used without additional testing by Plaintiff Newlands and Florida Subclass Members.

177.  As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiff Newlands and Florida Subclass Members have been injured and harmed because they would not have purchased the Products if they knew the truth about the Products, namely, that they were unfit for use as fire extinguishers.

178.  Plaintiff Newlands and Florida Subclass Members seek compensatory damages, attorney's fees, costs, and any other just and proper relief available under law

## COUNT VI
**(Violation of North Carolina's Unfair and Deceptive Practice Act,
N.C. Gen. Stat. §§ 75-1.1, et seq.)**

179.  Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

180.  Plaintiffs bring this claim individually and on behalf of all members of the Nationwide Class.

64

181.   Defendants engaged in unlawful, unfair, and deceptive trade practices in violation of the North Carolina Unfair and Deceptive Trade Practices Act by advertising, selling, and warranting the defective Products.

182.   Defendants knew that the Products were dangerous and not suitable for their ordinary and intended purpose.

183.   In advertising, selling, and warranting the Products, Defendants omitted material facts concerning dangers of using the Products. Defendants failed to give Plaintiffs and the other class members sufficient notice or warning regarding this Defect.

184.   Defendants intended that Plaintiffs and the other class members rely upon Defendants' omissions when purchasing the Products.

185.   Plaintiffs and the other class members were deceived by Defendants' concealment of the defect.

186.   Defendants' conduct was in commerce and affected commerce.

187.   As a direct and proximate result of these unfair, willful, unconscionable, and deceptive commercial practices, Plaintiffs and the other class members have been damaged and seek to recover actual and treble damages, as well as attorneys' fees and costs, and all other relief allowed under N.C. Gen. Stat §§ 75-16 and 75-16.1.

## COUNT VII
## (Breach Of Implied Warranty Under North Carolina Law, N.C.G.S.A. § 25-2-314)

188.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

189.   Plaintiffs bring this claim individually and on behalf of Members of the Nationwide Class.

190.   The Products were subject to implied warranties of merchantability as defined in N.C. Gen. Stat. § 25-2-314, running from the Defendants to the Plaintiffs.

191.   An implied warranty that the Products were merchantable arose by operation of law as part of the purchase of the Products.

192.   The Products are "goods" as defined by N.C. Gen. Stat. § 25-2-105.

193.   Defendants are "merchants" as defined by N.C. Gen. Stat. § 25-2-104.

194.   Plaintiffs are buyers as defined by N.C. Gen. Stat. § 25-2-103.

195.   Defendants breached the implied warranty of merchantability in that the Products were not in merchantable condition when the Plaintiffs purchased them, or at any time thereafter, and the Products are unfit for the ordinary purposes for which such Products are used.

196.   Indeed, Kidde has known for years that a defect rendered the Products useless given that their nozzles frequently become detached or become clogged, or

66

the Products require excessive force to discharge causing a failure to activate during a fire emergency.

197. Nonetheless, Defendants made partial representations to Plaintiffs while suppressing the Product Defect. Specifically, by displaying the Products and describing their features, the product packaging and Defendants' website implied that the Products were suitable for use as a fire extinguisher, without disclosing that the Products had a critical safety-related defect that could result in harm to users of the Products. As described above, Kidde was in receipt of knowledge pertaining to the Defect and yet for a period of several years continued to sell the defective Products.

198. Privity is not required because Plaintiffs and each of the Members of the Class are the intended beneficiaries of Defendants' contracts with wholesalers or retail sellers. Wholesalers and retailers were not intended to be the ultimate consumers of the Products and have no rights under these warranties. Defendants' warranties were designed for and intended to benefit the consumers only. Plaintiffs and the Members of the Class were the intended consumers of the Products.

199. Plaintiffs and Members of the Class have suffered damages caused by Defendants' breach of the implied warranty of merchantability and are entitled to recover compensatory damages, attorney's fees, and other relief this Court may deem appropriate.

