## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JANET TAYLOR and JAMES NEWLANDS, individually and on behalf of all others similarly situated, | Case No. 1:21-cv-00839-WO-JLW |
| Plaintiffs, | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| WALTER KIDDE PORTABLE EQUIPMENT, INC. | |
| Defendant. | |

Plaintiffs Janet Taylor and James Newlands (collectively, "Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendant Walter Kidde Portable Equipment, Inc. ("Kidde") for the manufacture, marketing, and sale of plastic handle fire extinguishers and push-button Pindicator fire extinguishers as identified below. Plaintiffs make the following allegations based upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys:

### NATURE OF THE ACTION

1.      This class action involves the most fundamental misrepresentation or material omission that a product can have: Defendant Kidde sold products it identified as a "fire extinguisher" when it knew that because of defects in the

products, they frequently would not work. The "fire extinguishers" would not discharge the product necessary to put out a fire. In short, Kidde was selling a product labeled as a "fire extinguisher" that did not extinguish fires. And consumers bought the product because they needed a "fire extinguisher," but did not receive one.

2.     In *McDaniel v. Kidde Residential & Fire & Com.*, the court determined that "punitive damages may be appropriate as a reasonable jury could find that Kidde was recklessly indifferent as to the safety of its customers." 2015 WL 1326332, at *1 (W.D. Pa. Mar. 24, 2015). The court's decision was based on the fact that the "Plaintiffs ha[d] introduced evidence raising a genuine issue of material fact that [Kidde's] conduct was <u>intentional, willful, wanton, or reckless</u>." *Id.* at *2. The court described "the evidence of record" which "reveal[ed] the failures of Kidde's quality control department," including "Kidde's Quality Control Manager, Stuart Jones, [who] testified that he was unaware of . . . complaints of fire extinguishers failing to discharge, even though it was his responsibility to oversee customer complaints and examine returned products." *Id.* at *2. The court's determination was also based on the fact that "Theresa Farrell, Kidde's corporate designee as to the customer call logs, testified that she had the most knowledge of anyone in her department about the customer call and complaint processes . . . [y]et, her testimony demonstrated that

2

she was unaware of what follow-up procedures occurred after Kidde received complaints of defective, non-, or malfunctioning devices." *Id.*

3.      Indeed, according to the United States Department of Justice, "Kidde knowingly failed to immediately report to the Consumer Product Safety Commission ("CPSC") upon obtaining information which reasonably supported the conclusion that fire extinguishers with plastic handles manufactured by Kidde, eventually recalled on November 2, 2017, <u>contained a defect which would create a 'substantial product hazard</u>.'" *United States of America v. Walter Kidde Portable Equipment Inc.*, 1:20-cv-01172, ECF No. 1 ¶ 16 (Dec. 30, 2020).

4.      The U.S. Department of Justice further determined that "Kidde also failed to immediately report information that its fire extinguishers created an <u>unreasonable risk of serious injury or death</u>" and that Kidde "<u>made material misrepresentations</u> to the CPSC and knowingly used a registered safety certification mark in an unauthorized manner in the sale of fire extinguishers affected by defects." *Id.*, ¶¶ 2-3.  The U.S. Department of Justice found that "[b]eginning <u>as early as 2005 and continuing until August 2017</u>, Kidde . . . failed to immediately report to the CPSC that it possessed information concerning nozzle detachment from fire extinguishers with plastic handles that it manufactured." *Id.*, ¶ 22.

5.      The U.S. Department of Justice based these allegations on the following relevant facts revealed during its investigation of Kidde: (1) "[d]espite test reports

showing discharge failures across many models of fire extinguishers <u>sold over decades</u>, and an acknowledgement from its engineers that they had 'not found any components out of specification,' in its November 2014 Section 15(b) report, Kidde reported to the CPSC that the defect involved out-of-specification valve components for a more limited set of models sold for only 15 months;" (2) "[d]espite test reports throughout December 2014 <u>showing consistent failures</u> across Kidde fire extinguisher models, Kidde informed the CPSC in January 2015 that 100% of its repaired fire extinguishers since November 2014 had passed performance tests. Kidde failed to disclose that the repaired units were tested by a machine, as opposed to a manual test that would more accurately reflect how consumers actually used the fire extinguishers. Kidde knew that manual testing showed <u>high failure rates</u> across many models of fire extinguishers; (3) "in connection with its 2014 reports to the CPSC and 2015 recall, Kidde reported 12 incidents of fire extinguishers failing to discharge to the CPSC, but Kidde had actually received reports of <u>at least 100 incidents</u> of fire extinguishers failing to discharge." *Id.*, ¶ 18.

6.     In turn, on January 4, 2021, The Honorable Loretta C. Biggs issued a Consent Decree of Civil Penalty and Permanent Injunction. *United States of America v. Walter Kidde Portable Equipment Inc.*, 1:20-cv-01172, ECF No. 3 (Jan. 4, 2021). The court ordered that "Kidde shall pay twelve million dollars ($12,000,000.00) to the United States as a civil penalty, pursuant to 15 U.S.C. §

2069." *Id.* at 3. This payment of civil penalty thereafter ended the U.S. Department of Justice's investigation into Kidde's conduct of knowingly manufacturing and selling defective fire extinguishers for over a decade.

7. However, consumers who relied on Kidde's legacy as a pioneer of fire and safety equipment and its affirmative representations and omissions that its fire extinguishers would properly function as such, have not been made whole. Accordingly, this class action seeks to remedy their injuries against Kidde for its manufacture and sale of over 40 million plastic handle fire extinguishers and push-button Pindicator fire extinguishers (collectively, the "Fire Extinguishers"), all of which suffered from the following defect in design: nozzles frequently becoming detached, becoming clogged, or requiring excessive force to discharge causing a failure to activate during a fire emergency (the "Fire Extinguisher Defect" or "Defect"). A fire extinguisher that fails to function properly during an emergency poses a threat to the life, safety, and property of the user and those in their immediate surroundings. This Defect rendered the Fire Extinguishers unsuitable for their principal and intended purpose.

8. Thus, Plaintiffs bring their claims against Kidde individually and on behalf of a class of all other similarly situated purchasers of the Fire Extinguishers for (1) violation of California's Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et. seq.*; (2) violation of California's Unfair Competition Law, Cal.

Bus. & Prof. Code §§ 17200-17210; (3) Breach of Implied Warranty under California's Song-Berly Act, Cal. Civ. Code § 1790, *et seq*.; (4) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; (5) violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.; (6) Breach of Implied Warranty under Florida Law, Fla. Stat. Ann. § 672.314; (7) Fraud; (8) Constructive Fraud; (9) Fraudulent Inducement – Concealment; (10) Fraudulent Inducement – Intentional Misrepresentation; (11) Money Had and Received; (12) Fraudulent Omission or Concealment; (13) Fraudulent Misrepresentation; (14) Negligent Misrepresentation; (15) Quasi-Contract / Unjust Enrichment; and (16) Violation of the Magnuson-Moss Warranty Act.

## PARTIES

9.     Plaintiff Janet Taylor is, and at all times relevant to this action has been, a resident of Elverta, California.  In or around September 2016, Plaintiff Taylor purchased a Kidde model H110G fire extinguisher with a plastic handle for approximately $30.00 from a brick-and-mortar Walmart located in Antelope, California.

10.     Prior to her purchase, Plaintiff Taylor reviewed the packaging of the H110G fire extinguisher.  A substantially similar example of the packaging is included below in black and white photocopy form as submitted in the matter of

6

*Gretchen McDaniel v. Kidde Residential and Fire & Commercial, et al.*, Case No. 2:12-cv-01439-NBF (W.D. Pa. Aug. 13, 2014), Dkt. No. 75-12, pp. 6-9. In purchasing the Kidde H110G fire extinguisher, Plaintiff Taylor relied on Kidde's express and implied representation that the fire extinguisher would properly function as a fire extinguisher.



11.     In reviewing the packaging, Plaintiff Taylor saw and relied on the representation that the Kidde fire extinguisher would fight fires and help her be prepared for fires.   Plaintiff Taylor saw and relied on Defendant's representations

and its express and implied warranties that the fire extinguisher could be used to fight fires stemming from various sources, that the fire extinguisher included a limited warranty for the benefit of the consumer, and had numerous features, including an easy to pull pin, easy-to-read gauge, quick and clear directions, and that it was backed by the world's leading fire extinguisher company.

12.     Based on those representations, Plaintiff Taylor understood from Kidde that she was purchasing an easy to use fire extinguisher that would allow her to effectively fight a fire in an emergency.  Plaintiff believed, consistent with Kidde's marketing representations, that the Fire Extinguisher she was purchasing was a premium product due to Kidde's reputation as a leader in the firefighting industry. In all, based on Defendant's packaging and the label identifying the product as a "fire extinguisher," Plaintiff believed that the Kidde fire extinguisher would properly function as a fire extinguisher, and she and her family could put out a household fire if and when necessary.

13.     Plaintiff Taylor did not know at the time she purchased the Kidde fire extinguisher that the fire extinguisher contained a defect that could result in the fire extinguisher not working when used or that the fire extinguisher had a high risk of discharge failure. Kidde had omitted to disclose those facts.

14.     Kidde's representations (and corresponding omissions) and express and implied warranties were included as a part of the basis of the bargain in that she

would not have purchased the fire extinguisher if the true facts had been known. But Plaintiff Taylor's Fire Extinguisher did not operate as marketed. Instead, Plaintiff Taylor's Fire Extinguisher suffered from a Defect, rendering the Device inoperable for its principal and intended uses.

15. In the spring of 2021, for example, the Fire Extinguisher Plaintiff Taylor purchased failed to activate when needed. As Plaintiff Taylor's son was working on his motorcycle in the family garage, a fire broke out. Plaintiff Taylor's son yelled for Plaintiff, asking her to bring a fire extinguisher. Plaintiff Taylor grabbed her Kidde model H110G and ran to the garage. When she pulled the pin to unlock the extinguisher and squeezed the handle to activate the flame-retardant spray, as the instructions directed, a small drizzle came out and otherwise stopped. As the flames continued to rise, Plaintiff Taylor grabbed baking soda and a water hose and successfully suppressed the flames. Plaintiff Taylor is still in possession of the Defective Extinguisher.

16. As a direct result of Kidde's material misrepresentations and omissions, Plaintiff Taylor has suffered, and continues to suffer, economic injuries. Plaintiff Taylor would not have purchased the Fire Extinguishers had there been a disclosure informing her that there was a risk that the fire extinguisher would not discharge when needed and that the fire extinguisher was, therefore, useless and unfit to perform its intended purpose. Plaintiff Taylor did not hear of Kidde's recall for the

9

defective fire extinguishers until 2021. In light of Kidde's pioneering legacy in fire and safety equipment, Plaintiff Taylor hopes to eventually trust Kidde's marketing, and hopes that an injunction that requires Kidde to more effectively alert consumers that they are at risk due to their fire extinguishers, will contribute to this goal.

17. Plaintiff James Newlands is, and at all times relevant to this action has been, a resident of Port Orange, Florida. In 2012, Plaintiff Newlands purchased two Kidde model H110G fire extinguishers with plastic handles from a brick-and-mortar Lowes's located in Orlando, Florida.

18. Prior to his purchase, Plaintiff Newlands reviewed the packaging of the H110G fire extinguisher. A substantially similar example of the packaging is included below in black and white photocopy form as submitted in the matter of *Gretchen McDaniel v. Kidde Residential and Fire & Commercial, et al.*, Case No. 2:12-cv-01439-NBF (W.D. Pa. Aug. 13, 2014), Dkt. No. 75-12, pp. 6-9.

19. In reviewing the packaging, Plaintiff Newlands saw and relied on the representation that the Kidde fire extinguisher would fight fires and help him be prepared for fires. Plaintiff Newlands saw and relied on Defendant's representations and its express and implied warranties that the fire extinguisher could be used to fight fires stemming from various sources, that the fire extinguisher included a limited warranty for the benefit of the consumer, and had numerous features,

10

including an easy to pull pin, easy-to-read gauge, quick and clear directions, and that it was backed by the world's leading fire extinguisher company.



20.    Based on those representations, Plaintiff Newlands understood from Kidde that he was purchasing an easy to use fire extinguisher that would allow him to effectively fight a fire in an emergency. Plaintiff believed, consistent with Kidde's marketing representations, that the Fire Extinguisher he was purchasing was a premium product due to Kidde's reputation as a leader in the firefighting industry. In all, based on Defendant's packaging and the label identifying the product as a

"fire extinguisher," Plaintiff believed that the Kidde fire extinguisher would properly function as a fire extinguisher, and he and his family could put out a household fire if and when necessary.

21.     Plaintiff Newlands did not know at the time he purchased the Kidde fire extinguisher that the fire extinguisher contained a defect that could result in the fire extinguisher not working when used or that the fire extinguisher had a high risk of discharge failure. Kidde had omitted to disclose those facts.

22.     Kidde's representations (and corresponding omissions) and express and implied warranties were included as a part of the basis of the bargain in that he would not have purchased the fire extinguisher if the true facts had been known.  But Plaintiff Newlands' Fire Extinguisher did not operate as marketed.  Instead, Plaintiff Newlands' Fire Extinguisher suffered from a Defect, rendering the device inoperable for its principal and intended uses.

23.     As a direct result of Kidde's material misrepresentations and omissions, Plaintiff Newlands has suffered, and continues to suffer, economic injuries.  Plaintiff Newlands would not have purchased the Fire Extinguisher had there been a disclosure informing him that there was a risk that the fire extinguisher would not discharge when needed and that the fire extinguisher was, therefore, useless and unfit to perform its intended purpose.  Plaintiff Newlands did not hear of Kidde's recall for the defective fire extinguishers until 2021.  In light of Kidde's pioneering legacy

12

in fire and safety equipment, Plaintiff Newlands hopes to eventually trust Kidde's marketing, and hopes that an injunction that requires Kidde to more effectively alert consumers that they are at risk due to their fire extinguishers, will contribute to this goal.

24.     Defendant Walter Kidde Portable Equipment, Inc. is a brand of Carrier Global Corporation.  Kidde is a Delaware corporation with its headquarters located at 1016 Corporate Park Drive in Mebane, North Carolina.  Kidde manufactures, markets, and distributes the Fire Extinguishers throughout the United States. Kidde sells the Fire Extinguishers on its website and through third-party retailers such as Walmart, The Home Depot, and Amazon.  North Carolina is the nerve center of Kidde's business activities, that is, the place where its high-level officers direct, control, and coordinate the corporation's activities, including account and major policy, financial, and legal decisions related to Kidde's fire extinguishers.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question).  This Court has jurisdiction over supplemental state law claims pursuant to 28 U.S.C. § 1367.

26.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interests and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are more than

13

100 Class members, members of the Classes (as defined below) are citizens of states different from Kidde, and greater than two-thirds of the members of the Classes reside in states other than the states in which Kidde is a citizen.

27.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Kidde resides in and is headquartered in this District, regularly transacts substantial business in this District, is subject to personal jurisdiction in this District, and therefore is deemed to be a citizen of this District.