## COUNT VIII
### (Fraudulent Misrepresentation)

200.  Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

201.  Plaintiffs bring this claim individually and on behalf of Members of the Nationwide Class.

202.  Each Plaintiff brings this claim against Defendants under the laws of the state where the Plaintiff lives.  Additionally, Plaintiffs bring this claim under the laws of North Carolina.  Plaintiffs reserve the right to represent a multi-state class that includes states with comparable applicable laws.

203.  Defendants falsely represented to Plaintiffs and the Class that the Products were safe to use to put out fires.

204.  Defendants intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiffs and the Class to purchase the Products.

205.  Defendants knew or should have known that their representations about the Products were false in that the nozzles frequently become detached or clogged, or the Products required excessive force to discharge, causing a failure to activate during a fire emergency.  Defendants knowingly allowed their packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiffs and the Class.

206.  Plaintiffs and the Class did in fact rely on these misrepresentations and purchased the Products to their detriment.  Given the deceptive manner in which Defendants advertised, marketed, represented, and otherwise promoted the Products, Plaintiff's and the Class' reliance on Defendants' misrepresentations was justifiable.

207.  As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class have suffered actual damages in that they would not have purchased the Products at all had they known of the safety risks associated with the use of the Products that do not conform to the Products' labels, packaging, advertising, and statements.

208.  Plaintiffs and the Class seek actual damages, attorney's fees, costs, and other such relief the Court deems proper.

## COUNT IX
### (Negligent Misrepresentation)

209.  Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

210.  Plaintiffs bring this claim individually and on behalf of Members of the Nationwide Class.

211.  Each Plaintiff brings this claim against Defendants under the laws of the state where Plaintiff lives.  Additionally, Plaintiffs bring this claim under the laws of North Carolina.  Plaintiffs reserve the right to represent a multi-state class that includes states with comparable applicable laws.

69

212. Defendants had a duty to Plaintiffs and the Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, detailing, distribution, and sale of the Products.

213. Defendants breached their duty to Plaintiffs and the Class by developing, testing, manufacturing, marketing, detailing, distributing, and selling products to Plaintiffs and the Class that did not have the qualities, characteristics, and suitability for use as advertised by Defendants and by failing to promptly remove the Products from the marketplace or take other appropriate remedial action upon becoming aware of the safety risks of the Products.

214. Defendants knew or should have known that the qualities and characteristics of the Products were not as advertised, marketed, detailed, or otherwise represented or suitable for their intended use and were otherwise not as warranted and represented by Defendants. Specifically, Defendants knew or should have known that (1) the nozzles frequently become detached or clogged, or the Products required excessive force to discharge, causing a failure to activate during a fire emergency and thereby not conforming to the packaging and labeling; and (2) the Products were otherwise not as warranted and represented by Defendants.

215. As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class have suffered actual damages in that they would not have purchased the Products at all had they known they would fail to operate during a fire emergency in

70

a manner that does not conform to the Product's labeling, packaging, advertising, and statements.

216.    Plaintiffs and the Class seek actual damages, attorney's fees, costs, and any other just and proper relief available.

## COUNT X
### (Fraudulent Concealment)

217.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

218.    Plaintiffs bring this claim individually and on behalf of Members of the Nationwide Class.

219.    Each Plaintiff brings this claim against Defendants under the laws of the state where Plaintiff lives.  Additionally, Plaintiffs bring this claim under the laws of North Carolina.  Plaintiffs reserve the right to represent a multi-state class that includes states with comparable applicable laws.

220.    Defendants concealed from and failed to disclose to Plaintiffs and the Class that use of the Products is accompanied by a risk that the nozzles frequently become detached or clogged, or the Products require excessive force to discharge, causing a failure to activate during a fire emergency and thereby not conforming to the packaging and labeling and other advertisements and statements, or Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

71

221.   Defendants further affirmatively concealed from Plaintiffs in advertising, marketing, detailing, and other forms of communication, including standard and uniform material provided with each Product, that the Products would fail to perform under the normal circumstances for which the Product was purchased.