## FACTUAL ALLEGATIONS

## I.     An Overview Of Kidde And Its Fire Extinguishers

### A.     Kidde Leverages Its Legacy To Drive Sales

28.     Kidde is a Carrier Global Brand.  As advertised, Carrier Global's "fire business encompasses a wide range of residential, commercial and industrial systems, including . . . fire, gas and water mist suppression and fire and gas safety solutions."[1]  Carrier Global's fire business is led by Kidde which describes itself as "one of the world's largest manufacturers of fire safety products . . . to protect people and property from fire and related hazards."[2]  Kidde claims to be "committed to ensuring [its] products are safe and dependable, especially those related to life safety

---

[1] Carrier Global Corporation, "Carrier Fire Solutions: Protecting What Matters Most," *Fire & Security*, Available at https://www.carrier.com/fire-security/en/north-america/Fire Extinguishers-services/product-category-solutions/fire-solutions/ (last visited Oct. 27, 2021).

[2] Walter Kidde Portable Equipment Inc., "About Kidde," Available at https://www.kidde.com/home-safety/en/us/about/ (last visited Oct. 27, 2021).

14

such as . . . fire extinguishers."[3]  To that end, Kidde proclaims that values such as quality, performance, and responsibility are among "the pillars of [its] business."[4]

29.    Relevantly, Kidde defined "responsibility," in part, as "we act with integrity and maintain the highest ethical standards" and "we care for the health and safety of our employees and customers."  Kidde proceeded to describe its commitment to innovation, noting that "we are a company of ideas, committed to research and development."  Kidde also stated that "we listen to our customers and respond to their needs" and "we are committed to excellence in customer satisfaction."

30.    Indeed, Kidde has long worked to create a context in the minds of reasonable consumers that it produces safe, reliable, and high-quality fire extinguishers.  For example, Kidde touted that "Walter Kidde patented the first portable fire extinguisher in 1917, and we have been committed to developing a wide selection of extinguishers for all applications ever since."[5]  Connecting this history

---

[3] Walter Kidde Portable Equipment, Inc., "Product Safety," Available at https://www.kidde.com/home-safety/en/us/about/product-safety/ (last visited Oct. 27, 2021).

[4] Walter Kidde Portable Equipment, Inc., "Kidde Core Values," Available at https://www.kidde.com/home-safety/en/us/about/corevalues/ (last visited Oct. 27, 2021).

[5] Walter Kidde Portable Equipment, "Fire Extinguishers," Available at https://web.archive.org/web/20150320232805/http://www.kidde.com/home-safety/en/us/products/fire-safety/fire-extinguishers/ (last accessed Feb. 3, 2022).

15

of innovation to its manufacturing, Kidde stated that, "***Fire Extinguisher types may change, but our commitment to safety will never flame out***."[6]

31.     Kidde then stated that, "[f]rom controlling a small home fire before it becomes a big one to selecting the correct model for your business, ***having an extinguisher within reach can be the difference between minor damage and catastrophe, or in extreme cases, life and death***.  We're here to help you choose, properly install and maintain the right solution whether it's for a home, business or almost anywhere in between."[7]  Kidde prominently featured this and like material on its website at all times during the relevant Class Period, including when Plaintiff Newlands made his purchase.

32.     For example, in or around September 2016, Kidde had prominently featured this material on its website:[8]



---

[6] *Id.* (emphasis added).

[7] *Id.* (emphasis added).

[8] Walter Kidde Portable Equipment, "Fire Extinguishers," Available at https://web.archive.org/web/20160529015714/http://www.kidde.com/home-safety/en/us/products/fire-safety/fire-extinguishers/ (last accessed Feb. 3, 2022).

33.     Kidde continued to play to its tradition of producing high quality fire extinguishers, noting that "Walter Kidde pioneered an industry devoted to making our world a safer place."  Playing to its legacy, Kidde went as far as to include a photograph of Mr. Kidde, and noted that "Today, Walter Kidde's pioneering spirit lives on through the company he founded.  We continue to lead the industry, consistently looking to solve new challenges and create technology that saves lives."



34.     Indeed, Kidde echoed this message directly on the product packaging relied upon by Plaintiffs in making their purchase.  For example, Defendant specifically stated that Kidde is the world's leader in the firefighting industry, a fact represented on the packaging that Plaintiffs read and relied on. Defendant leveraged this reputation as a reason for consumers, including Plaintiffs, to purchase its product over that of competitors.

17

### B. Kidde Touts The Defective Fire Extinguishers

35.     Kidde then repeatedly touted the importance of having a properly functioning fire extinguisher: "Having a fire extinguisher within reach can help you create a path to safety, and may even help put out a small, contained fire.  Be safer in your home by learning more about fire extinguishers."  Kidde then encouraged consumers that to be safe, they should "[p]lace a fire extinguisher within easy reach in rooms where fires are more likely to start such as the kitchen, living room and laundry room."

36.     To this point, Kidde then encouraged consumers to purchase a Kidde fire extinguisher, noting that "[i]t's your home.  Fill it with peace of mind."  An image from Kidde's website around September 2016 is included below:



37.     Kidde furthered these representations, stating that "When it comes to fire extinguishers, no company is more at home."  Recognizing the importance of fire extinguishers, Kidde noted that "[e]quipping your home with the right fire extinguisher is essential to the safety of your family and property.  And Kidde has a

wide variety of extinguishers to help.  Whether it's keeping a small self-contained fire from growing or creating a path to safety out of the home, ***having a fire extinguisher in your home can be the difference between a catastrophe and a close call***."  An image from Kidde's website around September 2016 is included below.  As demonstrated, a seemingly carefree woman lounges on a sofa, near her puppy, reading a newspaper:



38.     Kidde then affirmatively represented the defective Fire Extinguishers as "Kidde has designed some fire extinguishers with features that specifically address these types of dangers."  Kidde stated that "For example, Kidde's kitchen fire extinguisher has a ***proprietary nozzle design*** that allows a broad, dispersed discharge of agent that delivers a high volume, low velocity of dry chemical." (emphasis added).  Kidde also included pictures on its website showing the Fire Extinguishers in use putting out fires.  Examples are included below:

19

 

39.     But Kidde did not stop here, for one of the models at issue, Model FX340GW, for example, Kidde represented that it "is the #1 choice for all around home protection."  Kidde encouraged consumers that the Fire Extinguisher "fights fires common to the home, garage and workshop such as textiles, paint, wood, gasoline & energized electrical equipment" and that "this unit is easy to use and has a 10 year warranty."  Kidde emphasized that the "pressure gauge allows for immediate pressure status check" and has an "easy-to-pull safety pin."  An image of this page is set out below:

20



40.     Kidde does the same for another model at issue, Model FX210R.  Kidde states that the Fire Extinguisher "fights fires common to the home living areas such as wood, fabrics, furnishings, and drapes."  Kidde states that the "pressure gauge allows for immediate pressure status check" and has an "easy-to-pull safety pin." An image of this page is set out here:

21



41.     Kidde does the same for another model at issue, Model FX340H. Kidde states that the Fire Extinguisher "fights fires common to the office such as wood, paper & energized electrical equipment" and that it has a "pressure gauge" that "allows for immediate pressure status check" and has an "easy-to-pull pin." An image of this page is set out here:

22



42.     Kidde included like representations for each of the models at issue, including those purchased by Plaintiffs.  Numerous of these representations, which Plaintiffs saw and relied on, are included directly on the front of the packaging of the Fire Extinguishers.   For example, Kidde includes a photograph of a fire extinguisher on the front of the packaging along with the words "Fire Extinguisher." Defendant further represents that the product "Fights these fires" and proceeds to list the type of fires the product fights.  Defendant also claims that the product has an

"easy-to-pull safety pin" and provides for "easy use," despite its knowledge that the product is defective.

43.     A reasonable consumer, including Plaintiffs and the class members, would not expect that the product contained in that packaging would not function as a fire extinguisher.  Moreover, Kidde touts that its Fire Extinguishers "meet[] NFPA Recommendations." This latter representation is significant.   The National Fire Protection Association or "NFPA" is "the leading information and knowledge resource on fire, electrical and related hazards."  It was "established in 1896, devoted to eliminating death, injury, property and economic loss due to fire, electrical and related hazards."  However, as described, Kidde's defective Fire Extinguishers in fact resulted in injury to property and economic loss.  Despite Kidde's pre-sale knowledge of these facts, Kidde affirmatively misrepresented its Fire Extinguishers as meeting NFPA recommendations.

44.     Kidde also sets out directly on the packaging for the products, which Plaintiffs and class members would have seen, that the products are "UL" approved, "meets all OSHA requirements," "Bureau of Motor Carriers Approved," and "US Coast Guard approved," each of which serve to assure reasonable consumers that they are purchasing high quality life-saving products.

45.     Despite all of this, Kidde failed to disclose to consumers, including Plaintiffs and class members, that it has received hundreds of complaints related to

24

the propensity of its fire extinguishers to become clogged and to fail to discharge during fires.[9]  This Fire Extinguisher Defect has led to at least 16 reports of personal injury, including one fatality, and 91 reports of property damage.[10]  Kidde further failed to disclose that it had been sued on numerous occasions, where it had been determined that "a reasonable jury could find that Kidde was recklessly indifferent as to the safety of its customers," and that the United States Department of Justice had been actively investigating the Fire Extinguishers' high failure rates and Kidde's subsequent underreporting to the CPSC.

46.     With tens of millions of units sold at a price point of $12 to $200, Kidde has profited enormously from its failure to disclose the Fire Extinguisher Defect sooner.

47.     Kidde made partial representations while hiding the Defect.  Worse, Kidde, as described above, affirmatively misrepresented to Plaintiffs and Class Members that the Fire Extinguishers were safe and effective, going as far as to state that the faultily designed Fire Extinguisher "allow[ed] a broad, dispersed discharge of agent that delivers a high volume, low velocity of dry chemical."  Moreover, by displaying the Fire Extinguishers and describing their features, the Fire

---

[9] Mary H.J. Farrell, "Kidde Recalls More Than 40 Million Fire Extinguishers," *Consumer Reports* (November 2, 2017), Available at https://www.consumerreports.org/fire-extinguishers/kidde-fire-extinguisher-recall/ (last visited Oct. 27, 2021).

[10] *Id.*

25

Extinguishers' packaging, which Plaintiffs and class members relied upon, explicitly stated and further implied that the Fire Extinguishers were suitable for use as fire extinguishers, without disclosing that they had a critical safety-related defect that could inhibit the proper functioning of the device and lead to harm to users of the Fire Extinguishers.

48.     The Fire Extinguishers at issue are numerous.  Although sold under different brand names, these fire extinguishers are substantially similar.  They all suffer from the same Defect involving their tendency of their nozzles to frequently become detached, clogged, or require excessive force to discharge causing a failure to activate during a fire emergency.  Each fire extinguisher substitutes important metal components such as the handle or push button with cheaper and less reliable plastic handles or plastic push buttons.  Further, these fire extinguishers were sold for years despite Kidde's knowledge of the Defect, risking the personal health and safety of the consumer for corporate profits.  And these fire extinguishers, as discussed below, were subject to the same ineffective, sham recalls that left consumers uninformed and vulnerable.

49.     Moreover, despite the fact that Plaintiffs purchased their Fire Extinguishers from retailers such as Walmart and Lowe's, they still had a contract with Kidde.  For example, Kidde proudly touted that the relevant models came with a six-year warranty directly on the product packaging which Plaintiffs encountered

prior to this purchase. This warranty did not benefit the retailer. Instead, this warranty was for the sole benefit of end-users such as Plaintiffs and Class members, as described further below.

## II. Kidde's Defective Fire Extinguishers Risked The Lives, Safety, And Property Of Kidde's Consumers

50. The consequences of this Fire Extinguisher Defect can be severe. On March 18, 2017, one consumer, for example, submitted a report to the United States Consumer Product Safety Commission ("CPSC") concerning Kidde Model 1-A-10-BC. He stated that "I was working with beeswax [when] materials caught fire." The consumer wrote that "I tried to put [out] the fire with the Kidde extinguisher[,] but it didn't work." The consumer continued that "I had to get close to the fire to put it [out] with my jacket: as a result my jeans caught on fire and I ended up with a serious third-degree burn on my left leg." Consequently, the consumer reported that he "underwent skin graft surgery all around my left leg." He stated that he has "been recovering for almost one year" but that "[i]f the extinguisher had worked I could have put [out] the fire without getting close to it." Kidde was informed of this incident through the CPSC on April 6, 2017. Kidde responded to this consumer's complaint stating that "[b]ased upon the information provided, we cannot determine why the fire extinguisher failed to deploy."

51. On November 2, 2017, another consumer submitted a report to the CPSC concerning Kidde Model FA-110. The consumer stated that his "gas stove

27

caught on fire and my fire extinguisher did not work." He reported that as a result, "my stove burned and my house filled with smoke. The microwave above my stove was also ruined." He stated that he "had to call the fire department" and only "[a]fter the incident, I found out that my (recently purchased) fire extinguisher had been recalled. I had actually purchased it AFTER the recall." Kidde was informed of this incident by the CPSC on December 4, 2017.

52.    On November 17, 2017, another consumer submitted a report to the CPSC concerning Kidde Model FA-110. He stated that "[a]n oven fire flared up during preheating, and my wife grabbed the Kidde fire extinguisher which is kept several feet away. We believed this to be a smart purchase, and [a] great location." The consumer noted that "[t]his was our first use of the extinguisher, and we have previously reviewed how to use it." He explained that "I was upstairs, and heard her call for my help, and when I got halfway down the stairs I could see her depressing the lever multiple times, with no discharge from the extinguisher." As a result, he "ran back upstairs to grab some clothes to smother the flames . . . while attempting to not have the clothes catch on fire." He reported that "[i]n the process the flames burned my right hand, but I had to continue subduing the flames. Meanwhile[,] I was asking her to try different methods or angles with the extinguisher, but to no avail." The consumer concluded that "[f]inally, 1 puff of dry chemicals came out but it was not under proper pressure . . . the discharge caused no significant reduction

28

in the flame, but instead sprayed our counter, cabinets, sink, etc. with a fine layer of dust." Kidde was informed of this incident by the CPSC on December 5, 2017.

53. On December 1, 2017, another consumer submitted a report to the CPSC. The consumer stated that "[m]y neighbors' house was on fire. I recognized this and called 911, and ran over with my Kidde fire extinguisher." The consumer stated that "[a]t this point the house was filled with smoke but there was a medium sized fire and I tried to put it out but the fire extinguisher would not deploy – the father / a strong man also tried but it did not work." The consumer reported that "[l]uckily the firemen came about 3 minutes after we tried." But this did not prevent the following disastrous outcome: "[t]he fire caused [$]100,000 of damages (so far)." Kidde was informed of this incident by the CPSC, which sent its report to Kidde on December 11, 2017. Kidde responded shortly afterwards "apologiz[ing] for any inconvenience this has caused."

54. On January 20, 2018, another consumer submitted a report to the CPSC. The consumer stated that a "[s]mall fire was started from an old ember. First [the Kidde] fire extinguisher failed to discharge, the plastic handle just bent around the pin. Eventually got it to work but fire had grown significantly in the 15 seconds of fiddling it took to get it to discharge." The consumer stated that the "[e]xtinguisher only discharged about 50% of its contents. Daughter ran inside the house for our other [Kidde] extinguisher. It also failed to discharge and took fiddling because of

29

the plastic handle while the fire grew." The consumer stated that "[t]his [second] one did discharge all of its contents[,] but it was too late at this time, the fire grew and caught an adjacent field on fire resulting in minor structure damage and about 30 acres burned before the fire department could put it out." The consumer concluded that he "[c]ould have stopped the fire early if the extinguisher had functioned properly." Kidde was informed of this incident by the CPSC on February 9, 2018. Kidde responded shortly afterwards "sincerely apologiz[ing] for the incident that occurred."