222.   Defendants knew at the time they actively concealed this information that this information was material.

223.   The Products were, in fact, defective, unsafe, and unreliable because of the Defect as alleged herein.

224.   Defendants owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Products, and the Defendants' devaluing of safety and performance, because Plaintiffs and the Class relied on Defendants' material representations that the Products they were purchasing were safe and free from defects.

225.   Defendants were under a duty to disclose to Plaintiffs and the Class the true safety, quality, characteristics, fitness for use, and suitability of the Products because: (1) Defendants were in a superior position to know the true state of facts about their Products; (2) Defendants were in a superior position to know the risks associated with the use of, characteristics of, and suitability of the Products for use by individuals; and (3) Defendants knew that Plaintiffs and the Class could not reasonably have been expected to learn or discover that the Products were

72

misrepresented in the packaging, labels, advertising, and websites prior to purchasing the Products.

226. The aforementioned concealment was material because if it had been disclosed, reasonable consumers like Plaintiffs and the Class would not have bought the Products.

227. Plaintiffs and the Class justifiably relied on Defendants' reputation—along with Defendants' failure to disclose the faulty and defective nature of the Products—in purchasing Defendants' Products.

228. Plaintiffs and the Class justifiably relied on Defendants' omission to their detriment. The detriment is evidenced by the true quality, characteristics, and risk associated with the use of the Products, which is inferior when compared to how the Products are advertised and represented by Defendants.

229. As a result of their reliance, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain.

230. Defendants' conduct was knowing, intentional, and with malice; demonstrates a complete lack of care; and was in reckless disregard for the rights of Plaintiffs and the other Class members. Plaintiffs and the Class members are therefore entitled to an award of punitive damages.

231. As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class suffered actual damages in that they purchased Products that they would not have purchased at all had they known that Defendants' Products did not function as fire extinguishers and posed a threat to the lives, safety, and security of Plaintiffs and consumers.

232. Plaintiffs and the Class seek actual damages, attorney's fees, costs, and any other just and proper relief available under the laws.

## Count XI
## (Unjust Enrichment)

233. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

234. Plaintiffs bring this claim individually and on behalf of Members of the Nationwide Class.

235. Each Plaintiff brings this claim against Defendants under the laws of the state where the Plaintiff lives. Additionally, Plaintiffs bring this claim under the laws of North Carolina. Plaintiffs reserve the right to represent a multi-state class that includes states with comparable applicable laws.

236. To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

237. Plaintiffs and Class Members conferred benefits on Defendants by purchasing the Products.

74

238.   Defendants were unjustly enriched in retaining the revenues derived from Plaintiffs and Class Members' purchases of the Products.  Retention of those moneys under these circumstances is unjust and inequitable because Defendants failed to disclose that the Products were unfit for their intended purpose.  These omissions caused injuries to Plaintiffs and Class Members because they would not have purchased the Products if the true facts were known.

239.   Retention of those moneys also is unjust and inequitable because, as alleged above, Defendants commenced an ineffective recall that resulted in few returns, and generally no refunds, thereby protecting profits Defendants collected from selling the Products.

240.   Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiffs and Class Members is unjust and inequitable, Defendants have been unjustly enriched in an amount to be determined at trial.

## COUNT XII
### (Negligent Failure to Warn or to Instruct)

241.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

242.   Plaintiffs bring this claim individually and on behalf of Members of the Nationwide Class.

75

243. Each Plaintiff brings this claim against Defendants under the laws of the state where the Plaintiff lives. Additionally, Plaintiffs bring this claim under the laws of North Carolina. Plaintiffs reserve the right to represent a multi-state class that includes states with comparable applicable laws.

244. Defendants had a duty to instruct or to warn Plaintiffs and the Class regarding the defect and true risks associated with the Products.

245. Defendants failed to provide adequate instructions and/or warnings regarding the risks of the Products' nozzles frequently become detached or clogged, or the Products requiring excessive force to discharge, causing a failure to activate during a fire emergency.

246. Defendants had information regarding the true risks but failed to instruct and/or to warn Plaintiffs and Class Members.

247. Despite Defendants' obligation to unilaterally strengthen the instructions and/or warnings, Defendants instead chose to actively conceal this knowledge.