55. On December 7, 2020, another consumer submitted a report to the CPSC concerning Kidde Model H110G. The consumer stated that he "had what started as a minor grease fire on our kitchen stove . . . my wife then attempted to use the Kidde ABC fire extinguisher nearby but upon pulling the pin and squeezing the trigger, nothing happened." In turn, he "attempted as well, [but] to no avail. My wife was evacuating our two daughters and dog from the house and I was starting to dial 911 when I remembered I had another extinguisher [nearby]." So, he "grabbed it, returned within 30 seconds, and successfully put out the fire that had quickly grown to close to ceiling height." The consumer stated that "[u]nfortunately, the time lost allowed the fire to burn far longer than it would have, had our extinguisher worked properly." He reported that "[a]s a direct result of the failure, our stove's control partially melted and the smoke damage to our ceiling is going to require the

30

mineral fiber tiles to be replaced." The consumer concluded that he is "left with what I would estimate to be $1,200 in property damage." Significantly, after the event, the consumer "looked into why the extinguisher failed and found that the [CPSC] had issued a recall [in 2017] 'due to a failure to discharge and nozzle detachment.'" Kidde was informed of this incident by the CPSC on December 23, 2020. Kidde responded shortly afterwards noting that "[a]ny claim for property damage would be properly handled through the homeowner's insurance carrier."

## III. Kidde's Defective Fire Extinguishers Include More Than 134 Models Totaling Nearly 40 Million Devices In All

56.     The Fire Extinguishers at issue include several models that have been recalled. As demonstrated above and further below, Kidde' recall was totally ineffective at remedying the problems herein discussed. **Tens of thousands, if not hundreds of thousands of consumers, have not been informed of Kidde' recalls and are still at risk.** The models at issue include:

**Models Manufactured Between July 23, 2013 – October 15, 2014**

| | | | |
|---|---|---|---|
| 10BC | 1-A-10BC | 1A 10BCW | 2A10BC |
| 5BC | 5BCW | FA110G | FA110 |
| FA5B | FC110 | FC5 | FH/RESSP |
| FX10 | FX10BC | FX10K | FX210 |
| FX210R | FX210W | FX340GW | FX340SC |

31

| FX5II | KFH Twin | M110 Twin | M5 Twin |
|---|---|---|---|
| Mariner 10 | Mariner 110 | Mariner 5 | Mariner 5G |
| XL5MR | | | |

**Models Manufactured Between July 2, 2012 – August 15, 2017**

| AUTO FX5 II-1 | FC5 | M10G | FA10G |
|---|---|---|---|
| FS110 | M10GM | FA10T | FS110 |
| M110G | FA110G | FS5 | M110GM |
| FA5-1 | FX10K | M5G | FA5G |
| FX5 II | M5GM | FC10 | H110G |
| RESSP | FC110 | H5G | |

**Additional Recent Models**

| KK2 | 100D | 210D | 210D-1 |
|---|---|---|---|
| H110G | Home 110 | FX340SC-2 | Pro 5 TCM-8 |
| FX110E | FX340G | FA110G | FA10 |
| FX340GW-2 | | | |

57.    For models suffering from the same Fire Extinguisher Defect that have

yet to be recalled, and for which there is limited information publicly available,

32

Plaintiffs reserve the right to amend their complaint to reflect these additional models once they are identified.

## IV.    Kidde's Sham and Ineffective Recalls

### A.    Despite Knowledge of The Fire Extinguisher Defect, Kidde Dragged Their Feet, Requiring Multiple Recalls And Incurring Civil Penalties

#### 1.    Recalls: An Overview

58.    As a preliminary matter, the material described below must be placed in its proper context. Recall programs are ineffective at remedying the existence of unsafe products in circulation, leaving consumers at risk years after a recall program.[11] In fact, Craig Smith of Georgetown University and John Quelch of the Harvard Business School have written extensively on this topic, noting that "companies seem satisfied with low response rates . . . which, while meeting the letter of the law, may leave consumers dissatisfied if not endangered."[12]

59.    In the past, companies that have sought to maximize response rates have invested heavily. In 1982, for example, when Johnson & Johnson issued a recall for its Tylenol, "the company ran a series of 60-second television and radio

---

[11] FELCHER, E. MARLA. "Product Recalls: Gaping Holes in the Nation's Product Safety Net." *The Journal of Consumer Affairs* 37, no. 1 (2003): 170–79, at 176, http://www.jstor.org/stable/23860093 ("The Consumer Product Safety act gives CPSC regulators the authority to recall products from the market, but falls short of holding manufacturers responsible for getting recalled products back into their warehouses and out of use."

[12] *Id.* at 178. (quoting Smith and Quelch).

33

ads on all the major networks, urging consumers to throw out their bottles of Tylenol and promising to replace them with a safer product."[13]  In fact, Johnson & Johnson "spent over $100 million on the recall."[14]

60.    Here, by contrast, as demonstrated below, Kidde lied to the Consumer Product Safety Commission, warranting an investigation by the U.S. Department of Justice, the eventual filing of a complaint in federal court by these entities, and an issuance of civil penalties.  After all of that, Kidde still stood by, leaving it up to others to possibly pass on information about the Defect.  But as shown below, these efforts were a disaster.  As a result, consumers are still very much at risk as fires have continued unchecked by Kidde's equipment years after the Recall.  Finally, Kidde's recall program must be understood as a whole.  It is insufficient to view Kidde's latest 2017 recall in isolation.  Instead, the years long battle between the CPSC, the U.S. Department of Justice, and Kidde must be taken together.

## 2.    Kidde's Recall Program Has Been A Disaster

61.    On February 12, 2015, Kidde issued a recall involving 31 models of Kidde fire extinguishers manufactured between July 23, 2013 through October 15, 2014.  This recall involved a total of nearly 4.6 million units in the United States.[15]

---

[13] Id.

[14] Id.

[15] U.S. Consumer Product Safety Commission, "Kidde Recalls Disposable Plastic Fire Extinguishers Due to Failure to Discharge," (February 12, 2015), Available at

34

62.     Kidde's February 12, 2015 recall was woefully inadequate considering the severity of the problems with their fire extinguishers, as alleged in this complaint. Consumers who put their faith in Kidde's ability to manufacture high-quality firefighting Fire Extinguishers were led to believe that the equipment they purchased could keep them safe in life-threatening fires.  Instead, consumers had to learn the hard way and in times of crisis that the fire extinguishers they purchased were defective.  And, for a period of two-and-a-half additional years until Kidde issued its November 2, 2017 recall, over 32 million defective fire extinguishers remained in the marketplace and were purchased and relied upon by at-home consumers.

63.     In December 2015, the U.S. Department of Justice along with the CPSC filed a complaint against Kidde for failing to inform the CPSC in a timely manner about problems associated with Kidde's fire extinguishers.[16]  The DOJ alleged that before the 2015 recall, Kidde significantly underreported "the scope and nature of the defect and risk, and the number of Fire Extinguishers and models affected."[17]

64.     According to the U.S. Department of Justice, as early as November

---

https://www.cpsc.gov/recalls/2015/kidde-recalls-disposable-plastic-fire-extinguishers/# (last visited Oct. 27, 2021).

[16] Ryan Felton and Rachel Rabkin Peachman, "Kidde Mishandled Problems With Its Fire Extinguishers for Years as Homes Burned and Injuries Mounted," Consumer Reports (January 12, 2021), Available at https://www.consumerreports.org/product-safety/kidde-mishandled-problems-with-fire-extinguishers-for-years/#:~:text=Kidde%20eventually%20filed%20a%20new,require%20excessive%20force%20to%20discharge. (last visitedOct. 27,2021).

[17] *Id.*

2014, Kidde "failed to immediately and adequately report information that fire extinguishers with plastic handles manufactured by Kidde could become clogged or require excessive force to discharge and thus fail to activate during a fire emergency."[18] The U.S. Department of Justice determined that "[a]lthough Kidde provided some information to the CPSC regarding the discharge failures, it significantly underreported the scope and nature of the defect and risk, as well as the number of Fire Extinguishers and models affected." *Id.*

65. The U.S. Department of Justice described that "[i]n November 2014, Kidde proposed to the CPSC a recall of approximately 4.6 million fire extinguishers manufactured from July 2013 through October 2014 because the extinguishers risked not fully discharging when the lever is repeatedly pressed and released during a fire emergency, posing a risk of injury to consumers." *Id.* ¶ 17.

66. Misrepresenting material facts, Kidde "informed the CPSC that it had determined the cause of this defect to be an out-of-specification valve component." *Id.* However, Kidde's "testing and incident data show[ed] that the scope and nature of the defect and risk it had reported to the CPSC was false and misleading in material respects." *Id.* ¶ 18. The DOJ specifically determined that "[d]espite test reports showing discharge failures across many models of fire extinguishers sold

---

[18] *United States of America v. Walter Kidde Portable Equipment Inc.*, 1:20-cv-01172, ECF No. 1 ¶ 16 (Dec. 30, 2020)

36

over decades, and an acknowledgement from its engineers that they had 'not found any components out of specification,'" Kidde "in its November 2014 Section 15(b) report . . . reported to the CPSC that the defect involved an out-of-specification valve component for a more limited set of models sold for only 15 months." *Id.* ¶ 18(a).

67.     Moreover, "[d]espite test reports throughout December 2014 showing consistent failures across Kidde fire extinguisher models, Kidde informed the CPSC in January 2015 that 100% of its repaired fire extinguishers since November 2014 had passed performance tests." *Id.* ¶ 18(b).  However, "Kidde failed to disclose that the repaired units were tested by a machine, as opposed to a manual test that would more accurately reflect how consumers actually used the fire extinguishers."  The DOJ concluded that "Kidde knew that manual testing showed high failure rates across many models of fire extinguishers." *Id.*

68.     In connection with Kidde's 2014 "reports to the CPSC and 2015 recall, Kidde reported 12 incidents of fire extinguishers failing to discharge to the CPSC, but Kidde had actually received reports of at least 100 incidents of fire extinguishers failing to discharge." *Id.* ¶ 19.  Furthermore, "[a]fter the recall in February 2015, Kidde continued to accumulate additional reports of failures to discharge, demonstrating that the scope of the February 12, 2015 recall was far too narrow." *Id.* ¶ 20.  However, "Kidde did not disclose to the CPSC the additional test and incident reports demonstrating a wider problem with its fire extinguishers' discharge

37

mechanism until August 2017." *Id.* ¶ 21.

69.     The U.S. Department of Justice also determined that "[b]eginning as early as 2005 and continuing until August 2017, Kidde . . . failed to immediately report to the CPSC that it possessed information concerning nozzle detachment from fire extinguishers with plastic handles that it manufactured." *Id.* ¶ 22. Additionally, "[o]n November 15, 2014, Kidde engineers internally reported that testing over a previous five-week period showed a high occurrence of nozzles becoming dislodged from the fire extinguishers during discharge." But "Kidde did not provide this information to the CPSC until August 2017." *Id.* ¶ 23.

70.     The U.S. Department of Justice further determined that "[d]uring a 2015 civil penalty investigation by the CPSC regarding Kidde's reporting, Kidde materially misrepresented to the CPSC staff in the course of the staff's investigation of Kidde that the company had produced all relevant documents to the CPSC. The CPSC staff relied on Kidde's material misrepresentations in closing the civil penalty investigation." *Id.* ¶ 25. However, "[i]n August 2017, Kidde filed a new report under section 15(b), finally revealing the true nature and scope of the intermittent discharge defect, and reporting also the nozzle detachment defect." *Id.* ¶ 26. All in all, the DOJ concluded that "Kidde's report under section 15(b) also revealed the actual number of Fire Extinguishers and models affected, leading to the announcement of one of the largest recalls in CPSC's history." *Id.*

38

71.     Specifically, Kidde's 2017 recall was for nearly 38 million plastic-handle and push-button Pindicator fire extinguishers in the U.S., implicating 134 models produced as far back as 1973.[19]  Many of these models are set out above.  In addition, Kidde was ordered to pay a $12 million civil penalty in connection with the allegations that the company failed to timely inform the CPSC about problems with the fire extinguishers it manufactured.[20]

72.     The recall allowed Kidde to say it was doing right by consumers, but in fact the recall protected Kidde's profits by suppressing returns.  As a Consumer Reports' article notes, "[d]espite the 2017 announcement, many people seem to not have heard about the recall."[21]  Further, "[s]everal incident reports reviewed by [Consumer Reports], for example, involve Kidde fire extinguishers that had already been recalled."[22]

73.     Numerous of these consumer reports are included here and have continued well into the latter half of 2021, demonstrating that despite Kidde's recall,

---

[19] U.S. Consumer Product Safety Commission, "Kidde Recalls Fire Extinguisher with Plastic Handles Due to Failure to Discharge and Nozzle Detachment: One Death Reported," Available at https://www.cpsc.gov/Recalls/2018/Kidde-Recalls-Fire-Extinguishers-with-Plastic-Handles-Due-to-Failure-to-Discharge-and-Nozzle-Detachment-One-Death-Reported# (last visited Oct. 27, 2021).

[20] *United States of America v. Walter Kidde Portable Equipment Inc.* No. 1:20-cv-01172-LCB, ECF No. 3 (M.D.N.C. Jan. 4, 2021); U.S. Department of Justice, "Fire Extinguisher Manufacturer Ordered to Pay $12 Million Penalty for Delay and Misrepresentations in Reporting Product Defects," *Justice News*, Available at https://www.justice.gov/opa/pr/fire-extinguisher-manufacturer-ordered-pay-12-million-penalty-delay-and-misrepresentations (last visited Oct. 27, 2021).

[21] *See supra* n. 8.

[22] *Id.*

consumers have not heard of the recall and are still at risk of injury. In fact, as noted above, Plaintiffs did not hear of Kidde's recall until 2021. On August 2, 2021, for example, one consumer reported to the CPSC concerning Kidde Model Auto 5FX that his "fire extinguisher failed to discharge" and that "[a]s a result, the fire grew in size," leading to injuries sustained by the consumer. Kidde was informed of this incident through the CPSC on August 5, 2021.

### B. Many Consumers Were Unable To Contact Kidde To Secure Their Replacement Despite Following The Procedures Set Out By Kidde

74. Several customers who were informed of the recall were either unable to establish contact with Kidde despite repeated attempts or encountered issues with the website or customer service. One consumer wrote to Consumer Reports in 2018 stating that the "recall site won't allow me to enter information such as model number." The consumer continued that the "[i]nformation page seems to be dead."

75. Another consumer reported to Consumer Reports in 2018 that she "entered four units on the appropriate Kidde Product Safety Recall page . . . but the page does not include any button or other method to send the page to the company."

76. Another consumer reported to Consumer Reports in 2018 that she "ha[s] been waiting two months for my replacement." She reported that "[p]honing is impossible, on hold forever." She concluded that she "[w]ould like an honest answer from the company."

77. Another consumer reported to Consumer Reports in 2018 that they

40

"have been waiting since Nov[ember] 10[, 2017] for the replacements." The consumer stated that they "contacted [Kidde] by email and phone." The consumer concluded that they "would just like a straight answer from [Kidde]."