248. Plaintiffs and the Class would not have purchased, chosen, and/or paid for the Products if they knew of the risks discussed throughout the complaint before purchasing the Product.

249. The Defect proximately caused economic injuries to the Plaintiffs and the Class.

250. Plaintiffs and the Class suffered damages in an amount to be determined at trial.

## COUNT XIII
### (Negligent Design Defect)

251. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

252. Each Plaintiff brings this claim against Defendants under the laws of the state where the Plaintiff lives. Additionally, Plaintiffs bring this claim under the laws of North Carolina. Plaintiffs reserve the right to represent a multi-state class that includes states with comparable applicable laws.

253. Defendants negligently designed the Products. Defendants owed Plaintiffs and the Class a duty to design the Products in a reasonable manner. The design of the Products led to, including but not limited to, the nozzles frequently becoming detached or clogged, or the Products requiring excessive force to discharge, causing a failure to activate during a fire emergency.

254. The design of the Products to include the plastic handles rendered the Products not reasonably fit, suitable, or safe for their intended purpose.

255. The dangers of the Product outweighed the benefits and rendered the Products unreasonably dangerous.

256.    Safer, alternative designs existed, including models with metal instead of plastic handles.  Defendants produced numerous of these models and so did their competitors.

257.    The risk benefit profile of the Products was unreasonable, and the Products should have had stronger and clearer warnings and/or instructions or should not have been sold in the market.

258.    The Products did not perform as an ordinary consumer would expect.

259.    Plaintiffs and the Class suffered damages in an amount to be determined at trial.

## COUNT XIII
**(Violation Of The Magnuson-Moss Warranty Act,
15 U.S.C. §§ 2301, *et seq*.)**

260.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

261.    Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class.

262.    The Products are consumer products defined in 15 U.S.C. § 2301(1).

263.    Plaintiffs and the Class are consumers as defined in 15 U.S.C. § 2301(3).

264.    Defendants are suppliers and warrantors as defined in 15 U.S.C. § 2301(4) and (5).

78

265. In connection with the marketing and sale of the Products, Defendants impliedly warranted that the Products were fit for use as fire extinguishers. The Products were not fit for use as fire extinguishers due to the Defect described in the allegations above.

266. By reason of Defendants' breach of warranties, Defendants violated the statutory rights due to Plaintiff and the Class Members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, et seq., thereby damaging Plaintiff and the Class.

267. Plaintiff and the Class Members were injured as a direct and proximate result of Defendants' breach because they would not have purchased the Products if they knew the truth about the defective nature of the Products.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all Class and Statewide Subclass Members, request judgment against Defendants as follows:

A. For an Order certifying the Nationwide Class or, in the alternative, the Statewide Subclasses as defined herein, and appointing Plaintiffs and their Counsel to represent the certified Classes;

B. For an order declaring that Defendants' conduct violates the statutes referenced herein;

C. For an order finding in favor of Plaintiff and the Nationwide Class and

Statewide Subclasses on all counts asserted herein;

D.    For compensatory and treble and/or punitive damages in an amount to be determined by the Court and/or jury;

E.    For pre-judgment interest on all amounts awarded;

F.    For an order of restitution, disgorgement, and all other forms of monetary relief;

G.    For an order awarding Plaintiffs and the Nationwide Class and Statewide Subclasses their reasonable attorney's fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: October 28, 2021          Respectfully submitted,

*/s/ Martha A. Geer*
Martha A. Geer (State Bar No. 13972)
Sarah Spangenburg (State Bar No. 57381)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Facsimile: (919) 600-5035
Email: mgeer@milberg.com
Email: sspangenburg@milberg.com

Gregory F. Coleman (*pro hac vice forthcoming*)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: (865) 247-0080
Facsimile: (865) 522-0080

80

Email: gcoleman@milberg.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (*pro hac vice forthcoming*)
Sean L. Litteral (*pro hac vice forthcoming*)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
        slitteral@bursor.com

*Attorneys for Plaintiffs*