78. Another consumer reported to Consumer Reports in 2018 that they are "[n]ot sure [Kidde is] taking this recall seriously." The consumer reported that they were "told [the] replacement extinguisher would be sent out back in Nov[ember 2017] and nothing." The consumer called Kidde the day before making their report "and [Kidde] couldn't even find me in their system." The consumer concluded that the "[l]ady said she'd call . . . right back and never did . . . so taking things seriously? I think not." Another consumer responded that "[t]his is exactly what happened to me. What do we do now?"

79. Another consumer wrote to the Better Business Bureau (hereinafter "BBB") on June 7, 2018 that they "have 4 fire extinguishers that were part of the recall from the fall of 2017. I contacted Kidde within the first week after the recall to determine what needed to be done [to] receive replacements. I still have not received my [replacement]." Following up, the consumer "contact[ed] [Kidde] through the recall phone number given at least 8 times since the recall and have repeatedly had to re-confirm all my information, re-confirm all my fire extinguishers, and then have been told I would be receiving the new ones." But, the consumer wrote, "[t]hey have never shown up." The consumer then provided their

41

case reference number and wrote that "both [extinguishers] confirmed recalled for failure to deploy." Kidde was informed of this complaint by the BBB on the same day.[23]

80.     Another consumer reported to the BBB on July 3, 2018 that they "had three fire extinguishers subject to the current Kidde recall." The consumer "submitted a claim . . . to get the three fire extinguishers replaced in the fall of 2017. [But] [t]he replacement fire extinguishers[s] have not arrived." The consumer stated that "[e]ach time I called to follow up on the status of the replacement extinguishers, I was transferred to another person who said they would call back." However, the consumer wrote that they "did not receive a call" and "still do not have the replacement extinguishers." Kidde was informed of this complaint by the BBB on the same day.

81.     Another consumer reported to the BBB on August 17, 2018 that their "first call [to Kidde] was 11-03-17." The consumer then "made follow up calls 12-19-17, 02-28-18, and 05-01-18" and "also spoke to someone at Kidde [on] 5-01-18." The consumer reported that "[e]ach time I was told varying time frames for replacement fire extinguishers to arrive. Each time they would say they were missing some information at the previous call. Each time they would create a new

---

[23] Better Business Bureau, "What Complaints Do We Handle?" Online Complaint System, Available at https://www.bbb.org/consumer-complaints/file-a-complaint/get-started (last visited Oct. 27,, 2021).

reference [number]." But the consumer "received neither of the two fire extinguishers [Kidde] acknowledge[s] were part of the safety recall." Kidde was informed of this complaint by the BBB within two business days of the complaint. Kidde responded on August 21, 2018 only that it "will look into this issue."

82. Another consumer reported to the BBB on July 24, 2020 – more than two years after the recall – that after "[f]inding there is a recall on my Kidde fire extinguisher, I attempted, and failed to contact Kidde by these means: 1. [u]sing Kidde's online webmail (there is no email address listed), I filled out my request." The consumer reported, however, that "when I pressed 'Send,' the site did not respond." The consumer "tried again. No response. (I have no problem currently sending webmail to other sites, as [the BBB's] receipt of this webmail shows!)." The consumer continued: "2. I phone[d] the number on Kidde's site and pressed the 'I have a recall' option. No one answered. I called back and tried general customer support with the same non-response." The consumer concludes that they are "distressed insufficient notice was given at the time of the recall, as I have been relying on a defective product as a result." Kidde was informed of this complaint by the BBB within two business days of the complaint. Kidde responded on July 27, 2020: "apologiz[ing] for [the consumer's] inconvenience."

### C. Other Consumers Experienced Significant Delays In Securing A Replacement

83. For those consumers who did not cave to Kidde's test of exhaustion, many were, nonetheless, met with significant delays in securing their replacement.

84. One consumer wrote to Consumer Reports in 2019 that he "put [his] claim in twice since the day the recall was announced." But he reported that he has "heard nothing." He concluded: "I suppose my house must burn down before they send a replacement."

85. Another consumer reported to Consumer Reports in 2018 that he "[p]ut [his] recall request in [during] November 2017. It is now March 25, 2018." He urged that "someone should do a follow-up article exposing this fraud."

86. Another consumer reported to Consumer Reports in 2018 that "[i]t has been 5 months now since I requested a replacement Fire Extinguisher[,] and nothing has happened." She concluded "[w]hat do I have to do now?????"

87. Another consumer reported to Consumer Reports in 2018 that he is "[s]till waiting . . . five months since submitting claim and long times on hold only to be disconnected." He concluded that he is "[g]lad to see it's not personal."

88. Another consumer reported to Consumer Reports in 2018 that it is "March 19 . . . still waiting for the five units we submitted claim for on November 2 . . . no response whatsoever to repeated emails which included the ID # for claim."

89. Another consumer reported to Consumer Reports in 2018 that he

44

"submitted a claim and for several months [Kidde] made excuses, but now you can only reach the call center for rebates. They say you can submit another claim otherwise [they] cannot help you!" The consumer concluded that "this recall is a joke and nothing will get done!!!!"

90.    Another consumer reported to Consumer Reports in 2019 that "I put my claim [in] more than a year ago. When you call, you are on a hold for an hour or long[er]. When someone answers they simply lie, e.g., server is down, [or they] need to check and get back to you in 24 hours and so on." The consumer reported that "[n]o one ever calls. Why do they lie? Just tell us that you are not going to replace it." The consumer concluded that the "FTC should get after them, and fine this company for announcing a recall and won't fulfill."

91.    Another consumer reported to the BBB as recently as June 12, 2021 that "[t]he Kidde Fire Extinguisher has been recalled. However, I did not know that when I tried to use it to extinguish a fire in my outdoors B-B-Q. The fire extinguisher failed to spray a uniform amount of material as it was designed to do so. Instead the handle was extremely difficult to use and instead of a uniform amount of discharge, it sprayed a glob of material and then it went into a mode that would spray no longer. I have contacted Kidde by email and they said they would replace the extinguisher due to the recall within two to three weeks. It has been a month and today I placed my fourth call asking about the replacement. They advise that a replacement model

45

is not now in stock but that I should call in a week checking on the replacement status. Every time I call, the waiting time for a replacement gets pushed further forward. Kidde was informed of this complaint by the BBB within two business days of the complaint.

### D. Several Of The Fortunate Few Who Received Replacements Were Supplied With Either An Inferior Fire Extinguisher, A Damaged Product, Or Another Recalled Fire Extinguisher

92. Several of the consumers who succeeded in completing Kidde's marathon of endurance and setbacks were rewarded with a Fire Extinguisher inferior to the one that they intended to purchase, or their recalled Fire Extinguisher was replaced with an otherwise malfunctioning Fire Extinguisher, or even worse, their recalled Fire Extinguisher was replaced with *another* one of Kidde's recalled Fire Extinguishers.

93. One consumer wrote to Consumer Reports in 2018 that after following through with Kidde's recall process, "I was sent a discharged extinguisher with no pin." He stated that "I will keep [the recalled Fire Extinguisher] and send back the empty extinguisher [Kidde] sent me."

94. Another consumer reported to Consumer Reports in 2018 that "I received the replacement for one of the two fire extinguishers affected by the recall. The one being replaced is a model FX210R with a 4A40BC rating. The one I received is a Model FX210 with a 2A10BC rating." He stated that "[t]o me that

46

means that I only get ¼ of the area for a flaming fire with the replacement one." To remedy this situation, the consumer reported that "I have called Kidde twice and left messages with the answering service who said someone would call me back[,] but I have not received any return call." The consumer concluded that Kidde's "customer service is not very good."

95. Another consumer reported to Consumer Reports in 2018 that "I received my replacement Kidde fire extinguisher today. It was immediately apparent that the replacement extinguisher is significantly smaller than my original." The consumer stated that "[m]y original had a tank that was 14.5 inches tall and the replacement tank is only 12 inches tall. Diameter and pressure are the same. So that means the capacity of the replacement is 17% smaller!" He continued that "[i]n addition, the extinguisher I had was rechargeable, the replacement is not. Looking at the product catalog, I see they have a Pro 110 version which is much closer to what I had (Home 110) but instead they replaced my extinguisher with a smaller and cheaper version." The consumer concluded that "I called them 2 days ago and was told I would receive a call back but no call. What is my recourse?"

96. Another consumer reported to the CPSC on November 17, 2017 that "I just received two replacement Kidde fire extinguishers as part of the recall. One of my units arrived covered in powder, safety pin removed and at empty state according to the pressure monitor." The consumer stated that "I am not sure if the chemicals

47

I've touched are dangerous and if my other unit is safe." Kidde was informed of this consumer's complaint by the CPSC on December 19, 2017. Kidde responded that it "reached out to [the consumer] to discuss his concerns."

97. Another consumer reported to the CPSC on December 12, 2017 that "I just wanted to let you know about this ridiculous Kidde fire extinguisher recall. I got my replacement from them yesterday after waiting about three weeks (good thing there wasn't a fire in that long time)." The consumer continued that "I don't trust them and was concerned they sent me one with the same model number[,] so I called them to verify they didn't send me a recalled one. He checked the serial number and they did." The consumer continued: "They sent me a recalled fire extinguisher to replace a recalled one. And since they screwed up the guy at the call center . . . couldn't even send me a new one. He had to escalate it so an actual Kidde employee will call me back." The consumer reported that "[h]e said to call back if I don't hear from them in a week. So that will be a month without a working fire extinguisher plus probably another three weeks to get the replacement sent which may or may not be recalled." The consumer concluded that Kidde "need[s] to get fined or something. They can't send a recalled item to replace a recalled item and take forever in doing so when it is an item people rely on for safety." Kidde was informed of this consumer's complaint twice: once by the consumer and once by the CPSC on January 17, 2018. Remarkably, Kidde responded that "[i]f this consumer needs to

48

use the recalled fire extinguisher, while waiting for the replacement, they should do so."

98.     Another consumer reported to the CPSC on December 13, 2017 that "I have three Kidde Home fire extinguishers that were on the recall list[,] so I called the number which I was given to get placement ones (it's only a call center), I was sent two of the three replacements which were on empty." The consumer stated that "I have called three times to get the new ones replace[d] also and to receive my third original replacement but was told I had to wait until some[one] called me back." The consumer noted that "this started in November and to date [I] have never heard from anyone[;] right now I have three extinguishers which are defective and two new ones that are empty." The consumer concluded that "hopefully I don't have a fire in my house while I am waiting around for Kidde to respond." Kidde was informed of this consumer's complaint twice: once by the consumer and again by the CPSC on January 17, 2018. Kidde responded only that it "will be reaching out to . . . discuss the replacement units."

99.     Another consumer reported to the CPSC on December 30, 2017 that "I made a submission to Kidde and was promptly shipped a replacement. Unfortunately, what they sent me was a damaged and unusable extinguisher." The consumer stated that "[a]fter I reported the problem with the replacement to Kidde . . . they have ignored me." The consumer concluded: "I don't think this is

49

the way a recall is supposed to work." Kidde was informed of this consumer's complaint twice: once by the consumer and again by the CPSC on January 17, 2018. Kidde responded only that it "will be reaching out . . . to discuss the replacement."

100. Another consumer reported to the CPSC on January 12, 2018 that "[a] Kidde fire extinguisher which I purchased was recalled two years after I purchased it. [Kidde] sent me a replacement. Now, one year later, they informed me that the replacement is recalled." The consumer stated that Kidde "said they would send me a new one; it took them three months to do so." The consumer continued: "When I received the new fire extinguisher the gauge was on empty. In other words, they sent me a faulty extinguisher to replace the faulty extinguisher they had sent me to replace the original faulty extinguisher." The consumer reported that "[i]n addition, I checked the other Kidde extinguisher which I had purchased at the same time as the first one, and the gauge is on empty. This extinguisher [is] several years away from the expiration of Kidde's warranty. And this extinguisher was not part of any recall." The consumer concluded that "[i]t seems to me that this company should be investigated and that all consumers should be advised to check the gauge on their Kidde extinguishers on a regular basis." Kidde was informed of this complaint twice: once by the consumer and again by the CPSC on January 23, 2018. Kidde, however, responded only that it "would invite the individual making this report to contact" customer service.

101.   Another consumer reported to the CPSC on February 3, 2018 that "I did everything needed to have one of my extinguishers replaced through the recall. Unfortunately, the replacement unit I was sent was damaged before I received it." The consumer stated that "[a]ll of my attempts via phone and email to contact Kidde to remedy the situation have gone unanswered.  I am concerned that I now have two unsafe fire extinguishers, and I don't know how to proceed."  Kidde was informed of this complaint by the CPSC on May 7, 2018.  Kidde responded with respect to this complaint as well that it "would invite the individual making this report to contact" customer service.

102.   Another consumer reported to the CPSC on May 24, 2018 that his "Kidde Fire extinguisher was recalled.   Got replacement unit, however it was defective on arrival."  He stated that the "[y]ellow retardant material / powder was already leaking from the box.  This was extremely unfortunate as I just happened to have brought home my ~8 month [infant] from the hospital with chronic lung disease."   The consumer also included the following photographs with their complaint:

 

Kidde was informed of this complaint by the CPSC on August 15, 2018. Kidde responded only that it "will be reaching out to [the consumer] to [e]nsure that his fulfillment requests have been satisfied."

## V.    Kidde's Pre-Sale Knowledge Of The Defect

### A.    Kidde's Engineers Apprised Kidde Of The Defect Well Before The Recall. Nonetheless, Kidde Continued To Sell The Defective Extinguishers

103.    As the Department of Justice's investigation revealed, Kidde had long known about the Fire Extinguisher Defect. As described above, there are at least three sources of Kidde's knowledge. First, Kidde was informed as early as 2005 of the widespread problems involving its extinguishers. Nonetheless, Kidde failed to report this information to the CPSC as it was required to do by law. Second, in 2014, Kidde underreported the number of incidents reported to it, stating that it was aware of only 12 incidents, whereas the truth was that it was aware of well over 100

52

incidents involving the Fire Extinguishers. Third, Kidde's own internal test reports demonstrated consistent failures across the Fire Extinguishers.

104. In addition to these sources of knowledge, Kidde had long received reports of the plastic handle fire extinguishers and push-button Pindicator fire extinguishers frequently becoming detached, becoming clogged, or requiring excessive force to discharge causing a failure to activate during a fire emergency.

105. As demonstrated above, the CPSC operates a website where consumers can post complaints about unsafe Fire Extinguishers and provide details about any incidents they experienced.

106. Online safety reports to the CPSC show that Kidde knew or should have known of the Fire Extinguisher Defect since at least 2012, yet it continued to sell the defective Fire Extinguishers anyway.

107. Per federal regulations, all safety reports that are submitted online through the CPSC website are sent directly to the product's manufacturer. As set forth in more detail below, the CPSC website indicates that all safety complaints referenced herein were sent to Kidde, including the dates on which they were sent. Kidde also monitors safety complaints from the CPSC, and thus Kidde would have independently become aware of each safety complaint reported to the CPSC separate and apart from notice received from the CPSC.

108. On December 31, 2012, a consumer submitted a report to the CPSC

53

concerning Kidde Model FA110.  The consumer stated that he "was cooking on November 8th, 2012 . . . when a small grease fire began building with flames of approx[imately] 6-12' high, causing me to grab [a] fire extinguisher to put it out." He stated that he "removed the safety pin, verified the pressure indicator was green[,] pressed on the lever[,] but nothing came out."  The consumer stated that he "kept trying for approximately a minute longer pressing on [the] lever over and over[,] but nothing was coming out to end the fire."  The consumer stated that "there have been no injuries, but there was about $1000 worth of fire damages that could have been averted had this fire extinguisher worked."  The consumer stated that he independently contacted and alerted Kidde about this Fire Extinguisher Defect.  The CPSC also sent the report to Kidde on February 15, 2013.  Kidde responded shortly afterwards.  Hence, Kidde was alerted twice about this incident – once by the consumer directly and then again later by the CPSC.  Kidde responded by instructing the consumer to "contact [the] customer service manager."

109.  On August 10, 2013, another consumer submitted a report to the CPSC concerning Kidde Model H110G.  The consumer stated that his "pick up truck caught on fire on August 8, 2013."  He stated that "I grabbed my fire extinguisher (that has never been used before) and pulled the tab and squeezed the trigger."  The consumer noted that "[a] very small amount of chemical came out and the gauge then read empty, however it [was] still full."  As a consequence of this failure, the

54

consumer reported that "[t]he cab of my truck went up in flames and is now totaled." The consumer attached the following photograph of his truck:



The CPSC sent this complaint to Kidde on August 19, 2013. Remarkably, Kidde responded by stating that "[b]ased on a review of the information provided here, Kidde does not have sufficient information to believe that the specific product concerns suggest a defect that presents a substantial product hazard."

110.    On November 5, 2014, a Fire Department submitted a report to the CPSC concerning Kidde Model FX340SC-2. A representative of the Fire

55

Department stated that the Department "responded to a fire at an apartment complex." The representative explained that "[t]he occupant had tried to use a fire extinguisher and it would not function." The representative reported that "[a]bout 8 other fire extinguishers were tried and none of them worked" despite the fact that "[a]ll the extinguishers were new." The representative "advised that the extinguishers malfunctioned due to the plastic discharging mechanism not working" and further that "[t]he plastic handle was not strong enough to depress the discharge piston before collapsing." The CPSC sent this report to Kidde on December 4, 2014. Kidde responded that "[b]ased on the information provided to date, Kidde is unable to determine if the particular incident described involved a defect."

111. On March 10, 2015, another Fire Department submitted a report to the CPSC concerning Kidde Model Pro 5 TCM-8. A representative of the Department stated that "[t]he department responded to a report of an outside fire at a retail grocery store. The Ambulance was the first unit to arrive and found . . . cardboard on fire against the exterior of the store." The representative noted that "[t]he staff on the ambulance deployed the fire extinguisher from the ambulance in an attempt to extinguish, if not at least slow the fire until the arrival of the [Fire] Engine." The representative continued that "[t]he firefighter pulled the pin, removed the hose and squeezed the handle. After somewhat of a brief delay the powder 'dribbled' out [of] the end of the hose." The fire fighter "looked at the gauge which was still showing

56

in the green. She again squeezed the handle and the agent slowly left the hose. She attempted to shake the hose towards the flames to get any powder to be useful." Eventually the Fire Engine arrived mitigating the circumstance. The representative noted that "[t]his situation ended without injury or major property damage but could easily have ended differently should it [have] occurred in a structure or confined space, or [had there been] trapped occupants." The CPSC sent this report to Kidde on March 25, 2015. Kidde responded that it "is in the process of investigating this report."

112. On March 23, 2015, another consumer submitted a report to the CPSC concerning Kidde Model H110G. The consumer stated that "I attempted to use my Kidde Fire Extinguisher on a brush fire at a neighbor's home." He noted that he "depressed the plastic lever one time which worked." But "[t]he second time I tried, it was impossible to depress it. Another one could not be operated at all. The lever could not be depressed. Striking it on a tree or rock was the only way to depress the valve." The CPSC sent this report to Kidde on March 30, 2015. Kidde was aware of this malfunction as reflected by the fact it responded to this consumer's complaint shortly afterwards.

113. On August 14, 2015, another consumer submitted a report to the CPSC concerning Kidde Model FX340SC-2. The consumer stated that "I had a small fire in my house." He noted that "I proceeded to use my Kidde fire extinguisher for the

57

first time to put it out. The tank capacity point[ed] to full as it was never used before. After I pulled out the pin and squeezed the lever, the extinguisher puffed once and died." The consumer continued "[i]f the fire was larger or spread faster, it would [have] put my family's life in danger." The CPSC sent this report to Kidde on August 24, 2015.

114. On August 18, 2015, another consumer submitted a report to the CPSC concerning Kidde Model FA110. The consumer reported that "[d]uring annual fire extinguisher training we are required to put out a controlled fire. I pulled [the] pin and gave a short burst of extinguisher. I then proceeded to approach [the] base of fire and attempted to discharge the remainder of the bottle and nothing happened." The consumer stated that "[s]queezing the handle did nothing, it appears the valve is stuck. I had fire fighter person[nel] try also and nothing." The CPSC sent this report to Kidde on August 26, 2015.

115. On April 13, 2017, a Fire Investigator submitted a report to the CPSC concerning a defective extinguisher. The Fire Investigator stated that "[o]n April 12, 2017, 2350 hrs, there was a kitchen fire I investigated. The occupant of the residence attempted to use a Kidde 3lb disposable fire extinguisher and it failed to operate." The Fire Investigator stated that "[t]he date stamp on the base of the extinguisher was '2015.' The extinguisher was rated for ABC type fires and contained a number on the label of 'A99014677.' This model extinguisher appears

58

to be the same type of a recall previously issued on extinguishers made up to 2014." The Fire Investigator stated that "I attempted to use the extinguisher to see if I could get it to operate and I was unable to squeeze the handle to activate the extinguisher. The pin had been pulled . . . As a result of the inoperability of the extinguisher, an occupant of the residence used water to extinguisher a cooking oil fire and as a result spread the fire." The Fire Investigator continued that "upon my examination of the extinguisher I noticed a piece of plastic on the upper handle that is to extend into a hole in the lower handle; in my attempt to activate the extinguisher, I had to manually manipulate this protruding piece of plastic into the lower handle." The Fire Investigator concluded that "[t]his utilized a fine motor skill that, I believe a normal person would not be able to perform under a high stress situation as a fire." Kidde was informed of this incident by the CPSC on July 18, 2017. Kidde responded that it is "unable to determine what may have caused the alleged failure."

116. Every time the CPSC's website describes a consumer complaint, the website also discloses the date when CPSC sent that complaint to the manufacturer. This is separate from the portion of the safety complaint where the consumer states whether he or she independently contacted the manufacturer. As alleged above, all of the above-referenced complaints were sent to Kidde by CPSC shortly after being submitted to the CPSC.

117. For each of the following additional reasons, Kidde's management

59

knew or should have known about the complaints referenced above as soon as they began appearing on the CPSC website in 2012:

(a)    First, as noted above, Kidde was repeatedly contacted directly by consumers and by the CPSC about the same problem.

(b)    Second, the CPSC website is a government-run repository for complaints about safety-related defects, and many of Kidde's Fire Extinguishers appear on the website.  The CPSC website provides businesses with early warnings of product defects, and monitoring reports is easy because users can search for reports by company names.  Hence, since at least 2012, it required negligible effort for Kidde's management and other personnel to visit the CPSC website, type "Kidde" in the search field, and view a list of reports of safety incidents related to Kidde Fire Extinguishers, including reports about the Fire Extinguisher Defect at issue here.

(c)    Third, Kidde knows about the CPSC website because for each of the reports described above, Kidde registered a response.  For example, with regard to the first incident described and reported on December 31, 2012, Kidde responded that the consumer should contact customer service.

(d)    Fourth, for each of the recalls pertaining to the Defective Fire Extinguishers, Kidde has a hard-to-locate tab on its website linking consumers to details of the recall as posted on the CPSC's website.

118.    Despite Kidde's knowledge of these complaints, Kidde continued to manufacture, market, and sell these defective Fire Extinguishers for purchase for five additional years from the date of the first reported complaint on the CPSC website.  This does not include numerous complaints that were only made to Kidde and were not otherwise publicly disclosed.  Nonetheless, only on November 2, 2017 did Kidde issue a comprehensive recall on these Defective Fire Extinguishers.  And, even then, Kidde underreported the extent of these defects.

**B.      Other Indicia Of Kidde's Pre-Sale Knowledge**

119.    In addition to receiving safety complaints from the CPSC, Kidde also knew or should have known about the defects from several other sources.  First, Plaintiffs are informed and believe that Kidde maintains an online and telephonic consumer complaint database that allows consumers to report their experiences. Kidde would have been on notice from the information reported in these systems.

120.    Second, online reputation management (commonly called "ORM" for short), is now a standard business practice among most major companies and entails monitoring consumer forums, social media, and other sources on the internet where consumers can review or comment on Fire Extinguishers.  "Specifically, [online] reputation management involves the monitoring of the reputation of an individual or a brand on the internet, addressing content which is potentially damaging to it, and using customer feedback to try to solve problems before the damage to the

61

individual's or brand's reputation."[24]  Many companies offer ORM consulting services for businesses.

121.  Like most companies, Kidde presumably cares about its reputation and regularly monitors on-line consumer reviews because they provide valuable data regarding quality control issues, customer satisfaction, and marketing analytics. Reviews like those copied above would be particularly attention-grabbing for Kidde's management because extreme reviews are sometimes the result of extreme problems, and – just like any other company – Kidde is presumably sensitive to the reputational impact of negative online reviews.  Hence, Kidde' management knew or should have known about the above-referenced consumer complaints shortly after each complaint was posted online.

122.  Kidde's management also knew or should have known about the Fire Extinguisher Defect because of the similarity of complaints to the CPSC, the Better Business Bureau, Consumer Reports, and other websites.  The fact that so many consumers made similar complaints about the same product indicates that the complaints were not the result of user error or an anomalous incident, but instead a systematic problem with the product.  Here, the reports and complaints from consumers – whether made directly to Kidde employees or forwarded from the

---

[24] WebSolutions Maine, "Online Reputation," Available at https://websolutions-maine.com/online-reputation/ (last visited Oct. 27, 2021).

CPSC – were similar enough to put Kidde's management on notice that the incidents described were the result of a defect, and that the Fire Extinguishers were experiencing unusually high levels of complaints about the nozzles frequently becoming detached, becoming clogged, or requiring excessive force to discharge causing a failure to activate during a fire emergency.

123.    Even if Kidde was not made aware of the Fire Extinguisher Defect through the above sources – although they were – Kidde also would have learned through court filings.  Since at least 2012, several complaints have been filed against Kidde by plaintiffs in their individual capacities alleging the Defect described in this Complaint.  Descriptions contained in those complaints and information learned through discovery would have disclosed the Defect, especially in light of Judge Nora B. Fischer's determination on March 24, 2015 that "punitive damages may be appropriate as a reasonable jury could find that Kidde was recklessly indifferent as to the safety of its consumers."[25]

124.    On February 10, 2021, Plaintiffs' counsel sent Kidde a pre-suit demand, stating the demand letter was "pursuant to . . . the Consumers Legal Remedies Act, Civil Code § 1770 and U.C.C. § 2-607(3)(A) concerning breaches of warranty described herein on behalf of our client, Daniel Onn, *and all other similarly situated*

---

[25] *McDaniel v. Kidde Residential & Fire & Com*., 2015 WL 1326332, at *2 (W.D. Pa. Mar. 24, 2015).

*purchasers*." (emphasis added). Kidde, through Carrier Global, responded on February 25, 2021, stating that "We reject your assertions that we engaged in any improper behavior or in any manner violated any laws." Subsequently, on March 29, 2021, Mr. Onn, through counsel, filed his class action complaint "on behalf of himself and all others similarly situated against Defendant[] . . . Walter Kidde Portable Equipment, Inc. for the manufacture, marketing, and sale of plastic handle fire extinguishers and push-button Pindicator fire extinguishers[.]" *Daniel Onn v. Carrier Global Corporation*, Case No. 4:21-cv-02188-HSG, ECF No. 1 (N.D. Ca. March 29, 2021). Kidde did not remedy the situation. Instead, Kidde filed its Motion to Dismiss. *Id.*, ECF No. 28.

125. Against the weight of the evidence, Kidde has long denied that it has committed wrongdoing. It has done so when sued by families injured by Kidde's defective fire extinguishers, when sued by the U.S. Department of Justice along with the Consumer Product Safety Commission, and, again, by Mr. Onn. Kidde has received repeated notice of the fire extinguisher Defect and repeated its denials at every turn.

## TOLLING OF THE STATUTE OF LIMITATIONS

126. Any applicable statute of limitations has been tolled by the deceptive conduct alleged herein. Through no fault or lack of diligence, Plaintiffs and Class members were deceived regarding the Fire Extinguisher Defect and could not

64

reasonably discover the latent nature of the defect.

127. Plaintiffs and Class members could not reasonably discover Kidde's deception with respect to the Fire Extinguisher Defect prior to experiencing a failure and/or being informed of the reason for the failure. Within the time period of any applicable statute of limitations, Plaintiffs and Class members could not have discovered through the exercise of reasonable diligence that Kidde was concealing the Fire Extinguisher Defect.

128. Plaintiffs and Class members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Kidde was concealing a latent defect and/or that the Defective Fire Extinguishers contained a defect in design causing nozzles to frequently become detached, become clogged, or require excessive force to discharge and causing a failure to activate during a fire emergency. As alleged herein, the existence of the Fire Extinguisher Defect and safety risk were material to Plaintiffs and Class members at all relevant times.

129. At all times, Kidde is and was under a continuous duty to disclose to Plaintiffs and Class members the true standard, quality, and grade of the fire extinguishers at issue and to disclose the Fire Extinguisher Defect and potential safety risk associated with the fire extinguisher failing to function during an emergency.

130. Kidde knowingly, actively, and affirmatively concealed the facts

65

alleged in this Complaint, including the Fire Extinguisher Defect. Plaintiffs and Class members reasonably relied on Kidde's knowing, active, and affirmative concealment.

131. For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Kidde' fraudulent concealment, and Kidde is estopped from relying on any statutes of limitation in defense of this action.

## **CLASS ALLEGATIONS**

132. Plaintiffs bring this nationwide class action pursuant to 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as all persons in the United States who purchased the Fire Extinguishers (the "Class"). Excluded from the Class are persons who made such purchases for purpose of resale or who suffered a personal injury as a result of the Defect.

133. In connection with her California purchase, Plaintiff Taylor further seeks to represent a subclass of all Class Members who purchased the Fire Extinguishers in the State of California (the "California Subclass"). Excluded from the California Subclass are persons who made such purchases for purpose of resale or who suffered a personal injury as a result of the Defect.

134. In connection with his Florida purchase, Plaintiff Newlands further seeks to represent a subclass of all Class Members who purchased the Fire

66

Extinguishers in the State of Florida (the "Florida Subclass"). Excluded from the Florida Subclass are persons who made such purchases for purpose of resale or who suffered a personal injury as a result of the Defect.

135. As a result of additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

136. At this time, Plaintiffs do not know the exact number of members of the aforementioned Class and Subclasses ("Class Members" and either "California Subclass Members" or "Florida Subclass Members" respectively or collectively "State Subclass Members"); however, given the nature of the claims and the number of retail stores in the United States selling Kidde Fire Extinguishers, Plaintiffs believe that Class and State Subclass Members are so numerous that joinder of all members is impracticable.

137. There is a well-defined community of interest in the questions of law and facts involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class Members include:

(a)    whether Kidde misrepresented and/or failed to disclose material facts concerning the Fire Extinguishers;

(b)    whether Kidde's conduct was unfair and/or deceptive;

67

(c)     whether Kidde has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Kidde to retain the benefits conferred upon Kidde by Plaintiffs and the Class;

(d)     whether Plaintiffs and the Class sustained damages with respect to the common law claims asserted, and if so, the proper measure for their damages.

138.   With respect to the California Subclass, additional questions of law and fact common to the members that predominate over questions that may affect individual members include whether Kidde violated the California Consumers Legal Remedies Act as well as California's Unfair Competition Law.

139.   With respect to the Florida Subclass, additional questions of law and fact common to the members predominate over questions that may affect individual members include whether Kidde violated Florida's Deceptive and Unfair Trade Practices Act.

140.   Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, purchased, in a typical consumer setting, Kidde Fire Extinguishers, and Plaintiffs sustained damages from Kidde's wrongful conduct.

141.   Plaintiffs are adequate representatives of the Class and the State Subclasses because their interests do not conflict with the interests of the Class Members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The

68

interests of the Class members will be fairly and adequately protected by Plaintiffs and their counsel.

142.   The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Kidde's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Kidde's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

## COUNT I

**(Violation of California's Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq*.)**

143.   Plaintiff Taylor realleges and reincorporates by reference all paragraphs alleged above.

69

144.   Plaintiff Taylor brings this claim individually and on behalf of the members of the proposed California Subclass against Kidde for injunctive relief only.

145.   Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

146.   Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

147.   Civil Code § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

148.   Kidde violated Civil Code § 1770(a)(5), (a)(7), and (a)(9) by holding out Fire Extinguishers as fit for use as fire extinguishers, when in fact the Fire Extinguishers were defective, dangerous, and useless.

149.   The Defect at issue here involves nozzles frequently becoming detached, becoming clogged, or requiring excessive force to discharge causing a failure to activate during a fire emergency.  This Defect affected Kidde' plastic handle fire extinguishers and push-button Pindicator fire extinguishers as identified throughout this Complaint.

70

150.   Kidde has exclusive knowledge of the Defect, which was not known to Plaintiff Taylor or California Subclass Members.

151.   Kidde misrepresented to Plaintiff Taylor and California Subclass Members that the Fire Extinguishers could safely and effectively be used to suppress fires, while hiding the Fire Extinguisher Defect.  Specifically, by displaying the Fire Extinguishers and describing their features, the product packaging and Kidde's website represented that the product was suitable and effective for use as a fire extinguisher, without disclosing that the Fire Extinguishers had a critical safety-related defect that could result in harm to users of the Fire Extinguishers by failing to discharge.  As described above, Kidde was in receipt of knowledge pertaining to the Defect and yet for several years continued to sell the defective Fire Extinguishers.

152.   Plaintiff Taylor and the California Subclass Members have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Fire Extinguishers that they otherwise would not have incurred or paid.

153.   Accordingly, Plaintiff Taylor and the California Subclass Members seek injunctive relief.  Plaintiff Taylor reserves the right to amend this claim and to assert claims for damages.

Case 1:21-cv-00839-WO-JLW   Document 33   Filed 11/21/22   Page 71 of 116

## COUNT II
### (Violation of California's Unfair Competition Law,
### Cal. Bus. & Prof. Code §§ 17200, *et seq*.)

154.   Plaintiff Taylor realleges and reincorporates by reference all paragraphs alleged above.

155.   Plaintiff Taylor brings this claim individually and on behalf of the proposed California Subclass against Kidde.

156.   California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice."  For the reasons discussed above, Kidde has engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

### Unlawful

157.   Defendant's conduct is unlawful, in violation of the UCL, because it violates the Consumers Legal Remedies Act, California's False Advertising Law, and California's Song-Beverly Act.   Additionally, Defendant's conduct was fraudulent in violation of the common law as set forth below in individual counts.

### Unfair

158.   Defendant's conduct is also unfair, in violation of the UCL, because it violates California public policy requiring that goods which pass in California be accurately labeled.  To this point, Defendant's fraudulent omission / concealment

72

and its affirmative misrepresentations concerning the products are unfair to reasonable consumers.

159. Moreover, Defendant acted in an unethical, unscrupulous, outrageous, oppressive, and substantially injurious manner. Through its misrepresentations and omissions, Defendant engaged in unfair business practices and acts in at least the following respects:

a. Defendant promoted and sold products it knew were defective;

b. Defendant promoted and sold the products in their defective condition despite knowing that consumers do not expect a fire extinguisher to be unable to fulfill its principal and intended purpose of extinguishing fires, thus risking the lives and safety of consumers;

c. Defendant failed to disclose that the products are defective, and represented through its advertising and labeling that the products possess particular qualities that were inconsistent with Defendant's actual knowledge of the products;

d. Defendant failed to exercise adequate quality control and due diligence over the Products before placing them on the market; and

73

e.  Defendant minimized the scope of the problem with the Products, refusing to acknowledge that the products were defective in its advertising and packaging of the products; and

f.  Defendant underreported and misreported the scope of the Defect to the Consumer Products Safety Commission, which allowed the Products to continue in the stream of commerce, despite the Defect.

160.  The gravity of the harm resulting from Defendant's unfair conduct outweighs any potential utility. The practice of selling defective Products without providing an adequate remedy to cure the Defect—and continuing to sell those Products without full and fair disclosure of the Defect—harms the public at large and is part of a common and uniform course of wrongful conduct.

161.  The harm from Defendant's conduct was not reasonably avoidable by consumers. The products suffer from a latent defect, and even after receiving a large volume of consumer complaints of personal and property damage stemming from the Defect, including several lawsuits filed against Defendant for the same, Defendant did not disclose the Defect. Plaintiffs did not know of, and had no reasonable means of discovering the Defect.

162.  There were reasonably available alternatives that would have furthered Defendant's business interests by satisfying and retaining its customers while

maintaining profitability, such as: (1) acknowledging the Defect and providing a permanent fix; (2) adequately disclosing the Defect to prospective purchasers; and (3) offering suitable replacements.

## Fraudulent Conduct

163.    Defendant's conduct is fraudulent in violation of the UCL because it is likely to deceive reasonable consumers and:

    a.    Defendant knowingly and intentionally misrepresented the nature and quality of the products from Plaintiff and Class members to induce purchase;

    b.    Defendant knowingly and intentionally concealed the Defect from Plaintiff and Class members to induce purchase;

    c.    Defendant volunteered information to Plaintiffs and Class members through their marketing and packaging concerning the functionality of the products, without disclosing facts that would have materially qualified its representations; and

    d.    Defendant promoted the high quality and premium features of the products, despite its knowledge that the products were defective, and failed to correct its misleading disclosures.

164.    Defendant had ample means and opportunities to alert Plaintiff and Class members of the defective nature of the products, including on the product's

75

packaging. Defendant uniformly failed to disclose that the product was defective. Had Defendant disclosed that the product was defective, Plaintiff and Class members would not have purchased the product.

165. Defendant was under a duty to disclose the Defect because the Defect pertained to matters of safety and because Defendant had exclusive knowledge of the Defect before selling the devices stemming from its quality control and pre-release testing, repairs data and internal reporting mechanisms, online complaints posted to forums Defendant monitors; as well as investigations by the CPSC. All of this would have put Defendant on notice that the Products were not as advertised. Additionally, because it made misleading representations about the Products without disclosing the Defect, Defendant had an obligation to disclose the Defect.

166. Plaintiff Taylor and the other California Subclass Members suffered a substantial injury by virtue of buying the Fire Extinguishers that they would not have purchased absent Kidde' unlawful, fraudulent, and unfair marketing, advertising, packaging, and omissions about the defective nature of the Fire Extinguishers.

167. There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the defective nature of the Fire Extinguishers.

168. Plaintiff Taylor and the other California Subclass Members had no way of reasonably knowing that the Fire Extinguishers they purchased were not as

marketed, advertised, packaged, or labeled. Thus, they could not have reasonably avoided the injury each of them suffered.

169. The gravity of the consequences of Kidde's conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff Taylor and the other California Subclass Members.

170. Pursuant to California Business and Professional Code § 17203, Plaintiff Taylor and the California Subclass seek an order of this Court that includes, but is not limited to, an order requiring Kidde to (a) provide restitution to Plaintiff and the other California Subclass Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiff's and the California Subclass' attorneys' fees and costs.

171. This form of equitable relief is appropriate as legal remedies available to Plaintiffs and Class members are inadequate because they are not equally prompt and certain and in other ways efficient as equitable relief. Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award

of damages. Damages and restitution are not the same amount. Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far larger than the legal rate of interest would recognize. In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

## COUNT III
**(Breach of Implied Warranty Under the Song-Beverly Act,**
**Cal. Civ. Code § 1790, *et seq*.)**

172. Plaintiff Taylor realleges and reincorporates by reference all paragraphs alleged above.

173. Plaintiff Taylor bring this claim individually and on behalf of all members of the California Subclasses.

174. Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790. *et seq*., every sale of consumer goods in the State of California is accompanied by both a manufacturer's and retailer seller's implied warranty that the goods are merchantable, as defined in that Act. In addition, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose (here, to be used as fire extinguishers)

78

and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

175. California has codified the third-party beneficiary exception to any privity requirement. Therefore, while ordinarily, Plaintiff Taylor might be required to demonstrate vertical privity, she need not do so where, as here, she is a third-party beneficiary of Kidde's contracts with wholesalers or retail sellers and relied on Kidde's packaging in making her purchase. Plaintiff Taylor and members of the California Subclass are third-party beneficiaries because the extinguishers passed into commerce with warranties that were designed for the benefit of the end-user and not for the benefit of a wholesaler or retailer.

176. At least one source is instructive on the third-party beneficiary exception. When Defendant sells Products to retailers such as Walmart, Defendant provides those retailers with a Supplier Agreement. There is no reason to suspect that Defendant's form Supplier Agreement differs substantially from retailer to retailer. In one Supplier Agreement, Section 13, "Representations, Warranties, and Guarantees," Defendant "represents, warrants, and guarantees that: . . . (F) The merchandise shall be delivered in good and undamaged condition and shall, when delivered, be merchantable and fit/safe for the purpose for which the same are intended to be used, including but not limited to the consumer use." *See Gretchen*

*McDaniel v. Kidde Residential and Fire & Commercial, et al.*, Case No. 2:12-cv-01439-NBF (W.D. Pa. Aug. 13, 2014), Dkt. No. 75-12, p. 4.

177. As this Supplier Agreement demonstrates, Defendant's warranties extend "to the consumer use." *See id*. Mr. Joel Heiligenthal, an executive at Sam's Club owned by Walmart, the company for which the Supplier Agreement above was provided, testified in support of an interpretation supporting the third-party beneficiary exception, as the following exchange demonstrates:

> Q. So we can agree that the Supplier Agreement required that the suppliers, among other things, provide safe merchantable products that were fit for the intended use of the product?
>
> [Objection]
>
> A. I believe – yeah, I believe you repeated that line, and that's correct, yes, sir.
>
> Q. Okay. And we can agree . . . that the purpose of a fire extinguisher is to extinguish a fire?
>
> A. Yes.

*See id*. at pp. 4-5.

178. The Fire Extinguishers at issue here are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

179. Plaintiff Taylor and the Class Members who purchased one or more Fire Extinguishers are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

80

180. Kidde is in the business of manufacturing, assembling, and/or producing the Fire Extinguishers and/or selling the Fire Extinguishers to retail buyers, and therefore is a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

181. Kidde impliedly warranted to retailer buyers that the Fire Extinguishers were merchantable in that they would: (a) pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Fire Extinguishers are used. For a consumer good to be "merchantable" under the Act, it must satisfy both of these elements. Kidde breached these implied warranties because the Fire Extinguishers were unsafe and defective. Therefore, the fire extinguishers would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

182. Plaintiff Taylor and California Subclass Members purchased the Fire Extinguishers in reliance upon Kidde's skill and judgment in properly packaging and labeling the Fire Extinguishers.

183. The Fire Extinguishers were not altered by Plaintiff Taylor or the California Subclass Members.

184. The Fire Extinguishers were defective at the time of sale when they left the exclusive control of Kidde. The Defect described in this complaint was latent in the product and not discoverable at the time of sale.

81

185. Kidde knew that the Fire Extinguishers would be purchased and used without additional testing by Plaintiff and Class Members.

186. As a direct and proximate cause of Kidde's breach of the implied warranty, Plaintiff and Class Members have been injured and harmed because they would not have purchased the Fire Extinguishers if they knew the truth about the Fire Extinguishers, namely, that they were unfit for use as fire extinguishers.

187. Plaintiff Taylor and the California Subclass seek compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

## COUNT IV
### Violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*

188. Plaintiff Taylor realleges and reincorporates by reference all paragraphs alleged above.

189. Kidde's acts and practices, as described herein, have deceived and/or are likely to continue to deceive class members and the public. As described above, and throughout this Complaint, Kidde misrepresented the Fire Extinguisher and concealed the Defect.

190. By its actions, Kidde disseminated uniform advertising regarding the Fire Extinguishers to and across California. The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof.

Code § 17500, *et seq.* Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

191. The above-described false, misleading, and deceptive advertising Kidde disseminated continues to have a likelihood to deceive. Defendant both misrepresented the nature and quality of the Products and otherwise failed to disclose the Fire Extinguisher Defect and how it could put the user's life and property at risk.

192. Kidde continued to misrepresent to consumers that its Fire Extinguishers were capable of use for which such devices are intended. However, as described, this is not the case.

193. In making and disseminating these statements, Kidde knew, or should have known, its advertisements were untrue and misleading in violation of California law. Plaintiffs and other class members based their purchasing decisions on Kidde's omitted material facts. The revenue attributable to Fire Extinguishers sold in those false and misleading advertisements likely amounts to hundreds of millions of dollars. Plaintiffs and Class members were injured in fact and lost money and property as a result.

194. The misrepresentations and non-disclosures by Kidde of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitutes a violation of Cal. Bus. & Prof. Code § 17500, *et seq.*

83

195.   As a result of Kidde's wrongful conduct, Plaintiffs and the class members lost money in an amount to be proven at trial.  Plaintiffs and the class members are therefore entitled to restitution as appropriate for this cause of action.

196.   Plaintiffs and Class members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Kidde's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

197.    This form of equitable relief is appropriate as legal remedies available to Plaintiffs and Class members are inadequate because they are not equally prompt and certain and in other ways efficient as equitable relief.  Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages.  Hence, the Court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages.  Damages and restitution are not the same amount.  Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest.  Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far larger than the legal rate of interest would recognize.  In short, significant

84

differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

## COUNT V
### (Violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.*)

198.   Plaintiff Newlands realleges and reincorporates by reference all paragraphs alleged above.

199.   Plaintiff Newlands brings this claim individually and on behalf of all members of the Florida Subclass.

200.   Plaintiff Newlands and Florida Subclass Members are "consumers" under Fla. Stat. § 501.203(7), the Fire Extinguishers are "goods" within the meaning of the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA"), and the transactions at issue constitute "trade or commerce" as defined by the FDUTPA.

201.   The FDUTPA, Fla. Stat. § 501.204, provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

202.   For the reasons alleged above, Kidde violated and continues to violate the FDUTPA by engaging in the described unconscionable, deceptive, unfair acts or practices proscribed by Fla. Stat. § 501.201, *et seq*.

203.   Kidde's acts and practices, including its material omissions and affirmative misrepresentations, described herein, were likely to, and did in fact,

85

deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

204. At all times mentioned herein, Kidde engaged in trade or commerce in Florida, as defined by Fla. Stat. § 501.203(8), in that they advertised, offered for sale, sold, or distributed goods or services in Florida and/or engaged in trade or commerce directly or indirectly affecting the people of Florida.

205. Kidde repeatedly advertised, both on the labels for the Fire Extinguishers, on their website, and through a national advertising campaign, among other items, that the Fire Extinguishers were and are safe for use by individuals when in fact they were not safe for use in their ordinary and intended purpose.

206. As discussed, the Fire Extinguishers here are defective in that they have nozzles that frequently become detached or clogged, or they require excessive force to discharge causing a failure to activate during a fire emergency. This Defect affected Kidde's plastic handle fire extinguishers and push-button Pindicator fire extinguishers as identified throughout this complaint.

207. Kidde had exclusive knowledge of the Defect, which it did not disclose to Plaintiff Newlands or Florida Subclass Members prior to their purchasing the Fire Extinguishers.

208. Kidde misrepresented to Plaintiff Newlands and Florida Subclass Members that the fire extinguisher could safely and effectively be used to suppress

86

fires while hiding the Fire Extinguisher Defect. Specifically, by displaying the Fire Extinguishers and describing their features, the product packaging and Kidde's website represented that the product was suitable and effective for use as a fire extinguisher, without disclosing that the Fire Extinguishers had a critical safety-related defect that could result in harm to users of the Fire Extinguishers by failing to discharge. As described above, Kidde was in receipt of knowledge pertaining to the Defect and yet for years continued to sell the defective Fire Extinguishers.

209. Kidde's affirmative misrepresentations and omissions were material because they were likely to deceive reasonable consumers and induce them to buy the Fire Extinguishers without being aware that the Fire Extinguishers did not function effectively as fire extinguishers and posed a threat to the lives, safety, and security of Plaintiffs and consumers by making them believe that in the event of a fire they could use the Fire Extinguishers to extinguish the fire. However, as discussed throughout this complaint, these Fire Extinguishers are not in fact usable as extinguishers.

210. As a direct and proximate result of Kidde's unfair and deceptive acts or practices, Plaintiff Newlands and Florida Subclass Members suffered damages by purchasing the Fire Extinguishers because they would not have purchased the Fire Extinguishers had they known the truth, and they received a product that was worthless because it was unsafe for its ordinary and intended purpose.

211. Kidde's deceptive trade practices caused injury in fact and actual damages to Plaintiffs and class members because had they known the truth about the Fire Extinguishers, they would not have purchased them. Kidde's failure to disclose the Defect and its misrepresentations allowed it to profit at the expense of Plaintiffs and class members. The injuries were to legally protected interests. The gravity of the harm of Kidde's actions is significant and there is no corresponding benefit to consumers of such conduct.

212. Plaintiff Newlands and Florida Subclass Members seek relief for the injuries they have suffered as a result of Kidde's unfair and deceptive acts and practices, as provided by Fla. Stat. § 501.211 and applicable law.

**COUNT VI**
**(Breach of Implied Warranty Under Florida Law,**
**Fla. Stat. Ann. § 672.314)**

213. Plaintiff Newlands realleges and reincorporates by reference all paragraphs alleged above.

214. Plaintiff brings this claim individually and on behalf of all members of the Florida Subclass.

215. Every sale of consumer goods in the State of Florida is accompanied by both a manufacturer's and retail seller's implied warranty that the goods are merchantable, as defined in that Act. In addition, every sale of consumer goods in Florida is accompanied by both a manufacturer's and retail seller's implied warranty

of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose (here, to be used as fire extinguishers) and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

216. Kidde breached its implied warranty of merchantability when it designed, manufactured, distributed, and sold the Fire Extinguishers in their unsafe and unmerchantable condition.

217. Florida jurisprudence recognizes the third-party beneficiary exception to any privity requirement. Therefore, whereas ordinarily, Plaintiff Newlands may be required to demonstrate vertical privity, he need not do so where, as here, he is a third-party beneficiary to contracts between Kidde and wholesalers or retail sellers and relied on Kidde's packaging in making his purchase. Plaintiff Newlands and members of the Florida Subclass are third-party beneficiaries because the extinguishers passed into commerce with warranties that were designed for the benefit of the end-user and not for the benefit of a wholesaler or retailer.

218. When Defendant sells Products to retailers such as Lowe's, Defendant provides those retailers with a Supplier Agreement. Upon information and belief, Defendant's form Supplier Agreement does not differ substantially from retailer to retailer. In one Supplier Agreement, Section 13, "Representations, Warranties, and Guarantees," Defendant "represents, warrants, and guarantees that: . . . (F) The

merchandise shall be delivered in good and undamaged condition and shall, when delivered, be merchantable and fit/safe for the purpose for which the same are intended to be used, including but not limited to the consumer use." *See Gretchen McDaniel v. Kidde Residential and Fire & Commercial, et al.*, Case No. 2:12-cv-01439-NBF (W.D. Pa. Aug. 13, 2014), Dkt. No. 75-12, p. 4.

219. As this Supplier Agreement demonstrates, Defendant's warranties extend "to the consumer use." *See id*. Mr. Joel Heiligenthal, an executive at Sam's Club owned by Walmart, the company for which the Supplier Agreement above was provided, testified in support of an interpretation supporting the third-party beneficiary exception in the following deposition exchange:

> Q. So we can agree that the Supplier Agreement required that the suppliers, among other things, provide safe merchantable products that were fit for the intended use of the product?
>
> [Objection]
>
> A. I believe – yeah, I believe you repeated that line, and that's correct, yes, sir.
>
> Q. Okay. And we can agree . . . that the purpose of a fire extinguisher is to extinguish a fire?
>
> A. Yes.

*See id*. at pp. 4-5.

220. Kidde constitutes a "merchant" within the meaning of Fla. Stat. Ann. § 672.104.

221. The Fire Extinguishers at issue here are "goods" within the meaning of Fla. Stat. Ann. § 672.105.

222. Plaintiff Newlands and the Florida Subclass Members who purchased one or more of the Fire Extinguishers are "buyers" within the meaning of Fla. Stat. Ann. § 672.103(1)(a).

223. Kidde is in the business of manufacturing, assembling, and/or producing the Fire Extinguishers and/or selling the Fire Extinguishers to retail buyers, and therefore is a "manufacturer" and "seller" within the meaning of Fla. Stat. Ann. § 672.103(d).

224. Kidde impliedly warranted to retailer buyers that the Fire Extinguishers were merchantable in that they would: (a) pass without objection in the trade or industry under the contract description, (b) are of fair average quality within the description; (c) are fit for the ordinary purpose for which such goods are used; (d) run within the variations permitted by the agreement; (e) are adequately contained, packaged, and labeled as the agreement may require; and (f) conform to the promises or affirmations of fact made on the container or label.

225. Kidde breached the implied warranty under Florida law because the Fire Extinguishers were unsafe and defective. Therefore, the fire extinguishers would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

91

226. Plaintiff Newlands and Florida Subclass Members purchased the Fire Extinguishers in reliance upon Kidde's skill and judgment in properly packaging and labeling the Fire Extinguishers.

227. The Fire Extinguishers were not altered by Plaintiff Newlands or the Florida Subclass Members.

228. The Fire Extinguishers were defective at the time of sale when they left the exclusive control of Kidde. The Defect described in this complaint was latent in the product and not discoverable at the time of sale.

229. Kidde knew that the Fire Extinguishers would be purchased and used without additional testing by Plaintiff Newlands and Florida Subclass Members.

230. As a direct and proximate cause of Kidde's breach of the implied warranty, Plaintiff Newlands and Florida Subclass Members have been injured and harmed because they would not have purchased the Fire Extinguishers if they knew the truth about the Fire Extinguishers, namely, that they were unfit for use as fire extinguishers.

231. As noted above, any pre-suit notice beyond that which had already been given to Kidde, would have been futile. Kidde has demonstrated a knack for denying responsibility including in the face of serious charges following a detailed investigation by the U.S. Department of Justice as well as numerous federal court

92

rulings determining that Kidde acted in reckless disregard of the safety and well-being of its consumers.

232.   Accordingly, Plaintiff Newlands and Florida Subclass Members seek compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

## COUNT VII
**(Fraud)**

233.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

234.   Plaintiffs bring this claim individually and on behalf of the Class under the laws of the state in which each respective Plaintiff purchased their Fire Extinguishers.

235.   At the time Plaintiffs and Class members purchased their Fire Extinguishers, Kidde did not disclose, but instead concealed and misrepresented, the Defect as discussed herein.

236.   Kidde affirmatively misrepresented the Fire Extinguishers, giving the Fire Extinguishers the appearance of a device capable for use as such and that is free from defects.

237.   Kidde also knew that its omissions and misrepresentations regarding the Fire Extinguishers were material, and that a reasonable consumer would rely upon

93

Kidde's representations (and corresponding omissions) in making purchasing decisions.

238. Plaintiffs and Class members did not know—nor could they have known through reasonable diligence—about the Defect.

239. Plaintiffs and Class members would have been reasonable in relying on Kidde's misrepresentations (and corresponding omissions) in making their purchasing decisions.

240. Plaintiffs and Class members had a right to rely upon Kidde's representations (and corresponding omissions) as Kidde maintained monopolistic control over knowledge of the true quality of the Fire Extinguishers and of the Defect.

241. Plaintiffs and Class members sustained damages as a result of their reliance on Kidde's omissions and misrepresentations, thus causing Plaintiffs and Class members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

## COUNT VIII
### (Constructive Fraud)

242. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

243. Plaintiffs bring this claim individually and on behalf of the Class under the laws of the state in which each respective Plaintiff purchased their Fire Extinguishers.

244.   At the time Plaintiffs and Class members purchased their Fire Extinguishers, Kidde did not disclose, but instead concealed and misrepresented, the Defect as discussed herein.

245.   Kidde affirmatively misrepresented the Fire Extinguishers, giving Fire Extinguishers the appearance of a device capable for use as such and that is free from defects.

246.   Kidde also knew that its omissions and misrepresentations regarding the Fire Extinguishers and the Defect were material, and that a reasonable consumer would rely upon Kidde's representations (and corresponding omissions) in making purchasing decisions.

247.   Kidde had an obligation not to omit or misrepresent the Fire Extinguishers or the Defect because in addition to the fact that the Fire Extinguishers pertained to matters of safety: (a) it was in the sole possession of such information; (b) it made misleading representations regarding the quality of the Fire Extinguishers; (c) Plaintiffs and class members relied upon Kidde to make full disclosures based upon the relationship between Plaintiffs and class members, who relied on Kidde's representations and omissions, and were reasonable in doing so, with the full knowledge of Kidde that they did and were reasonable in doing so.

95

248. Plaintiffs and Class and Subclass members did not know—nor could they have known through reasonable diligence—about the Defect and of the true quality of the Fire Extinguishers.

249. Plaintiffs and class members would have been reasonable in relying on Kidde's misrepresentations (and corresponding omissions) in making their purchasing decisions.

250. Plaintiffs and class members had a right to rely upon Kidde's misrepresentations (and corresponding omissions) as, in addition to the fact that the Defect pertained to safety, Kidde maintained monopolistic control over knowledge of the true quality of the Fire Extinguishers and of the Defect, and what information was available regarding the Defect.

251. Kidde breached its duty to Plaintiff and class members to make full disclosures of the Defect.

252. Plaintiffs and class members sustained damages as a result of their reliance on Kidde's omissions and misrepresentations, and Kidde's breach of its duty, thus causing Plaintiff and class members to sustain actual losses and damages in a sum to be determined at trial.

## COUNT IX
### (Fraudulent Inducement – Concealment)

253. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

254.   Plaintiffs bring this claim individually and on behalf of the Class under the laws of the state in which each respective Plaintiff purchased their Fire Extinguishers.

255.   Defendant concealed the Defect from Plaintiffs.  The Defect interferes with the proper use of the Fire Extinguishers, rendering them unreliable and unsafe in emergencies.

256.   Defendant owed Plaintiffs and consumers a duty to disclose the Defect because it was exclusively known or accessible only to Defendant.

257.   Defendant owed a duty to Plaintiffs and other consumers to disclose the Defect because it knew or should have known that the Defect was not reasonably discoverable by Plaintiffs and other consumers.

258.   Defendant intentionally failed to disclose the Defect, which only it knew, to all consumers, including but not limited to Plaintiffs.

259.   Defendant owed Plaintiffs and other consumers a duty to disclose the Defect because Defendant made representations but did not disclose facts that would materially qualify the facts disclosed, or that would render their disclosures likely to mislead.

260.   Defendant actively concealed the Defect from Plaintiffs and other consumers while simultaneously touting its safety and industry-leading quality of its Products, including the Fire Extinguishers.

97

261.  Defendant knew or should have known of the Defect.  Defendant concealed the Defect and made contrary representations about the safety and industry-leading quality of its Products, including the Fire Extinguishers.

262.  Defendant hid the Defect from the public.  Defendant did not take any meaningful and effective action calculated to apprise all of its consumers, including Plaintiffs, about the true nature of the Defect, but instead, denied any knowledge or responsibility for the Defect.

263.  Defendant concealed material information regarding the true nature of the Defect in every communication it had with consumers, including Plaintiffs, and made contrary representations about the safety and industry-leading nature of its Products.

264.  Defendant knew or should have known that having a improperly functioning fire extinguisher can and will likely lead to danger for its consumers.  A fire extinguisher incapable of fighting fires due to a Defect is inherently unsafe.

265.  Defendant actively concealed and/or omitted to disclose these material facts, in whole or in part, to protect its profits and avoid adequate recalls that would have hurt the brand's image and cost Defendant money, and it did so at Plaintiffs' and the Class's expense.

266.  Because Defendant knew that any reasonable consumer would not purchase a defective Fire Extinguisher or would purchase one only at a substantially

reduced price, and Defendant was concealing material information about the Defect, Defendant must have known that Plaintiffs were acting on the basis of mistaken knowledge that Defendant's Fire Extinguishers were safe and reliable when they decided to purchase the Products at market price.

267. Plaintiffs could not have discovered the Defect because Defendant kept all testing information confidential.

268. Defendant actively concealed an important fact from Plaintiffs and the Class or prevented Plaintiffs and the Class from discovering that fact.

269. Plaintiffs and the Class did not know about the Defect before purchasing the Products. Plaintiffs and the Class relied on Defendant to disclose material defects.

270. Plaintiffs and the Class purchased the Products with the reasonable belief, based on representations made by Defendant, that their Fire Extinguishers would be able to be used without their being subjected to the danger of a Defect.

271. Defendant intended to deceive Plaintiffs by continuing to market the Products as effective fire extinguishers while concealing the existence of the Defect which posed major safety concerns.

272. Plaintiffs and the Class reasonably would have behaved differently had the omitted information about the defective Fire Extinguishers been disclosed. If

Plaintiffs and the Class had known the Products were defect, Plaintiffs and the Class would have behaved differently in that they would not have purchased the Products.

273. Plaintiffs and the Class were harmed by Defendant's concealment of the Defect.

274. Defendant's concealment of the Defect was a substantial factor in causing Plaintiffs' and the Class's harm.

275. Defendant's concealment substantially influenced Plaintiffs and the Class to purchase the Products.

276. The concealed Defect was material.

277. Plaintiffs allege that Defendant fraudulently concealed the concealed facts with malice, oppression, or fraud.

278. Alternatively: (1) the conduct constituting malice, oppression, or fraud was committed by one or more officers, directors, or managing agents of Defendant who acted on behalf of Defendant; (2) the conduct constituting malice, oppression, or fraud was authorized by one or more officers, directors, or managing agents of Defendant; or (3) one or more officers, directors, or managing agents of Defendant ratified the conduct after it occurred.

279. Kidde did not disclose, but instead concealed and misrepresented, the Defect as discussed herein.

280. Kidde knew, or should have known, that the Fire Extinguishers were falsely portrayed and that knowledge of the Defect was withheld from the consumer public.

281. Kidde also knew that its omissions and misrepresentations regarding the Fire Extinguishers were material, and that a reasonable consumer would rely on Kidde's misrepresentations (and corresponding omissions) in making purchasing decisions.

282. Plaintiffs and Class members did not know—nor could they have known through reasonable diligence—about the Defect.

283. Plaintiffs and Class members would have been reasonable in relying on Kidde's misrepresentations (and corresponding omissions) in making their purchasing decisions.

284. Plaintiffs and Class members had a right to rely on Kidde's misrepresentations (and corresponding omissions) as Kidde maintained a monopolistic control over knowledge of the Defect and what information was made available regarding the Defect.

285. Kidde intended to induce—and did, indeed, induce—Plaintiffs and Class members into purchasing the Fire Extinguishers based upon their affirmative representations and omissions.

286.   Plaintiffs and Class members sustained damages as a result of their reliance on Kidde's omissions and misrepresentations, thus causing Plaintiffs and Class members to sustain actual losses and damages in a sum to be determined at trial.

## COUNT X
### (Fraudulent Inducement – Intentional Misrepresentation)

287.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

288.   Plaintiffs bring this claim individually and on behalf of the Class members under the laws of the state in which each respective Plaintiff purchased their Fire Extinguishers.

289.   This claim is made separate and apart from any breach of warranty allegations made herein.

290.   Prior to Plaintiffs and the Class members making their decision to purchase the Products, Defendant made misrepresentations to them through its advertising and printed marketing materials, including the Product packaging.  Those representations are set forth above.

291.   Defendant knew that its representations, as alleged above, were false. At all relevant times, Defendant knew that the Products had inherent defects that would prevent them from being merchantable and that the Defect would substantially

102

impair the use, value, or safety of the Products, and that the Products could not be conformed to the applicable warranties.

292. Defendant, as alleged above, intentionally made misrepresentations of material facts to Plaintiffs and the Class members concerning the qualities, attributes, and lack of defects in the Products, despite Defendant's knowledge that these representations of material facts made to Plaintiffs and the Class members were false at the time they were made.

293. Defendant intended that Plaintiffs and the Class members rely on those representations that the Products did not have an inherent and irreparable defect, and that the Products were safe and reliable, to induce Plaintiffs and the Class members to purchase the Products.

294. Plaintiffs and the Class members justifiably and reasonably relied on Defendant's foregoing misrepresentations concerning the Products' ability to function as a fire extinguisher, their lack of defects and their capabilities and qualities when deciding to purchase the Products.

295. Plaintiffs and the Class members were harmed, in whole or in part, as a result of their reliance upon Defendant's misrepresentations, as they purchased products that they would not have otherwise purchased.

296. Plaintiffs' and the Class members' reliance on Defendant's misrepresentations was a substantial factor in causing their harms.

297. As a result of Defendant's intentional misrepresentations, Plaintiffs and the Class members seek restitution of the cost of the Products and damages in an amount to be determined at the time of trial.

298. Defendant's conduct in employing these unfair and deceptive practices was malicious, willful, recklessly disregarded the harm to consumers, and was so reprehensible as to warrant the imposition of punitive damages.

299. In addition, Defendant's deliberate failure to disclose the Defect was undertaken on a massive scale, and Defendant earned profits as a result of its failure to disclose the defects.

300. As a direct and proximate result of the malice, oppression, and/or fraud, Plaintiffs and the Class members are entitled to punitive damages and exemplary punitive damages in an amount according to proof at trial.

## COUNT XI
### (Money Had and Received)

301. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

302. Plaintiffs bring this claim individually and on behalf of the Class under the laws of the state in which each respective Plaintiff purchased their Fire Extinguishers.

303. As a result of the Plaintiffs' and Class members' purchase of the Fire Extinguishers, Kidde received money for its own use and benefit, and, as a result of

104

its breaches of contract and breaches of the covenant of good faith and fair dealing implied in those agreements, became indebted to the Plaintiffs and the Class members in an amount to be determined at trial.

304. No part of any of the monies due and owing to Plaintiffs and Class members has been repaid, although Plaintiffs and Class members demand repayment, leaving the balance due, owing, and unpaid in an amount to be determined at trial plus interest.

## COUNT XII
### (Fraudulent Misrepresentation)

305. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

306. Plaintiffs bring this claim individually and on behalf of the Class under the laws of the state in which each respective Plaintiff purchased their Fire Extinguishers.

307. Kidde falsely represented to Plaintiffs and the Class that the Fire Extinguishers were safe and effective to use to put out fires.

308. Kidde intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiffs and the Class to purchase the Fire Extinguishers.

309. Kidde knew or should have known that its misrepresentations about the Fire Extinguishers were false in that the nozzles frequently become detached or

105

clogged, or the Fire Extinguishers required excessive force to discharge, causing a failure to activate during a fire emergency. Kidde knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiffs and the Class.

310. Kidde made these material misrepresentations to boost or maintain sales of the Fire Extinguishers, and in order to falsely assure purchasers of the Fire Extinguishers that Kidde is a reputable company and that its Fire Extinguishers are reliable and able to perform as promised. The false representations were material to consumers because the representations played a significant role in the value of the Fire Extinguishers purchased.

311. Plaintiffs and the Class did in fact rely on these misrepresentations and purchased the Fire Extinguishers to their detriment. Given the deceptive manner in which Kidde advertised, marketed, represented, and otherwise promoted the Fire Extinguishers, Plaintiffs' and the Class's reliance on Kidde's misrepresentations was justifiable.

312. As a direct and proximate result of Kidde's conduct, Plaintiffs and the Class have suffered actual damages in that they would not have purchased the Fire Extinguishers at all had they known of the safety risks associated with the use of the Fire Extinguishers that do not conform to the Fire Extinguishers' labels, packaging, advertising, and statements.

313. Plaintiffs and the Class seek actual damages, attorney's fees, costs, and other such relief the Court deems proper.

## COUNT XIII
### (Fraudulent Concealment or Omission)

314. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

315. Plaintiffs bring this claim individually and on behalf of the Class under the laws of the state in which each respective Plaintiff purchased their Fire Extinguishers.

316. At all relevant times, Kidde was engaged in the business of designing, manufacturing, distributing, and selling the Fire Extinguishers.

317. Kidde, acting through its representatives or agents, delivered the Fire Extinguishers to its own distributors and various other distribution channels.

318. Kidde willfully, falsely, and knowingly omitted to disclose various material facts regarding the quality and character of the Fire Extinguishers, including the Defect.

319. Rather than disclosing to the consumers of the truth regarding the Defect, Kidde misrepresented the quality of the Fire Extinguishers as discussed herein at the time of purchase.

320. Kidde hid the facts about the Fire Extinguishers' Defect and the probability that the Fire Extinguishers would not discharge when needed to

107

extinguish a fire in order to boost or maintain sales of the Fire Extinguishers, and in order to falsely maintain its claimed reputation as a reputable company and that its Fire Extinguishers are reliable and able to perform as promised. Kidde's fraudulent omissions were material to consumers because they would not have purchased a fire extinguisher that had a significant chance of failing to work in the event of a fire or would only have paid a bargain basement price for it.

321. Plaintiffs and Class members accepted the terms of use, which were silent on the latent Defect. Plaintiffs and Class members had no way of knowing the facts that Kidde concealed regarding the Fire Extinguishers and the Defect, and had no way of knowing, given that concealment, that Kidde's representations about the Fire Extinguishers were misleading.

322. Although Kidde had a duty to ensure the accuracy of the information it publicized regarding the Fire Extinguishers and the Defect, it did not fulfill these duties.

323. Kidde omitted material facts partly to pad and protect its profits, as it believed that profits and sales of its Fire Extinguishers were essential for its continued growth and to maintain and grow their reputation as a premier designer and vendor of the Devices. Such benefits came at the expense of Plaintiffs and class members.

324. Plaintiffs and Class members were unaware of these material omissions, and they would not have acted as they did had they known the truth. Plaintiffs' and Class members' actions were justified given Kidde's failure to disclose the truth about the Fire Extinguishers and the Defect. Kidde was in exclusive control of material facts, and such facts were not known to the public.

325. Due to Kidde's fraudulent omissions, Plaintiffs and Class members sustained injury due to the purchase of Devices that did not live up to their advertised representations. Plaintiffs and class members are entitled to recover full refunds for the Fire Extinguishers they purchased due to Kidde's omissions, or they are entitled to damages for the diminished value of their Fire Extinguishers, amounts to be determined at trial.

326. Kidde's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiffs, and class members' rights and well-being, and in part to enrich itself at the expense of consumers. Kidde's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competitor fire extinguishers. Kidde's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## COUNT XIV
### (Negligent Misrepresentation)

327. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

328. Plaintiffs bring this claim individually on behalf of the Class under the laws of the state in which each respective Plaintiff purchased their Fire Extinguishers.

329. Kidde had a duty to Plaintiffs and the Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, detailing, distribution, and sale of the Fire Extinguishers.

330. Kidde breached its duty to Plaintiffs and the Class by developing, testing, manufacturing, marketing, detailing, distributing, and selling Fire Extinguishers to Plaintiffs and the Class that did not have the qualities, characteristics, and suitability for use as advertised by Kidde and by failing to promptly remove the Fire Extinguishers from the marketplace or take other appropriate remedial action upon becoming aware of the safety risks of the Fire Extinguishers.

331. Kidde knew or should have known that the qualities and characteristics of the Fire Extinguishers were not as advertised, marketed, detailed, or otherwise represented or suitable for their intended use and were otherwise not as warranted and represented by Kidde. Specifically, Kidde knew or should have known that (1)

110

the nozzles frequently become detached or clogged, or the Fire Extinguishers required excessive force to discharge, causing a failure to activate during a fire emergency and thereby not conforming to the packaging and labeling; and (2) the Fire Extinguishers were otherwise not as warranted and represented by Kidde.

332.   As a direct and proximate result of Kidde's conduct, Plaintiffs and the Class have suffered actual damages in that they would not have purchased the Fire Extinguishers at all had they known they would fail to operate during a fire emergency in a manner that does not conform to the Fire Extinguisher's labeling, packaging, advertising, and statements.

333.   Plaintiffs and the Class seek actual damages, costs, and any other just and proper relief available.

## COUNT XV
### (Quasi-Contract / Unjust Enrichment)

334.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

335.   Plaintiffs bring this claim individually and on behalf of Members of the Nationwide Class.

336.   Each Plaintiff brings this claim against Kidde under the laws of the state in which each respective Plaintiff purchased their Fire Extinguishers.

337.   To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

111

338. Plaintiffs and Class Members conferred benefits on Kidde by purchasing the Fire Extinguishers.

339. Kidde was unjustly enriched in retaining the revenues derived from Plaintiffs and Class Members' purchases of the Fire Extinguishers. Retention of those moneys under these circumstances is unjust and inequitable because Kidde failed to disclose that the Fire Extinguishers were unfit for their intended purpose. These omissions caused injuries to Plaintiffs and Class Members because they would not have purchased the Fire Extinguishers if the true facts were known.

340. Retention of those moneys also is unjust and inequitable because, as alleged above, Kidde commenced an ineffective recall that resulted in few returns, and generally no refunds, thereby protecting profits Kidde collected from selling the Fire Extinguishers.

## COUNT XVI
### (Violation Of The Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*)

341. Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

342. Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class.

343. The Fire Extinguishers are consumer Fire Extinguishers defined in 15 U.S.C. § 2301(1).

112

344.	Plaintiffs and the Class are consumers as defined in 15 U.S.C. § 2301(3).

345.	Kidde is a supplier and warrantor as defined in 15 U.S.C. § 2301(4) and (5).

346.	In connection with the marketing and sale of the Fire Extinguishers, Kidde impliedly warranted that the Fire Extinguishers were fit for use as fire extinguishers. The Fire Extinguishers were not fit for use as fire extinguishers due to the Defect described in the allegations above.

347.	By reason of Kidde's breach of warranties, Kidde violated the statutory rights of Plaintiff and the Class Members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*., thereby damaging Plaintiffs and the Class.

348.	Any pre-suit notice beyond that which had already been given to Kidde, would have been futile. Kidde has demonstrated a knack for denying responsibility including in the face of serious charges following a detailed investigation by the U.S. Department of Justice as well as numerous federal court rulings determining that Kidde acted in reckless disregard of the safety and well-being of its consumers.

349.	Plaintiffs and the Class Members were injured as a direct and proximate result of Kidde's breach because they would not have purchased the Fire Extinguishers if they knew the truth about the defective nature of the Fire Extinguishers.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all Class and Statewide Subclass Members, request judgment against Kidde as follows:

A.    For an Order certifying the Nationwide Class or, in the alternative, the Statewide Subclasses as defined herein, and appointing Plaintiffs and their Counsel to represent the certified Classes;

B.    For an order declaring that Kidde's conduct violates the statutes referenced herein;

C.    For an order finding in favor of Plaintiff and the Nationwide Class and Statewide Subclasses on all counts asserted herein;

D.    For compensatory and treble and/or punitive damages in an amount to be determined by the Court and/or jury;

E.    For pre-judgment interest on all amounts awarded;

F.    For an order of restitution, disgorgement, and all other forms of monetary relief;

G.    For an order awarding Plaintiffs and the Nationwide Class and Statewide Subclasses their reasonable attorney's fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: November 21, 2022

Respectfully submitted,

**BURSOR & FISHER, P.A.**

_____*/s/ Sean L. Litteral*_____
Sean L. Litteral

L. Timothy Fisher (*pro hac vice*)
Sean L. Litteral (*pro hac vice*)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
Email: ltfisher@bursor.com
        slitteral@bursor.com

Martha A. Geer (State Bar No. 13972)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Facsimile:  (919) 600-5035
Email: mgeer@milberg.com
Email: sspangenburg@milberg.com

Gregory F. Coleman (*pro hac vice
forthcoming*)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: (865) 247-0080
Facsimile:  (865) 522-0080
Email: gcoleman@milberg.com

*Attorneys for Plaintiffs*

115

## CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)

I, Sean L. Litteral, declare as follows:

1.      I am an attorney at law permitted to practice in the State of North Carolina for this matter.  I am an attorney at Bursor & Fisher, counsel of record for Plaintiff Taylor.  Plaintiff Taylor resides in Palm Desert, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the forum, as Defendant's principal place of business is located within this forum.


I declare under the penalty of perjury under the laws of the State of North Carolina and the United States that the foregoing is true and correct and that this declaration was executed at Oakland, California this 21st day of November, 2022.

        */s/ Sean L. Litteral*
        Sean L. Litteral

Case 1:21-cv-00839-WO-JLW   Document 33   Filed 11/21/22   Page 116 of 116